BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matters of: | |
| PARENT on behalf of STUDENT, | OAH CASE NO. 2009040640 |
| v. | |
| LAFAYETTE ELEMENTARY SCHOOL DISTRICT. | |
| PARENT on behalf of STUDENT, | OAH CASE NO. 2009081105 |
| v. | |
| LAFAYETTE ELEMENTARY SCHOOL DISTRICT. | |

## DECISION

Administrative Law Judge (ALJ) Gary A. Geren, Office of Administrative Hearings (OAH), State of California, heard the above-captioned matter in Lafayette, California, on February 2-4, 8-10, 17- 18, and 25, and March 4 and 5, 2010.

Student was represented by Lina Foltz, Attorney at Law. Student's parents (Parents) were present throughout the hearing, either jointly or individually. Student was not present at the hearing.

Lafayette Elementary School District (District) was represented by Sarah Daniel, Attorney at Law, from the firm of Dannis, Woliver and Kelly. Dana Sassone, District's Director of Student Services, was present throughout the hearing.

At hearing, oral and documentary evidence were received. Both parties timely filed closing briefs that were marked for identification as Student's Exhibit 37 (Student's Brief)

and District's Exhibit 60 (District's Brief), respectively.  The record was closed and the matter submitted for decision on May 17, 2010.[1]

Student filed for a due process hearing in case number 2009040640 (First Case). Student filed for a second due process hearing in case number 2009081105 (Second Case). On September 22, 2009, Student's cases were consolidated for hearing; the decision timelines are calculated using the Second Case.

## ISSUES[2]

*Student's Issues*

I.    Did District deny Student a free and appropriate public education (FAPE) from April 18, 2007, through March 18, 2008?

II.   Did District deny Student a free and appropriate public education (FAPE) from March 18, 2008, through March 16, 2009?

III.   Did District deny Student a FAPE from March 16, 2009, through June 2009?

IV.   Must District make reimbursement or provide compensatory education to Student?

## PARTIES' CONTENTIONS

*STUDENT'S CONTENTIONS*

*Contentions Related to Student's Issue I (April 18, 2007, through March 18, 2008)*

Student contends that District denied him a FAPE during this time because at Student's Individualized Education Program (IEP) meeting of April 18, 2007, District:

A.    Failed to ensure the attendance of necessary and qualified District staff;

B.    Failed to provide necessary and accurate information about Student's needs, including his response to an intervention (RTI);

---

[1] On April 17, 2010, a status conference was convened by Presiding Administrative Law Judge (PJ) Judith Kopec. At the status conference, PJ Kopec continued the matter for good cause to allow additional time for the parties to file their briefs on May 17, 2010.

[2] At the conclusion of the hearing, the parties were instructed to submit a concise written statement of the issues to be determined based on the evidence presented at hearing.  To the extent practicable, the essential issues and contentions raised by Student are rearranged for the sake of clarity.

C.     Failed to evaluate Student's vision, hearing, motor perceptual domain and his potential need for assistive technology;

D.     Failed to explain to Parents the educational implications of District's assessments;

E.     Failed to identify Student's needs for services related to dyslexia, auditory processing deficits, and social/emotional functioning;

F.     Failed to include a statement in the IEP about how Student's disability could affect his involvement and progress in the general education curriculum;

G.     Failed to define Student's auditory processing deficit as dyslexia;

H.     Failed to include in Student's IEP objectively measurable goals and objectives;

I.     Failed to include special education services that were appropriate to address Student's dyslexia and auditory processing deficits;

J.     Failed to identify appropriate and necessary classroom accommodations and assistive technologies;

K.     Failed to provide special education and related services based upon scientific research and appropriate assessments;

L.     Denied Parents the opportunity to meaningfully participate in Student's April 18, 2007 IEP because it:

M.     Failed to reassess Student's needs after his April 18, 2007 IEP was developed;

N.     Failed to document Parents' concerns about Student's auditory processing needs and Parent's request that a speech-language evaluation be conducted; and

O.     Failed to provide accurate and timely progress reports throughout Student's 2007-2008 school year.

*Contentions Related to Student's Issue II (March 18, 2008, through March 16, 2009)*

Student contends that District denied him a FAPE during this period because at Student's IEP meeting of March 18, 2008, District:

A.     Failed to develop appropriate and measurable goals and to implement appropriate instructional methodologies;

B.     Failed to have all necessary team members present at IEP meetings;

3

C.      Failed to document an IEP meeting allegedly held among District staff in or about April 2008;

D.      Failed to provide a timely speech and language assessment following Mother's written request;

E.      Failed to provide Parents with information regarding the requirements for obtaining an independent educational evaluation (IEE);

F.      Failed to assess Student in the areas of:

      1.      Speech and language;

      2.      Auditory processing;

      3.      Visual motor;

      4.      Occupational therapy;

      5.      Social/emotional;

      6.      Assistive technology and accommodations; and

      7.      Dyslexia;

G.      Failed to reassess Student's needs after his March 18, 2008 IEP was developed;

H.      Failed to provide Extended School Year (ESY) services;

I.      Failed to provide appropriate instruction techniques; and

J.      Improperly stayed a compliance complaint Student filed with the California Department of Education (CDE).

*Contentions Related to Student's Issue III (March 16, 2009, through June 2009)*

Student contends that District denied him a FAPE during this time because at Student's IEP meeting of March 16, 2009, District:

A.      Failed to properly identify Student's disability as "auditory processing;"

B.      Failed to consider Dr. Guterman's report and adopt her diagnoses of "severe dyslexia;" and

4

C.     Failed to use appropriate methodologies.

*DISTRICT'S CONTENTION*

*District Provided Student with a FAPE from April 18, 2007, through June 2009*

District contends that it provided Student with a substantive FAPE and it did not commit any procedural violations of the IDEA. District also contends that it did not commit any procedural violations, but if it did, those violations, neither separately or in aggregate, did not impede Parents' participation in the IEP process; result in Student being denied a FAPE; or result in Student losing any educational benefit.

FACTUAL FINDINGS

*Background and Jurisdiction*

Student is an 11-year-old boy, who at all relevant times lived within the District's boundaries with his mother (Mother), father, and 7-year-old sister. Before enrolling in District, Student attended a private pre-school at Children's Day School from ages three to five, without any reported difficulties.

*Kindergarten (2005-2006 school year)[3]*

Student enrolled in District at the beginning of his kindergarten year, attending Lafayette Elementary School. This was also the first year District began using a Response to an Intervention (RTI) model as an intervention strategy to assist struggling learners. Generally, the purpose of RTI is to provide early and effective intervention to students requiring additional support. During 2005-2006, District's RTI program assisted students only in the subject of reading.

District's RTI model was explained by Mary Maddux, the principal at Lafayette Elementary School, who oversees her school's RTI program. She testified credibly that at the beginning of each school year, all students are given a battery of universal screenings. District then prepares an "assessment wall" card for each student that identifies his or her grade level; test scores, and other biographical information; results of the screenings; and teachers' classroom observations. In October, the school holds "assessment wall" meetings for each grade level. At these meetings, students are divided into three categories: "Intensive," "Strategic," and "Benchmark." Student's cards are then placed on the "assessment wall," under the names of their respective teachers. Each classroom is comprised of a blend of students from each category.

---

[3] Student does not contend that he was denied a FAPE while in kindergarten. However, some discussion of that year provides background information necessary to the analysis of contentions that arose later.

Students placed in the "Intensive" category are those whose universal screenings and classroom performance indicate they are performing well below grade level; students in the "Strategic" category are comprised of students who fall within the instructional range of the grade's curriculum, but who are in need of additional educational supports; and "Benchmark" is comprised of students performing at or above grade level.

District then uses these categorizations to determine the level of intervention students receive. For example, "Tier I" intervention includes extra in-classroom support, where a student might receive more reading instruction in a small group within his or her general education classroom. "Tier 2" services are provided to students by specialists, such as a reading specialist, but in the general education setting. "Tier III," the highest level of intervention, provides small-group instruction in the Instructional Support Program (ISP).[4]

Although RTI has elements similar to special education services like "push-in" and "pull-out" sessions, it is part of District's general education program. RTI students who receive instruction in special education settings, for example, in the ISP, are referred to as "guests" of that program. Ms. Maddux persuasively testified that District's RTI program successfully identifies students' areas of need early in their education and then provides those students with intensive, targeted instruction.

"Assessment wall" meetings are held three times per year to monitor all students' progress. At Lafayette, these meetings are attended by Ms. Maddux; Carol Harris[5] (reading specialist); Jane Jones[6] (resource specialist); as well as the teachers from the particular grade level being discussed.

---

[4] "ISP" is District's designation for what is more commonly referred to as a Resouce Specialist Program (RSP). Some of the documentary evidence and testimony referenced RSP services. Those terms are considered interchangeable.

[5] Ms. Harris received her bachelor of science degree from California Polytechnic State University, San Luis Obispo, in 1976; her teaching credential from St. Mary's College, in 1978; her reading specialist credential from Hayward State University in 1991; and her masters of science in reading from Hayward State University in 1991. She has been employed by District since 1978. Ms. Harris is a member of the International Reading Association, California Reading Association, and Contra Costa Reading Association. She is the Lafayette School District's Teacher of the Year for the 2009-2010 school year, and she was recognized in *Who's Who Among America's Teachers* in 2004, 2005, and 2008. She has attended numerous seminars on the topic of dyslexia and is well-versed about the effects of this condition on students and she is mindful of the effective remediation techniques used to teach dyslexic students how to read. As discussed later, Ms. Harris provided credible and persuasive testimony about teaching reading, generally, and showed meaningful insight when developing Student's IEPs, in part because she worked with him four times per week over the course of approximately two years.

[6] Ms. Jones has a bachelor of education degree in elementary education from the University of Windsor, Ontario, Canada, in 1974; and a master of science degree in special education from National University, in 1989. She has a multiple subject credential; a learning handicap credential; and a language development specialist credential, as well as a resource specialist certificate of competence. For the most part since 1973, Ms. Jones has been teaching struggling learners how to read. She has received significant training on dyslexia and is well-qualified to provide reading interventions for children with dyslexia.

Early in Student's kindergarten year, through RTI, District identified Student as in need of reading intervention. District began providing Student with additional instruction at the "Tier I" service level. Student's reading progressed during kindergarten, as chronicled in his report cards:

First Trimester Report

[Student] is in the alphabet awareness stage of reading. He now recognizes the majority of the letters and sounds and is getting intervention and support from Mrs. Harris as well as small-group support in class.

Second Trimester Report

[Student] is getting extended intervention and support through the reading lab, small reading groups with classroom teachers and speech, to work on sounds, blending and segmenting of words.

Third Trimester Report

[Student] continues to show solid growth in both his language arts and mathematical skills... His reading decoding skills are improving and he is gaining confidence.

At the conclusion of kindergarten, Student attended a summer class where he continued to work on developing his reading skills.

*First Grade (2006-2007 school year)*

Student's need for "Tier 1" supports continued during first grade. Student's first grade, first trimester report card states: "[Student] receives additional support from the reading, resource, and speech teachers."

On October 12, 2006, a Parent-Teacher Conference was held. The notes from that conference state that Student was to " [c]ontinue with Reading Lab, Resource and Resource Speech. SST [Student Study Team] scheduled for November 8, 2006. "

On November 8, 2006, the SST meeting was held. The team recommended Student continue work in the Reading Lab as a "guest" of the ISP program. Over the course of Student's first grade year, District increased the level of services he received.

In February 2007, a second SST meeting was held. At this meeting, the team recommended Student undergo a comprehensive psychoeducational assessment to determine if he was eligible for special education services and supports. On February 20, 2007, Student's mother consented to an assessment plan permitting District to conduct the evaluations necessary to determine Student's eligibility.

7

The assessment was conducted by two District employees: Ms. Jones completed her assessment report on March 23, 2007; on April 17, 2007, Michelle Charpentier, a school psychologist intern, working under the supervision of Patrick Gargiulo, school psychologist for District, completed her comprehensive psychoeducational report.  On April 18, 2007, Student's initial IEP meeting was held.

*Student's Issue I: Was student denied a FAPE between April 18, 2007, and March 18, 2008?*

*Adequacy of Student's Initial Assessments[7]*

A school district's assessments shall be conducted by trained and knowledgeable personnel, except that individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist.  In conducting an assessment, a district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student.

Ms. Charpentier administered the following tests: the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV); the Comprehensive Test of Phonological Processing (CTOPP); and the Wide Range Assessment of Memory and Learning (WRAML-2).  She reviewed Student's health and developmental history, and his educational history.  She also conducted classroom observations of Student, and obtained teacher comments about their observations of Student.  Ms. Charpentier noted Student's test-taking behavior, measured his cognitive function, analyzed the assessment results, and included all of this information in her assessment report.

In pertinent part, her report states:

[¶...¶]

The CTOPP was administered to gather additional information about [Student's] phonological processing.  Results from the CTOPP are characteristic of a child with difficulties in the areas of reading and writing.  His phonological processing

---

[7] District contends that the adequacy of Ms. Charpentier's assessment was previously litigated in OAH Case No. 2008120161 heard by ALJ Charles Marson in April and May 2009.  District contends that Student cannot, therefore, relitigate this issue here.  Official notice was taken at hearing of ALJ Marson's decision.  At Factual Finding 36 of his decision, ALJ Marson states:

*Appropriateness of the April 2007 assessment*

Because the District is liable to reimburse Parents for the IEE they obtained regardless of the merits of the April 2007 assessment, it is unnecessary to decide here whether that assessment was appropriate.

Accordingly, despite District's assertion to the contrary, neither res judicata nor collateral estoppel prevents Student from raising the appropriateness of the April 2007 assessment.

abilities—including his awareness of and ability to manipulate phonological information and his phonological memory—are within the Low to Below Average Range.

[¶...¶]

Based on the results from testing and on observations during testing, it seems that [Student] will continue to benefit from intensive support for the development of his phonological skills in order to improve his reading and writing.

Ms. Jones's four-page report also includes summaries of Student's background information, his present levels of performance, and his educational needs. Her report includes behavioral observations of Student and details his test results on the Woodcock Johnson Psycho-Educational Battery, Third Edition (WCJ-III), including subtests in the areas of reading, mathematics, and written language.

In pertinent part, Ms. Jones's report states:

[Student] was referred for Special Education testing due to concerns regarding academic progress in the area of language arts.

Weaknesses were found to be in the areas of reading, spelling, and written language. There is a significant discrepancy between ability and academic performance. Based on current assessments, needs may not be met in the regular classroom and may require special education services in the area of language arts.

Based on Ms. Charpentier's and Ms. Jones's reports, the IEP team concluded that Student was eligible to receive special education services under the qualifying category of Specific Learning Disability (SLD), more specifically identified in the IEP eligibility documents as a "Processing Disorder," and then further refined as a problem with "Phonological Processing."

Ms. Jones testified credibly that she spoke in detail with Student's general education teacher and Ms. Charpentier about Student in preparing her portion of the eligibility assessment. Ms. Jones testified persuasively that her report, Ms. Charpentier's report, and the collective findings of the IEP team, accurately identified Student's primary deficit as being a phonological processing disorder.

Importantly, Ms. Jones was not merely guided by reviewing Student's formal assessments results, but also by her experience with Student while working with him during four days per week for 45 minutes per day, providing reading specialist services, during his first grade year. Accordingly, she held greater insight into Student's needs than one merely conducting an assessment would have.

9

This fact is particularly noteworthy with respect to the auditory processing issue, discussed in detail later. For example, Ms. Jones testified persuasively that in her entire experience with working with Student, she did not observe him exhibiting problems with processing auditory information, such as an inability to follow oral instructions. For example, Student did not repeatedly ask Ms. Jones, "What?" when being given instructions, which, based on her education, training and experience, is a behavior that she would have expected to see in a child with a significant auditory processing disorder.

Despite the comprehensive assessments completed by Ms. Charpentier and Ms. Jones that supported an IEP team decision finding Student eligible, Student contends that District's assessments were not comprehensive enough because they did not include assessments in the areas of auditory processing; motor/perceptual development; speech and language; social/emotional status; and assistive technology. Each of these contentions will be discussed, in turn.

*Auditory Processing*

Support for Student's contentions was provided by the opinions of Student's three expert witnesses, each of whom testified at hearing. Dr. Tina Guterman, a pediatric neuropsychologist, assessed Student in December 2008 and January 2009. She prepared a nueropsychoeducational evaluation that is undated, but testified that in the normal course of business it would have been prepared in January 2009. There is no reason to dispute Dr. Guterman's testimony about when she prepared her report (approximately 21 months after District's assessments); Dr. Deborah Ross-Swain, a speech and language pathologist, assessed Student in March 2008 and prepared a report, dated March 24, 2008 (13 months after District's assessments); and Dr. Dimitra Loomos, a Doctor of Audiology, assessed Student in November 2007 and prepared a "Central Auditory Processing Evaluation," dated December 30, 2007 (eight months after District's assessments).

Each witness was well-qualified to render opinions following their respective assessments. However, their testimony, neither individually, nor in aggregate, supports a finding that the District's initial assessments were flawed, or more particularly, that District inadequately assessed Student in the area of auditory processing.

It is well-settled law that the adequacy of a district's' evaluation is judged by a "snapshot rule," which is to say, that a district is only obligated to accurately assess a student based on the information known at the time of the assessment. The "snapshot rule" is dispositive of the adequacy of District's initial assessment.

None of these experts' assessments was available for District's consideration during its initial assessment. Each of Student's experts testified that Student's profile could have changed in the time between District's assessments and theirs. The crux of the experts' opinions is essentially that District's assessments could have been better refined.

Dr. Guterman opined that "red flags" were raised by Ms. Charpentier's report that should have placed District on notice that Student suffered from "severe dyslexia."

Dr. Ross-Swain opined that Student had deficits in "auditory discrimination; auditory attention; immediate auditory memory; auditory sequential memory; auditory working memory; auditory latency; auditory synthesis; auditory analysis; auditory conceptualization; and auditory comprehension." All of these are discrete diagnoses contained within the larger diagnosis of auditory processing disorder. Dr. Ross-Swain opined that as part of District's initial evaluation, it should have referred Student to an audiologist.

Dr. Loomos opined that Student had "deficits in the integration of audio information, as well as in binaural integration and separation," and that District failed to identify these in its assessment. Following her diagnoses, Dr. Loomos recommended Student receive the highly controversial, sound-based therapy known as the Tomatis Method, in which children listen to Gregorian chants or classical music composed by Mozart through headphones.

Collectively, these expert opinions were unpersuasive. First, because of the delay between District's assessments and those of Student's experts, Student's developmental profile and his capacities likely changed, both because of his maturation, as well as because of his receiving reading interventions at school. Therefore, Student's experts' "Back to the Future" analysis about what District could or should have known, as much as 21 months earlier, does not support the conclusion that Ms. Charpentier's and Ms. Jones's assessments were flawed or incomplete.

Second, the Special Education Local Plan Area (SELPA) form used by District when assessing students' special education eligibility, lists under the heading "Processing Disorder," eight different types of processing disorders. These include, "Auditory Processing" and "Phonological Processing," listed on the form one after the other. Each District witness who opined on the subject credibly explained that Student's disability was most accurately identified as being in the sub-category of "phonological processing," rather than "auditory processing." Student produced insufficient evidence to support his contention that District overlooked "auditory processing" as the more accurate characterization of Student's qualifying disability.

Third, Ms. Charpentier's and Ms. Jones's assessments accurately identified Student's deficits as affecting his ability to read, which included his struggles with processing phonemes. The summaries and conclusions contained in these reports were consistent with what District's history with Student had been. By contrast, Student's experts lacked experiential knowledge of Student's struggles, and instead relied solely on their test results to form their opinions.

Lastly, the fact that District did not label Student's disability as an "auditory processing disorder," choosing instead a "phonological processing disorder," at least in this instance, is a distinction with no meaningful consequence. Student's core problem was with reading, and characterizing his eligibility as a "phonological processing disorder" adequately

identified Student's needs, such that District was able to devise and implement appropriate reading intervention strategies. Student did not present persuasive evidence that District's reading interventions would have been materially different had his eligibility designation been characterized as "auditory processing."

*Motor/Perceptual Development*

Student did not exhibit a suspected disability in this area at the time of District's initial assessments. For example, Student's handwriting was deemed satisfactory each trimester on his report card during the 2006-2007 school year. Also, his report card notes that he "completes work neatly and legibly."

Because of concerns expressed by Parents, Student's first grade teacher invited District's occupational therapist to observe Student's classroom work. Student performed well enough that no formal, follow-up assessment of Student's motor/perceptual development was deemed necessary.

Also, Mr. Gargiulo testified that it is a common practice for school psychologists to specifically observe a student's motor/perceptual abilities when a student completes the written portions of a psychoeducational evaluation. As part of Mr. Gargiulo's oversight of Ms. Charpentier's work, he confirmed that such observations were made during Student's assessment. Mr. Gargiulo's testimony is also supported by Ms. Charpentier's report, particularly, her observations of Student's completion of the "Draw A Person" test.

Lastly, the February 2007 assessment plan that preceded Ms. Charpentier's evaluations was signed by Mother on February 20, 2007. The plan specifies that a "Motor/Perceptual Development" evaluation was to be administered. Ms. Charpentier completed this assessment.

*Speech-Language Evaluation*

There was insufficient evidence presented by Student to establish that a speech and language assessment was necessary as part of the initial assessment, or that District ignored Parents' request that one be conducted. In fact, the evidence produced on this point supports the opposite conclusion. Student previously received speech and language services from District for articulation problems. By the time of the initial assessment, these articulation problems were remediated. Ms. Jones, who developed the assessment plan, testified persuasively that prior to February 2007, District and Parents agreed that Student no longer needed the speech-language services. On that basis, speech and language services were ended without objection by Parents.

The February 2007 assessment plan itemizes potential assessment areas. It contains a line titled, "Communication Development: To Measure How the Child Understands and Uses Language and Speech." The box next to this line is unchecked, indicating that neither District nor Mother saw a need for a speech and language assessment to be conducted.

12

*Social/Emotional*

The February 2007 assessment plan included Mother's consent to assess Student in the Social/Emotional area. Thereafter, Ms. Charpentier completed an assessment using the Behavior Assessment System for Children, Second Edition (BASC-2). Ms. Charpentier also gathered information about Student's social/emotional functioning by talking with Mother, observing Student's classroom behavior, and by interviewing his classroom teacher. Ms. Charpentier's report states that while Student "displays some anxious behaviors and utterances" and "some anxiety during testing," she concluded that these behaviors "did not seem to negatively impact his performance."

Based on Ms. Charpentier's findings and conclusions, District was not obligated to conduct a more comprehensive social/emotional assessment. Ms. Charpentier's finding that Student's test anxiety did not "negatively impact his performance" is also supported by the testimony of Jody Carson, Student's second grade teacher, who did not observe Student displaying significant social/emotional issues while in her classroom. Her observations are supported by the narrative reports contained in Student's report cards wherein she notes:

> [Student] is often kind and helpful to others and is well-liked by his peers. [Student] continues to build his independent work habits and skills, and the social maturity needed to use effective problem solving strategies rather than silly or inappropriate behaviors that do not aid him in arriving at the intended goal of the project. [Student] has a positive and mature attitude towards learning.

Ms. Charpentier's report and Ms. Carson's persuasive testimony, and her corroborating written evidence, support the conclusion that Student did not need to be assessed in the area of social/emotional development.

*Assistive Technology*

Ms. Carson persuasively testified that she monitors all of her students to see if they would benefit from assistive technology. If she determines a student has this need, she requests a formal assessment. She did not find a need in Student's case. Similarly, Mother, who is an active participant in Student's education, did not request District to conduct an assistive technology assessment as part of Student's February 2007 assessment plan. Student failed to produce evidence to support his contention that he needed assistive technology to access his general curriculum.

*Dyslexia*

Dyslexia was broadly defined at hearing by expert witnesses as a learning disability in the area of reading, more accurately as a sound/symbol relationship disorder. District's witnesses made clear, however, that dyslexia is not a term used to determine special education eligibility; rather, it is a disorder defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).

13

Ms. Jones testified credibly that while District does not "diagnose dyslexia," she fully understands what the condition is, and that she has received specialized training in how to teach children with dyslexia to read. Ms. Jones established that when dealing with dyslexic students, she utilizes a blend of various teaching techniques to meet that student's needs. These techniques include those derived from Lindamood Bell (LMB), in which she has received certified training: BLOCKS; LIPS; Spelling with LIPS; Sight Words; Seeing Stars; and Visualizing and Verbalizing.[8]

Similarly, Ms. Harris testified credibly that in her 19 years as a reading specialist, she has worked with many students with dyslexia, citing studies indicating that approximately one in five students has the condition. Ms. Harris provided illuminating and persuasive testimony about what reading specialists call "consolidation." Consolidation occurs when a child is able to effectively access the five pillars of reading: phonemic awareness; decoding; fluency; comprehension; and vocabulary. In common terms, consolidation is referred to by teachers as a time when student's reading skills "pop": that point in time when a student's "reading light pops on."

In Ms. Harris's experience, consolidation usually occurs sometime during the first or second grade. It is not unusual, however, to see consolidation occur in the third or the fourth grade, particularly with struggling learners. Ms. Harris cogently likened this developmental milestone to children losing their baby teeth—they all eventually lose them, but over a wide range of time. Ms. Harris has never worked with a dyslexic student unable to reach consolidation. Ms. Harris opined convincingly that Student would have reached consolidation based on the reading interventions he was receiving, but because he was a struggling learner, consolidation was likely to occur later in his developmental process than would be the case with typically developing peers.

Ms. Harris and Ms. Jones enjoy a professional collegiality; they often discuss the educational strategies and progress of their students, thus pooling their 60 years of collective teaching experience. Additionally, Ms. Harris observed Ms. Jones's class virtually "everyday." She testified persuasively that Ms. Jones's teaching techniques were appropriate and that she used effective strategies for teaching children with dyslexia to read, and more particularly, that the strategies used with Student were appropriate.

District did not, therefore, deny student a FAPE by failing to identify him as "dyslexic," instead using the SLD/Processing Disorder/Phonological Processing paradigm to identify his reading disability.

---

[8] These programs are offered at LMB centers that are certified as non-public agencies (NPA) by the CDE. Some school districts have agreements with LMB to offer these programs at school sites provided by school district personnel who have been trained by LMB.

*Visual, Hearing and Motor Disability*

An IEP team must reach a determination regarding the effect that any "visual, hearing, or motor disability," may have on a student's ability to access his general education.

In Student's Closing Brief, he substitutes the term "deficit" for "disability." This is a distinction with a substantive difference. There was no evidence produced to establish that Student suffered from a visual, hearing, or motor *disability*. For example, a student who needs to wear eye glasses has a visual *deficit*; that student does not necessarily have a visual *disability* for the purpose of special education eligibility.

Joan McClure[9] was Student's first grade general education teacher. Based on her observations, she did not believe Student exhibited behavior that warranted assessments in these areas. Ms. McClure noted that Student made progress with his reading capabilities. She characterized Student as "generally, a happy boy," who was able to access his first grade curriculum. Ms. McClure attended the initial IEP meeting where Ms. Charpentier's and Ms. Jones's reports were presented; she testified credibly that Ms. Charpentier's report was consistent with her observations of Student in her general education classroom. The weight of the evidence did not establish that Student had a visual, hearing or motor disability.

*Parent's Role in the Initial Evaluation*

The IDEA assumes meaningful participation by parents in aiding districts to accurately assess a student's needs.

Student spent a substantial portion of the hearing challenging the appropriateness of District's initial assessment. It is uncontradicted that Mother signed Student's initial assessment plan on February 20, 2007. Over three years thereafter, on March 5, 2010, on the 11th day of the hearing, Mother testified that she signed the assessment plan, but that she, "only scanned it over" before approving it, thus evidencing she gave the assessment plan no more than a cursory review.

Conducting a comprehensive assessment of a student, as District did in this case, is a difficult and time-consuming process requiring the coordination of various members of the district's staff. Meaningful parental consent following adequate consideration of the plan is an important part of the IDEA process, as evidenced by the requirements placed on districts to keep parents informed of their and their children's rights in developing IEPs. Accordingly, Student's much-belated attack on the adequacy of the initial assessment plan is tempered by the fact that Mother did not fulfill her obligation to provide meaningful review and comment as to the appropriateness or thoroughness of the plan at that point in the IEP process where it was incumbent on her to do so.

---

[9] Ms. McClure has taught first grade for 14 years. She holds a bachelor of arts degree in library science and a master of science degree in education.

15

Despite Mother's nominal involvement, the weight of the evidence established that District's initial evaluation of Student was adequate. District reasonably relied on accurate assessment results to develop Student's April 18, 2007 IEP, as discussed more fully below.

*The IEP Meeting of April 18, 2007*

Student contends that the April 18, 2007 IEP meeting was conducted inappropriately because the team failed to include all necessary members; failed to provide necessary and accurate information; failed to provide progress reports from Student's RTI work; denied Parents the opportunity to meaningfully participate; and relied on an inadequate initial evaluation. Each contention will be addressed in turn.

*Necessary Attendees*

A district is required to have "at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech language pathologist, or remedial reading teacher" present at an IEP team meeting. District met its obligation.

Attendees at Student's April 18, 2007, initial IEP meeting included Mary Maddux, (administrative designee); Ms. McClure (general education teacher); Ms. Jones (special education teacher); Ms. Charpentier (school psychologist intern); and Mother.

Student contends that because Ms. Charpentier was a school psychologist intern, she was "unqualified to conduct individual diagnostic examinations." The facts and law do not support this. It is undisputed that at the time of the initial IEP team meeting, Ms. Charpentier held a school psychologist intern credential pursuant to California Education Code section 56324, subdivision (a) that was issued by the California Commission on Teacher Credentialing (CCTC). Credentialed school psychologist interns are authorized, as a matter of law, to "conduct psychoeducational assessments for the purpose of identifying special needs." This is exactly what Ms. Charpentier did.

Ms. Charpentier worked under the supervision of a fully credentialed and experienced school psychologist, Mr. Gargiulo, who is in his 16th year of practice. He is also an associate professor at St. Mary's College. As part of his work for District, each school year Mr. Gargiulo supervises interns holding the above-referenced credential. Mr. Gargiulo testified persuasively that his supervision of interns is consistent with the relevant portions of the National Association of School Psychologists's Guidelines.

Mr. Gargiulo's demeanor, manner, and attitude exhibited while testifying supports a finding of his credibility. He answered all questions put to him in a clear and concise fashion. His responses were responsive and to the point. He easily recalled the central facts surrounding this matter and did not provide evasive answers when asked pointed questions. Mr. Gargiulo provided persuasive testimony that Ms. Charpentier was not only appropriately credentialed, but exceptionally well-qualified. He also opined credibly that Ms.

16

Charpentier's evaluation was an accurate assessment of Student's profile at the time the assessment was conducted.

Regarding Student's contention that Ms. Charpentier's evaluation understated Student's cognitive abilities, Mr. Gargiulo concluded that it is not uncommon "for a child's cognitive abilities to fluctuate from test to test." This opinion, too, was credible and supported the accuracy of Ms. Charpentier's report, as well as the fact that she was a qualified attendee at the IEP meeting.

Accordingly, Ms. Charpentier's attendance at the initial IEP meeting satisfied District's obligation to have necessary attendees participate in the IEP meeting. Ms. Charpentier held the appropriate credential, was adequately supervised, and provided accurate assessment data following appropriately administered tests.

*Meaningful Parental Participation*

A procedural violation is a denial of a FAPE if, as a result of the procedural violation, a parent is denied meaningful participation in the decision-making process of the IEP team. A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meetings, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP.

Parents received a copy of Ms. Charpentier's psychoeducational assessment the day before the April 18, 2007 IEP meeting. District members of the IEP team were present at this meeting and available to answer any questions posed by Parents. The entire IEP team, including Mother, agreed to the appropriateness of Student's IEP. Mother expressed no disagreement with the accuracy of Ms. Charpentier's psychoeducational report at that time.

Parental participation at this meeting is memorialized on the first page of the IEP meeting form where Mother signed and initialed the following:

I have received copies of the Individualized Education Program, assessment reports, Parent's Rights/Procedural Safeguards and the information and decisions indicated above have been explained to me.

I participated in the development of this IEP and I give my consent to the IEP as written in the services required to implement the program.

Mother testified in this matter. She holds an associate of arts degree in liberal arts and a bachelor of arts degree in political science, with a minor in English, from the University of California at Berkeley. Her testimony showed that she is intelligent and articulate. She has been actively involved in overseeing the education of her son at each stage of his development. Accordingly, she was fully capable of participating, and if need be, advocating for her son's educational interests at his IEP meetings. Furthermore, she understood the implications of initialing and signing the IEP document.

As with her approval of the assessment plan, Mother attempted to distance herself from the consequences of her signing the IEP, testifying that she "did not read the goals and objectives at the meeting, but read them sometime later." Accordingly, any lack of parental participation at the IEP meeting cannot be blamed on District. Student produced no evidence that Mother's assent was gained through fraudulent or other improper means. Accordingly, District may rely on Mother's written confirmation that she understood and participated in the IEP meeting to establish that point here.

*Provision of Accurate Information*

A district using an RTI model must report a student's response to the interventions at a subsequent IEP meeting. However, this requirement only applies when RTI is being used to assess a student's special education eligibility.[10] Student asserts that District was required to report Student's response to interventions; however, this contention misses the legal mark. Here, RTI was used by District as an intervention strategy, not as a means to determine Student's special education eligibility. Therefore, Student failed to establish a legally cognizable argument by way of this contention.

Furthermore, the weight of the evidence established that District provided Parents with accurate information prior to the IEP meeting. A document from the second SST meeting, which immediately preceded Student's initial IEP meeting, contains a section entitled "Evaluation of Progress/Modifications Tried." Notes under this section state that "Speech services have been discontinued—articulation; Issue of glasses has been addressed—now has correct prescription; Hearing screening was normal; Does well in small-group, overwhelmed in large group." This document identifies Student's areas of need, modifications/actions, and who within District would be assigned to provide each service noted. Student's contention that Parents were not provided information about Student's progress under the RTI program is inaccurate since Mother signed this document memorializing her participation as a "team member" at the meeting where these matters were discussed.

*Progress Reports*

An IEP must contain objectively measurable goals for a student to meet while the IEP is in effect. The IEP must also contain a description of when periodic reports will be issued concerning the progress a student is making towards meeting those goals. Student's IEP documents show he made progress on each of his goals, which was persuasively testified to by Ms. Jones, who prepared Student's progress notes.

District witnesses credibly testified that throughout Student's enrollment in District, they routinely sent progress reports home with Student. Mother was uncertain about whether

---

[10] A student's Specific Learning Disability eligibility may be determined by using either the student's ability versus student's actual achievement discrepancy model, or by an RTI model. There is no dispute that Student's eligibility here was determined by using the "ability to achievement discrepancy model."

she received reports, but her testimony about what documents she did and did not receive from District was sketchy. For example, on cross-examination Mother testified that she had not seen several documents, until it was pointed out to her that she had, in fact, signed them. Also, Mother testified that she maintained a file of all documents received from the District, which she kept in chronological order. However, Mother did not produce this file. If progress reports were missing from this chronologically maintained file, the absence of these reports would have provided some evidence to support Student's contention that District did not provide them. Without such evidence, however, there is no reason to disbelieve District's representations that it routinely sent progress reports home with Student.

*Appropriateness of Student's IEP Developed at the April 18, 2007 Meeting*

An annual IEP must contain a statement of the individual's present levels of academic achievement and functional performance, including the manner in which the disability of the individual affects his involvement and progress in the regular education curriculum. An annual IEP must also contain a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general education curriculum; and (2) meet each of the pupil's other educational needs that result from the individual's disability.

The first page of the April 18, 2007 IEP states that "Student meets eligibility criteria for special education services due to specific learning disability which requires special education services." That page goes on to state that the team recommended ISP for Language Arts to address needs that could not be met in the general education environment. His IEP specified that four times per week, Student was to be "pulled out" of his general education classroom to spend 45 minutes in ISP, working among a small group of fellow students.

Student contends that his IEP developed at this meeting failed to provide him with a FAPE because it failed to provide scientifically researched goals and objectives reasonably calculated to provide Student with educational benefit; failed to include objectively measurable goals; failed to include a statement about how his disability could affect his involvement and progress in the general education curriculum; failed to identify appropriate and necessary classroom accommodations and assistive technology; failed to provide appropriate services to address Student's dyslexia, motor/perceptual development, and auditory processing deficits; and failed to include an offer of an ESY placement. Each contention will be addressed in turn.

*Appropriate Goals and Objectives*

The IEP team developed four goals and objectives in the curriculum content area of reading; and developed three additional goals and objectives in writing. Student's goals and objectives reasonably followed the data gathered by District's assessments, as well as what District knew about his need based on "Assessment Wall" meetings held near the time of his initial enrollment in District.

Student did not establish by a preponderance of the evidence that these goals and objectives were inappropriate. The crux of Student's contentions is premised on the opinions of Student's experts, which were found to be unpersuasive for the reasons discussed previously. Just as these experts' opinions provided insufficiently persuasive evidence to support Student's contention that assessments were inadequate, their opinions are similarly unpersuasive about the inadequacy of his goals and objectives set forth in his IEP.

*Objectively Measurable Goals*

Each goal set forth in the IEP was to be measured by informal tests and work samples, conducted over three trials. Each goal was written for Student to obtain 80 percent accuracy on at least two of three trials. Ms. Jones testified persuasively that these goals were designed specifically to enable Student to participate in and access his general curriculum. Ms. Jones's testimony established that these goals provided adequate detail to track Student's progress.

*Appropriateness of Services*

Student contends that the instruction provided by his Ms. Jones was inadequate. Ms. Jones explained in detail the typical routine she would follow with Student and his small group of fellow students:

Warm-up. Students would begin by making the basic sounds required to read and write, such as, "Ah, " "Um," and "Ur." As students became more proficient at replicating these sounds through the year, less time was spent on this activity.

Blending sounds. Ms. Jones instructed students to watch her mouth as she pointed with her fingers to the shapes her lips made as she blended various sounds.

Sight word development. Since some words cannot be sounded out phonologically, for example, the word "the," they must be memorized. Accordingly, students were instructed to pretend they were writing on a white board (providing kinesthetic reinforcement) with their eyes closed. The students would simultaneously say the sight word, while writing it in the air.

Writing sight words. Students would follow sight word development by physically writing the sight word on the whiteboard.

Sound manipulation. Using LMB blocks representing different sounds, students would rearrange the order of the blocks to spell different words; using letter tiles instead of blocks, students would change the order of the tiles to create different words, for example, "if" to "it"; and Students were allowed to use tiles to make up their own sounds.

Writing sentences. Students made up short sentences by combining sight words and "sounded out" words.

Drawing pictures. Since students had worked hard, Ms. Jones rewarded them by allowing them to draw. She also used this time to help individual students who were struggling with the day's assignments.

Ms. Jones testified persuasively that she attempts to build the foundation for her students to reach the highest level of achievement possible, with the hope that they will gain sufficient reading proficiency to exit from special education altogether. There is no reason to discount her efforts based on the weight of the evidence presented. Accordingly, the reading services provided by Ms. Jones were appropriate to meet Student's needs and to provide him with some meaningful educational benefit.

## Student's Progress

Ms. Jones noted Student's progress every trimester on the goal and objective sheets of his IEP. She convincingly testified that Student made meaningful educational progress during this time, and her testimony is supported by these documents. For example, by March 2008, Student was able to decode "consonant-vowel-consonant (CVC)" words; continued to build his sight-word vocabulary; and increased his reading fluency.[11]

### Statement About Disability in IEP

Student contends that his IEP did not include a statement about his disability as required by the IDEA. Student's contention lacks evidentiary support. The first paragraph on the goals and objectives page of the April 18, 2008 IEP states, "Present level of performance, relationship to core curriculum and needs identified." The paragraph goes on to specifically detail the nature of Student's learning struggles. The last sentence of the paragraph concludes, "During oral discussion [Student's] knowledge and comprehension are good but when struggling to read comprehension often suffers." This is an adequate statement of Student's disability.

Even assuming this statement is somehow deficient, Student failed to establish that a more detailed statement was needed to provide Student with a FAPE, or to allow Mother to participate in the IEP process, particularly since she only skimmed over the statement anyway. Procedural violations do not, in and of themselves, support the conclusion that Student was denied a FAPE. Such is the case here.

---

[11] Ms. Harris testified credibly that in March 2008, District proposed Student receive additional reading interventions from her in the Reading Lab, which Ms. Harris described as a "really fun place," enjoyed by all of the students who attend it. Had Parents consented to this additional service, Student would have a received a "boost" in his reading skills prior to the commencement of the summer break. Parents refused this offer because they did not want Student to attend the Reading Lab, believing that it had a negative stigma attached to it.

*Accommodations*

Ms. Carson testified credibly that she regularly consulted with Ms. Jones throughout Student's second grade year about what accommodations Student might need. This cooperation led to appropriate accommodations being included in Student's general education classroom, which included assigning Student to sit in the front row, so Ms. Carson could observe Student as he read and reread passages to her. By this arrangement, Ms. Carson could also watch Student read to himself to see if he was struggling and in need of her intervention.

Ms. Carson noted that at the beginning of the school year, Student took longer than other students to complete his assignments. However, by the end of the year, Student completed assignments sooner and more accurately. He told Ms. Carson that he was no longer becoming fatigued when doing his assignments. Ms. Carson's credible testimony established that Student's needs were reasonably accommodated.

*Assistive Technology*

No evidence was produced by Student to support the contention that he needed assistive technology during this timeframe, or that, Student was denied educational benefit because no assistive technology assessment was completed.

*Appropriate Instruction and Services*

Student contends, generally, that District failed to provide appropriate specialized instruction and services. His contention was not adequately supported by the weight of the evidence.

Within months of Student's enrollment, District recognized that Student struggled to read. District initially provided Student with additional reading services in the reading lab taught by Ms. Harris, and as a "guest" in Ms. Jones's ISP, as well as providing an SST program. Because of this history, District had meaningful insight into Student's needs once he entered the special education process. As a result, the remedial services provided to Student by District under his April 18, 2007 IEP were appropriate.

Throughout Student's second grade year (fall 2007 through spring 2008), Ms. Jones used a program developed by the University of Utah titled "Metra Companion Reader." Ms. Jones explained credibly that this is a "sequential curriculum" developed by culling out the best components from older, more established reading remediation programs. The aim of "Metra Companion Reader" is to help struggling readers. In addition to the "Metra Companion Reader" program, Student received four days per week, in 45-minute intervals, additional services in a program called "Visualizing and Verbalizing."

At the conclusion of Student's second grade year, Ms. Jones was concerned about Student's reading proficiency, but no more concerned than she was about all of her students,

each of whom were struggling readers. Ms. Jones opined credibly that she observed slow but steady progress in Student's reading proficiency during the time raised by this issue.

The evidence established that District provided Student with a FAPE from April 18, 2007, through March 18, 2008: District adequately assessed Student; accurately determined his special education eligibility designation; identified his unique needs; conducted an appropriate IEP meeting; developed and implemented appropriate goals and objectives into Student's IEP; provided appropriate special education and related services; and appropriately memorialized Student's progress on his IEP documents.

*Student's Issue II: Was student denied a FAPE between March 18, 2008, through March 16, 2009?*

*Appropriateness of Student's March 18, 2008 IEP*

   *Goals and Objectives*

Goals and objectives were developed to address Student's needs in reading and writing. This IEP contained nine goals, each to be measured by informal tests and work samples over three trials. Each goal was written for Student to obtain 80 percent accuracy on at least two of the three trials. Student was to be "pulled-out" to receive ISP services in a small group, with 45-minute sessions, four times per week. The weight of the evidence established that these goals and objectives were reasonably calculated to meet Student's needs.

   *Parental Participation*

Mother approved this IEP. Her initials and signature establish that she received required copies of special education materials; that she participated in the development of the IEP; and that she consented to the implementation of the IEP goals and objectives. The weight of the evidence established that Mother, as part of the IEP team, also agreed with the adequacy of the goals and objectives.

   *ESY*

An IEP may provide that a student attend a school program following the end of the school year. The IEP team must find that this extended school year is necessary to provide the student with a FAPE because interruption of the child's school program will result in regression.

The IEP forms contain a page that contains a line stating, "Student requires extended school year program: Yes or No." The box indicating "No" is checked. There was no evidence that Student required ESY to be provided with a FAPE. Student failed to establish that he suffered regression.

23

*Adequacy of Instructional Services*

During this time, Student received remediation services through the "Project Read" program, which is based on Orton-Gillingham practices that testimony established is a well-accepted methodology for teaching struggling students to read. This program included assignments where Student read chapter books. With this instruction, Ms. Jones, for example, would have Student recite back to her what he believed to be the essential point of the passage he just completed. Ms. Jones testified credibly that "Project Read" was an efficacious methodology used to remediate Student's reading problem. The weight of the evidence did not establish that Student's educational services were inadequate.

*Necessary Attendees at the IEP Meeting of March 18, 2008*

California Education Code section 56341 requires an IEP team to include:

- One or both parents or representative;
- A regular education teacher;
- A special education teacher or provider;
- A district representative;
- An individual qualified to interpret assessment results;
- Other individuals at the discretion of the family or district; and
- The student, when appropriate.

Student alleges that District should have had a school psychologist, speech and language pathologist, and occupational therapist, at this IEP meeting.

Attendees at this IEP meeting included Mother, Ms. Carson (Student's regular education teacher), Ms. Jones (his RSP teacher), and Ms. Maddux (school principal and District representative). Since no assessments were presented at this IEP meeting, the attendance of a school psychologist, speech and language pathologist, or occupational therapist was not needed to interpret any assessment results. There was no evidence that any member of the team exercised his or her discretion to invite additional participants, or that it was appropriate for Student to attend the meeting. Accordingly, all statutorily required attendees were present.

*Undocumented IEP Meeting*

Student contends that an undocumented IEP meeting was held in April 2008. The evidence showed that Mother, Jane Gebers (District speech pathologist), and Ms. Jones met individually and separately on several occasions during the spring of 2008. During these meetings, Student's auditory processing disorder and the interventions he received were discussed. However, at these meetings changes to Student's special education programming, his services, or his placement, were not discussed according to the testimony of Miss Gebers and Ms. Jones.

Student mischaracterizes the nature of these meetings. There is no legal prohibition forbidding educators from meeting informally to discuss the educational needs of students among themselves or with a parent. The more credible testimony on this point established that the meetings that took place in the spring of 2008 were informal conversations, not undocumented IEP meetings. While it is true that decisions to change a student's special education programming, services, or placement, requires a full meeting of the IEP team, the weight of the evidence established that these type of matters were not discussed during the informal conversations held by Miss Gebers and Ms. Jones with Mother.

*Untimely IEP Meeting*

Student contends that no timely IEP meeting was held following the alleged undocumented IEP meeting, discussed above. Finding that no undocumented IEP meeting was held, the contention about its timeliness is rendered moot.

*Speech and Language Assessment*

A student must be assessed in all areas of suspected disability. If a parent requests that a student be assessed, the district must present a written assessment plan to the parent within 15 days, unless the district believes the assessment is not necessary.[12]

Mother and Ms. Jones exchanged e-mails in May 2008 that specifically discussed Student's auditory processing disorder and how that related to his special education eligibility classification. On May 5, 2008, during the course of these exchanges, Mother asked District to conduct a speech and language assessment. On May 20, 2008, 15 days later, Ms. Jones and Miss Gebers met with Mother to explain the scope and details of the speech and language assessment plan Miss Gebers prepared. After discussing the assessment, Mother did not provide her consent, but instead waited for over four months, until September 17, 2008, before consenting. Because of this delay, the September 17, 2008 IEP meeting was conducted without the benefit of the information that a speech and language assessment would have provided. Any lack of information available to the IEP team regarding Student's speech and language needs, therefore, is due to Parent's delay in consenting.

*Student's September 17, 2008 IEP Meeting*

On September 17, 2008, another IEP team meeting was held. Among the attendees were Ms. Maddux; Ms. Lauren Bole (Student's general education teacher), Miss Gebers, Ms. Jones, Dr. Loomos, Parents, and Linda Geller (Student's special education advocate). During this meeting, Parents shared Dr. Loomos's report with the other members of the IEP team for the first time; the report had been prepared nine months earlier.

---

[12]  If a district refuses to assess a student after a request for assessment has been made, the district must then provide the parent with "prior written notice" explaining why the request is being refused.

At this meeting, Parents requested a binocular vision assessment, an occupational therapy assessment, and a speech and language assessment that were to be completed within 60 days. They also asked for a determination of what literature materials would be available for Student on audiotape and requested District to develop new goals and objectives in the five essential areas of reading by September 26, 2008. Parents also requested that District share Student's IEP file and reports from outside providers with his classroom teacher, provide Student with new accommodations, and note Parent's disagreement with Ms. Charpentier's report stating that Student had "low-average cognitive ability."

According to Mr. Gargiulo, Parents were particularly upset about Student's test results on the WISC-IV, which noted his cognitive function to be in the low-average range. This was the first time Parents expressed disagreement with Ms. Charpentier's report which had been presented to them on April 17, 2007, seventeen months earlier. According to testimony from each District witness who attended this meeting, Parent and their advocate were primarily focused on Charpentier's assessment of Student's cognitive function. For example, Mr. Gargiulo testified that this issue became a "sticking point," prohibiting progress from being made on any other portion of Student's IEP. This meeting ended acrimoniously, without an agreed upon IEP being developed by the team.

In response to Parents' concerns expressed at the meeting, two days thereafter, District members of the IEP team prepared a new comprehensive assessment plan that was consistent with what Parents and their advocate requested at the IEP meeting. Mr. Gargiulo stated that in his experience it is very unusual to comprehensively reassess a student before the triennial assessment is due, but District offered to do so to address Parents' concerns and to move the IEP process forward.

*September 17, 2008 Proposed IEP*

Following the meeting of September 17, 2008, District also proposed that Student continue to receive ISP services four times per week, for 50 minutes each. This proposed IEP also included accommodations in the following areas: functional positioning so that Student's right ear faced the teacher; simplified instructions; flexible or extended time to complete assignments; and assistive devices such as use of a CD player for Student to listen to "Books on Tape." The IEP documents note that progress on the Student's existing goals and objectives would be noted on the goals and objectives pages of his IEP. Parents refused to consent to the implementation of this proposed IEP.

*September 24, 2008 Assessment Plan*

A school district may not assess a student without parental consent. District presented the assessment plan it developed after the September 17, 2008 IEP meeting to Mother on September 24, 2008. District proposed to assess Student in the following areas:

**Educational Achievement:** Observations, standardized tests, classroom tests, and work samples may be used to measure skills in readiness, basic reading

comprehension, written expression, math calculation and reasoning, oral expression and listening comprehension.

**Social/Emotional/Behavioral Status:** Observations, student self-report, rating scales, projective majors and standardized test may be used to measure the student's ability to build and maintain satisfactory relationships and use appropriate behaviors.

**Motor/Perceptual Development:** Observations and tests to measure how a child coordinates body movement and how/he perceives the world through sensory input may be used.

**Communication Development:** Observations, language samples, classroom tests and standardized test may be used to measure how the child understands and uses language and speech.

**Intellectual Development:** Observations, rating scales and standardized tests may be used to measure the student's use of basic psychological processes to solve problems in both familiar and new situations. These measures gauge learning rate and help terrific school performance.

The assessment plan also notes:

**Recent Assessments to be Considered:** Listening Center (8/24/08); Auditory Pathways (12/30/04)

Mother received a copy of the assessment plan, along with a Notice of Procedural Safeguards and information for independent educational evaluations (IEE). A cover letter prepared by Dr. Sassone dated September 25, 2008, was sent along with these materials. Mother testified that she reviewed the letter and enclosures and she understood what they said. Mother testified that she refused to provide her consent to this assessment plan because she was concerned about the anxiety the assessment process may have caused Student.

Mother's withholding of consent was unreasonable. For example, Student's Social/Emotional functioning was one area to be assessed, at Mother's request. An assessment in this area would have provided the entire IEP team with greater insight into any anxiety Student had; what the source(s) of that anxiety might be; and how the IEP team might develop and implement strategies to address his anxieties while in his educational setting. Additionally, a comprehensive assessment was necessary, as Dr. Sassone credibly explained, to obtain data needed to best develop "the highly defined goals that Parents wanted." Parents' lack of consent to these assessments frustrated the IEP process by denying the IEP team necessary information about Student's present levels of performance.

*Speech and Language Assessment*

In late fall 2008, Mother provided consent for District to conduct a speech and language assessment. Miss Gebers conducted an expedited assessment.[13] Miss Gebers[14] completed her assessment on November 14, 2008.

Miss Gebers's report is seven pages in length, is single-spaced, and is rich in detail. Miss Gebers testified credibly that the assessment materials she used were nondiscriminatory, administered in English, and were valid for the purposes for which they were used. Miss Gebers administered the evaluation in compliance with testing instructions. The test results indicated age-appropriate "receptive and expressive oral language skills in the areas of morphology, syntax, semantics and pragmatics." As a result, Student was found not to need speech and language therapy to access his educational program. As Miss Gebers testified, the assessments were consistent with "the [Student] she knew."

At the time of her assessment, Miss Gebers did not suspect that Student had disabilities beyond his phonological processing disorder. For example, Student could accurately construct sentences and he had no problem conjugating irregular verbs. According to Miss Gebers, student was "very verbal." Miss Gebers testified credibly that she is trained to look for and to detect suspected areas of disability.

Also, Miss Gebers convincingly contradicted Dr. Guterman's opinion that Student's occasional mispronunciation of words, for example, saying "restroy," rather than "destroy," raised a "red flag" that District overlooked. Miss Gebers explained that, had Student's mispronunciations of words been the rule rather than the exception, it would have been impossible to understand what Student was saying, but such was not the case with Student, whom, again, she found to be "very verbal."

Based on Miss Gebers's training, including her special education credential, and her extensive experience, her opinion that Student did not need speech and language interventions is persuasive, as are her observations that he did not have any other undetected special education needs.

---

[13] This was not Miss Gebers's first experience working with Student. Early in his kindergarten year she provided speech services to help him articulate the "K" sound, and later that same year, she helped Student articulate the "L" sound. During Student's first grade year, Miss Gebers determined that Student no longer needed her services, her interventions having been successful.

[14] Miss Gebers obtained a bachelor of arts degree in speech communication from California State University, in 1974, and a master of arts in communicative disorders in 1975. She is authorized to practice Speech-Language Pathology and holds a Standard Teaching credential, a Special Education credential, a Speech and Hearing credential, as well as a Life credential, all issued by the CCTC. She has authored two books on literature and speech remediation, as well as produced a video on Interactive Reading. She has worked as a speech and language pathologist since 1975, the last 20 years with District. From 1998 to 2004, she was a course instructor at St. Mary's College.

*Occupational Assessment*

In December 2008, Parents provided consent for District to assess Student's occupational therapy needs. Michelle Weinman, a registered occupational therapist, conducted the assessment and completed her report on January 7, 2009. Ms. Weinman's record is five pages in length, single-spaced, detailed, and thorough. The report includes information on Student's medical/developmental history; behavioral observations; validity of assessments; evaluation methods; evaluation results; a discussion on Student's posture/movement; sensory considerations; gross motor skills; fine motor skills; and a summary of her findings.

Ms. Weinman's report concludes:

Results of Occupational Therapy testing indicate that [Student] has attained the basic foundations of movement control including; sufficient postural support for desk sitting, sensory awareness of upper and lower extremities in space, and basic gross motor skills. In the fine motor area, [Student] demonstrates functional manual dexterity, as well as crayon and scissor management.

Student failed to call a registered occupational therapist to testify in this matter. Accordingly, there is insufficient evidence to support Student's contention that Student's occupational therapy needs were not fully addressed, or that the conclusions reached by Ms. Weinman were in any way inaccurate.

*District's Obligation to Reassess*

In light of Parent's refusal in September 2008 to provide consent for a comprehensive assessment, District was only obligated to reassess Student in the two areas—speech and language and occupational therapy—where parental consent was received. Parents withheld consent from District to conduct the balance of the assessments District proposed in the September 24, 2008 assessment plan. In response to Parents withholding consent, District filed a request for due process seeking an order permitting the proposed assessments to be conducted. After hearing that due process matter, on July 1, 2009, ALJ Charles Marson issued a decision and an order permitting District to complete a comprehensive assessment.

Student's contention that District denied him a FAPE for failing to reassess him is unpersuasive and unsupported by the record. During the time in question, District expeditiously and thoroughly completed the assessments for which Parents provided consent. Parents frustrated the IEP process by their unwarranted withholding of consent of a more comprehensive assessment. It is disingenuous for them now to argue that Student was denied a FAPE because District did not conduct the assessments they requested at the September 17, 2008 IEP meeting, but that Parents refused to provide consent. District could do no more than assess Student in the areas permitted by Parents. Since a more precise measure of Student's present levels of performance could only have been determined by the

29

use of reasonably current assessment data, any shortcoming in Student's IEP that followed rests with Parents, not District.[15]

*November 18, 2008 Facilitated IEP(FIEP) Meeting*

On November 18, 2008, a FIEP[16] team meeting was held.[17]  The desired outcomes of the FIEP are stated on FIEP documents as follows:

By the end of the meeting we will have:

An agreement about [Student's] present levels of performance based on his assessed needs;

An agreement on measurable goals for [Student];

A discussion about the instructional strategies to address [Student's] goals and an agreement on accommodations based on all assessment information; and

An appropriate IEP that can be supported by all and implemented by the district.

No agreement was reached at the FIEP.  The following day, the facilitator sent an e-mail to Parents, stating:

It was good to meet both of you yesterday.  I look forward to supporting your efforts with [Student's] IEP meeting as we continue.  I can feel and understand your frustration and hope that I was able to clarify the requirements of the IEP process as we spoke.  As requested by [Mother] during our phone conversation, following the facilitated IEP meeting for [Student], I'm sending this e-mail to confirm the proposal I communicated to you from the district.

*It was my perception that when you were asking for more reading goals with greater specificity than the ones already included that the district was*

---

[15]  This is consistent with ALJ Marson's Factual Finding 42, which states:

The development of adequate annual goals for Student's IEP's requires accurate information about his present levels of performance.  The requirement the goals be measured assumes an accurate starting point.  District witnesses testified without contradiction that new assessments would assist them in writing better goals.

[16]  The SELPA provides a neutral facilitator at FIEPs to assist districts and parents who are in disagreement about the appropriateness of a student's special education services achieve resolution.

[17]  The FIEP was originally scheduled for November 13, 2008; however, Parents canceled that meeting so it was rescheduled to this date.

*agreeable and willing to provide those. Given your communication with them
about being in disagreement with their assessment after the last IEP meeting
ended, I understand their position that they have the responsibility and right to
update [Student's] assessment information prior to agreeing to an Independent
Educational Evaluation (IEE), when the assessment is more than one year old
(I believe March or April 2007, since we were reviewing March 2008 goals)
per the regulations for the IDEIA 2004. In fact, as I stated, I believe you
would be in a stronger position to request an IEE once they provided current
data about [Student's] abilities and areas of educational need.*

*The district has offered to provide you with that assessment plan and update
on [Student's] current reading abilities and is willing to expedite the
assessment to have it completed by the next IEP meeting sometime between
8:30-12:00 per our calendar review today; I believe you were going to
confirm this date and time once you checked your calendar at home. I also
shared, when you suggested that you didn't want the same team that completed
the last assessment to assess his abilities again, that the district is willing to
assign another team from within the district to update [Student's] assessment.
(Emphasis added).*

Please contact me if I can answer any questions that may arise after you share
this information with [your advocate], or if you'd like to discuss this further via
conference call (which as I indicated, I am able to set up from my office
phone). I look forward to supporting this team to move forward as you
continue to work in the best interest of [Student].

The neutral facilitator's e-mail confirms District's witnesses' testimony that District
worked diligently, expeditiously, and reasonably, to assess Student's needs, so that it could
develop an IEP with additional goals and objectives, consistent with Parents' and Student's
advocate's demands. This e-mail confirms that District proposed to provide Student with
expedited assessments, updates on his current reading abilities, and to assign him a different
assessment team. Despite this, this FIEP was continued, without a new IEP being agreed
upon.

*December 12, 2008 IEP Meeting*

On December 8, 2008, Mother canceled the IEP meeting scheduled for December 12,
2008. An e-mail from District confirming the cancellation goes on to state:

You [Mother] also requested the OT report. The assessment is not yet
completed and the schedule for completion will depend somewhat on
[Student's] school attendance. We will have this report available no later than
January 28, 2009. We will make every attempt to have the assessment report
completed and to you prior to the IEP would schedule.

At Mother's request, the next IEP meeting was continued until January 26, 2009. The weight of the evidence established District cooperated with Parents in order to garner their full participation in the IEP process.

*January 26, 2009 FIEP Meeting and Proposed IEP*

On January 26, 2009, the FIEP was reconvened. There are 21 pages of documents related to this FIEP explaining Student's special education needs as well as Parents' rights under the IDEA. The documents related to this FIEP meeting are thorough and detailed. For example, there are five pages of goals that District proposed. Each page sets forth highly detailed reports of Student's then-present levels of performance, to the extent they could be determined without a comprehensive assessment being completed; a clear statement of Student's "Curriculum Standard or Essential Skill" to be worked on by District staff; highly detailed explanations of the "Measurement Plan and Documentation Required" to track Student's progress; highly detailed explanations of the intended proficiency that Student was expected to achieve; and specific dates upon which Student's "Progress on Goals" would be measured and recorded.

The proposed goals offered in this proposed IEP were in the areas of "Reading Word Analysis," "Fluency and Vocabulary," "English Language Arts," "Reading Comprehension," "Writing/Spelling," "Writing Strategies," "Penmanship," and "Punctuation." In total, there are approximately 31 discrete items embedded in these goals and objectives, each aimed at meeting Student's special education needs.

The "Program Description Summary" of this proposed IEP states that Student was to receive services in the ISP from January 20, 2009, to November 30, 2009, four times per week, for 105 minutes per day, which was an increase in the level of services Student received under his last agreed upon and implemented IEP. The proposed services to be provided were in the areas of "reading, written language, and handwriting."

Student failed to produce persuasive evidence supporting why this detailed and thoroughly prepared proposed IEP was inadequate to meet Student's educational needs, and thus was not an offer of a FAPE. Accordingly, Student failed to meet his burden of proof on this contention.

Student failed to produce persuasive evidence to explain why this detailed and thoroughly prepared proposed IEP was inadequate to meet Student's educational needs, and thus was not an offer of a FAPE. Accordingly, Student failed to meet his burden of proof on this issue.

*Information Provided to Parents*

Mother testified that she consented to this IEP. However, the IEP document shows otherwise. The only portion of the IEP that Mother signed was an acknowledgement that she received a copy of the special education parental rights brochure. Page four of the brochure

explains in detail Parents' rights regarding IEEs. Accordingly, the contention that Parents were not informed of the IEE is not supported by the record.

*Compliance Complaint*

Student contends that District improperly caused a compliance complaint that Student filed with CDE to be dismissed. The weight of the evidence established that CDE dismissed the compliance complaint on its own volition following Student's filing of his request for due process hearings. Accordingly, Student offered insufficient evidence to support this contention.

*Student's Issue III: Was Student denied a FAPE from March 16, 2009, through June 2009?*

*March 16, 2009 IEP and Proposed IEP*

The January 26, 2009 meeting was reconvened on March 16, 2009. The documents for this meeting total 10 pages. Like the January 26, 2009 meeting notes, these notes show Student's educational needs were discussed in great detail.

The IEP meeting included 11 attendees, including Dr. Guterman, whose recommendations were considered by the IEP team. District considered Dr. Guterman's report, but District members of the team questioned Dr. Guterman's two main recommendations that the IEP documents be altered to reflect Student's disability as "severe dyslexia," and that Student continue to receive instruction at a LMB clinic, rather than at his school. District witnesses testified that they had a legitimate concern about using the "severe dyslexia" language from the DSM-IV, rather than tracking the special education nomenclature of "phonological processing disorder." District's witnesses testified that they also believed District's remedial reading instruction, largely based on LMB techniques, was adequate to address Student's needs. The weight of the evidence established that District was correct on both counts.

District's use of the Specific Learning Disability/ Processing Disorder/ Phonological Disorder paradigm not only tracked the language used on the SELPA forms, but also identified Student's disability. District's desire to provide accurate special education eligibility descriptions justifies its use of special education terms to the extent practicable. Conversely, Dr. Guterman's labeling of Student as "severely dyslexic" is based on her work in private practice and in non-public schools. Accordingly, her opinion about how a special education disability should be described in an IEP is less persuasive than the opinions held by District's witnesses who testified credibly that they are well-versed in special education protocols.

*Appropriateness of Educational Services*

As for the methodologies District intended to use to teach Student, the "Program Description Summary" of the proposed IEP recommends Student receive two hours per day,

five days per week, in a small-group setting, with one-to-one instructional support services based on LMB strategies, and 30 minutes per day, five days per week, to work on non-language arts goals. The weight of the evidence supported that District's staff was adequately trained to provide the instruction described in the IEP.

Parents did not consent to the implementation of this proposed IEP. The last page of these documents includes an "IEP Action Plan," requiring District staff to conduct further assessments and to draft additional goals to be discussed at a subsequent IEP meeting, which District did.

*June 4, 2009 IEP Meeting and IEP*

Parents consented to this IEP, which is substantially similar to the IEP proposed at the March 26, 2009 IEP meeting. Any delay in implementing this IEP, thus denying Student a FAPE, rests with Parents, not with District.

*Student's Issue IV: Reimbursements*

Parents may be entitled to reimbursement for the costs of services they have procured for their child when: (1) the school district has failed to provide a FAPE and (2) the private placement or services are determined to be proper under the IDEA.

*LMB Services*

On January 26, 2009, District increased its offer of resource support services for Student. Parent did not consent to this increase in District-provided services. On March 16, 2009, District again offered student 30 minutes per day in the ISP to work in a small group to address his writing goals, and an additional two hours per day of one-to-one resource time to address his reading concerns. The IEP specified that LMB instructional strategies would be used during the two hours per day, in a systematic, appropriate fashion with LMB-trained staff. Parents refused this, too. Instead, Mother chose to place Student in a LMB clinic, two hours per day, withdrawing Student from his school to do so.

The weight of the evidence established that District was capable of meeting Student's needs. Merely because Parent preferred to enroll Student in LMB, does not mean reimbursement is required. This is particularly true since the weight of the evidence showed that District's remedial instruction was superior to that provided by LMB, based on the testimony of Heather Dugan, a LMB Center Director who testified telephonically. Ms. Dugan holds far less experience teaching struggling learners to read than either Ms. Harris or Ms. Jones.[18]

---

[18] Ms. Dugan holds a bachelor of arts degree in political science from Cal Poly San Luis Obispo. She has been employed by LMB for approximately five years, the majority of the time as either an administrator or a trainer of new employees. She does not hold a California teaching credential, nor has she ever been employed by a public school. She is not particularly familiar with the California State Teaching Standards.

34

*Tomatis Therapy*

Student's claimed progress in Tomatis Therapy is supported by questionable evidence. Student completed his first "block" of Tomatis therapy in June 2008; however, Student's post-testing was not done until January 2009. Mother unpersuasively testified on this point, as follows:

Question: Why was the post-test not done until January?

Answer: I was just giving him time. It was something we could do when we were ready to do it. We have a lot of different things going on. It was done when we could do it.

Mother's choice to delay the post-testing at The Listening Center, where Student received Tomatis training, diluted any probative value the data may have otherwise provided. The Listening Center conducted a pre-test of Student on February 27, 2008, and a post-test on January 7, 2009, eleven months later. According to the pre- and post-test results, Student made astounding progress. For example, on the Token Test for Children, Second Edition (TTFC-2), which assessed "[Student's] ability to follow spoken directions of increasing length and complexity," Student's age-equivalent scores improved from a 4.9 to an age equivalency of 11.5. The narrative summary of the TTFC-2 states:

The results indicate that [Student] experiences very little difficulty with auditory processing skills that enable him to follow spoken directions. These skills are interpreted as being within normal limits based on [Student's] standard score and percentile rankings. His performance on this test indicates substantial improvement.

Between June 2008 and January 2009, District continued to provide Student with special education services. Dr. Ross-Swain, Student's speech and language expert, conceded that it would be impossible to parse out gains attributable to Student's Tomatis training from gains attributable to District's interventions, and other variables. This opinion is consistent with the fact that as part of her work-up of Student, Dr. Ross-Swain did not observe Student at school, did not know of modifications made to Student's classroom environment, did not speak with Student's teachers, and only observed Student in her clinical setting. Also, between February 2008 and January 2009, Dr. Ross-Swain did not observe Student at all.

Based on the delay in the post-testing by the Listening Center of six months following Student's completion of his first Tomatis Therapy, and the inability to parse out the effect on Student of other variables, such as Student's maturation and the District provided services, Student failed to establish by a preponderance of the evidence that he needed Tomatis Therapy in order to receive a FAPE.

35

*Student's Request for Reimbursement for Private Evaluations*

If a parent disagrees with the district's assessment, the parent may request an IEE, and under certain circumstances the district will be required to pay for the IEE. Student's requests will be discussed in turn.

### Dr. Loomos's Evaluation

Student failed to present any evidence regarding the cost of this report. Additionally, Student failed to present any evidence that Parents requested an evaluation in auditory processing from the District. The evidence established that Parents never requested an IEE in the area of auditory processing, or gave notice to District of their intent to obtain a private report. Parents are entitled to an IEE only when they disagree with an assessment conducted by a district. Accordingly, the weight of the evidence established that Student is not entitled to reimbursement.

### Dr. Guterman's Evaluation

Student presented no evidence regarding the cost of this evaluation. Additionally, this matter has been previously litigated and decided. According to District's Closing Brief, District represented that payment has been made to Parents pursuant to ALJ Marson's previously issued order. If that is true, this point is all the more moot. In any event, no additional reimbursement payment beyond what ALJ Marson ordered shall be made to Parents by District.

*Compensatory Education*

When a school district fails to provide a FAPE to a student with a disability, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA. Compensatory education is a form of equitable relief that may be granted for the denial of appropriate special education services to help overcome lost educational opportunity. The purpose of compensatory education is to ensure that the student is appropriately educated within the meaning of the law. Where the actions of parents are unreasonable, equitable relief may be reduced or denied. Student, as discussed below, made progress throughout each time period addressed in this decision, and was provided with a FAPE by District. Additionally, Parents' conduct in not providing meaningful review of Student's initial assessment plan; not adequately reviewing Student's initial IEP; not timely consenting to the comprehensive assessment plan; not sharing with the IEP team with a copy of Dr. Loomos's initial assessment; and their delay in obtaining Student's post-testing from Dr. Loomos, sufficiently frustrated the IEP process such that the equitable remedy of compensatory education is unwarranted.

*District's Contention: Was Student provided FAPE from April 18, 2007, through June 2009?*

The IDEA requires school districts to offer students with disabilities a FAPE. This requires a district to provide a student who has a disability with a program to address his unique needs and to provide him with educational benefit.

Through District's RTI Program, District identified Student as a struggling reader within weeks of his enrollment. District increased, or offered to increase, the duration and frequency of interventions to address his reading problem, and to also expand the scope of services Student received. Because of their history with Student through the RTI and SST processes, District staff was well aware of Student's suspected areas of disability at the time they assessed his initial special education eligibility.

District prepared thorough, adequate, and appropriate IEPs, for each timeframe addressed by this Decision. District met the procedural requirements for conducting IEPs. And, most importantly, Student made educational progress throughout his enrollment in the District.

Ms. Carson testified credibly that Student was able to access his second grade general education curriculum, and despite his challenges, Student was able to understand grade-level material, albeit with more struggle than students without disabilities. Student "still loved to read," which Ms. Carson considered to be a "big barometer" that Student was making progress because in her experience students who become overly frustrated with their reading problems, end up not liking to read at all.

Lauren Bole[19] was Student's general education teacher during Student's third grade year. She testified credibly that she appropriately accommodated Student's needs while he was in her classroom. For example, Student was seated near her and she provided him with a shortened homework schedule. Ms. Bole also exchanged e-mails with Mother regarding what subjects were being covered with Student in his class. Ms. Bole concluded that over the course of Student's third grade year, "his improvement seemed steady," including the areas of punctuation; grammar; spelling; fluency; and decoding. Lastly, Ms. Bole did not observe any additional areas of deficits exhibited by Student that concerned her.

The most persuasive testimony in this matter was provided by Dr. Sassone.[20] She attended the March 2009 IEP meeting where she spoke directly with Dr. Guterman about her

---

[19] Ms. Bole obtained a bachelor of arts degree and a master's degree from the University of Pacific. Her education included three university-level classes in special education, where she learned how to work with special education students in the general curriculum, as well as learning the importance of maintaining communication with the special education teachers regarding a student's unique needs.

[20] Dr. Sassone obtained a bachelor of arts degree in psychology from the University of California at Berkeley in 1972; a master's degree in education, from Berkeley in 1975; a PhD in education from Berkeley in 1979; and a master of arts in educational leadership from St. Mary's College in 1994. She holds credentials in Administrative Services and Pupil Personnel. She worked as a school psychologist in the San Ramon Valley

assessments and recommendations. Prior to testifying, she listened to an audio tape of that IEP meeting and reviewed a transcript that she had her staff prepare from the recording of the meeting. Dr. Sassone was present throughout the 11-day hearing, and thus heard all of the evidence Student offered in support of each of his contentions.

Dr. Sassone testified credibly that the Slosson Oral Reading Test (SORT) upon which Student relied extensively to support his contention that District's interventions were ineffective, actually proved the opposite. Dr. Sassone explained persuasively that SORT scores have an inherently high-standard error of measurement, or standard of error. This means that examiners may expect significant variability in students' test scores from tests taken at different times. Put another way, the SORT is not a finely calibrated instrument. Consequently, SORT scores, when viewed across time, do not provide the most accurate measurement of a student's performance and skill level at any given test-taking period.

To the extent that SORT scores may be used to provide some, albeit imprecise, measure of a students' progress, after analyzing Student's scores entered into the record here, Dr. Sassone concluded that Student made progress. To support her conclusion, Dr. Sassone prepared an exhibit which was also entered into the record. The exhibit shows nine SORT scores from January 2007 until May 2009. Each of Student's standard SORT scores shows that he tested within the standard error of measurement, with a 95 percent confidence level, thus supporting District's contention that Student made educational progress. Had Student not progressed, his scores would have fallen below this range because the SORT scores are age-based. The test data, therefore, showed that despite Student's disability, he made relative progress on the SORT.

Dr. Sassone's exhibit also includes two SORT tests conducted by LMB in October 2008 and May 2009. Student's standard scores tested within the standard error on these tests, as well, thus corroborating the accuracy of District's tests.[21]

Dr. Sassone's testimony established that District's staff was well-trained to educate children suffering from dyslexia. For example, each staff member under her supervision has, pursuant to her instructions, read the book titled, *Overcoming Dyslexia*, authored by Sally F. Shawitz M.D., a professor at Yale University. Tenets from Dr. Shawitz book are incorporated into District's RTI program.

Dr. Sassone's testimony is entitled to substantial weight in deciding this matter because of her education, training, experience, knowledge of Student's history, and her observation of the evidence presented at hearing. Her testimony made clear that she fully understood the issues and contentions presented. She provided clear and cogent explanations which refuted each of Student's central contentions.

---

Unified School District from 1979 to 1994, where she conducted the type of assessments discussed at length during this hearing.

[21] This is true even though LMB conducted twelve assessments of Student on the same day, which because of the fatigue factor is a questionable examination practice.

For example, on the issue of dyslexia, Dr. Sassone testified that on several occasions she has also read Dr. Shawitz's book, as well as attended several of Dr. Shawitz's lectures on dyslexia. Dr. Sassone provided persuasive testimony that she is knowledgeable about dyslexia and the interventions available to remediate it.

Dr. Sassone answered all questions put to her on both direct- and cross-examinations in a candid, forthright fashion. She held a calm demeanor throughout her testimony. Her testimony was helpful and persuasive regarding the appropriateness and adequacy of District's special education assessments, IEPs, and interventions, it provided Student. She drafted the comprehensive goals and objectives Parents ultimately approved, and her 20-plus years of working in special education provided a basis for her opinions that Student's experts lacked.

## LEGAL CONCLUSIONS

### Burden of Proof

Student, by seeking relief, assumed the burden of proving the essential elements of his claims. (*Shaffer v. Weast* (2005) 546 U.S. 49, 62 [163 L.Ed.2d 387].)

### Elements of a FAPE

Under the IDEA and State law, children with disabilities have the right to a FAPE. (20 U.S.C. § 1400(d); Ed. Code, § 56000.) A FAPE means special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge to parent; (B) meet the standards of the state educational agency; (C) include an appropriate pre-school, elementary school, or secondary school education in the state involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of Title 20 of the United States Code. (20 U.S.C. § 1401(9).). "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(a)(29).)

In *Board of Educ. v. Rowley* (1982) 458 U.S. 176; 102 S.Ct. 3034 (*Rowley*), the Supreme Court defined districts' obligation to provide a FAPE. In *Rowley*, the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* 458 U.S. at p. 198.) School districts are required to provide a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201; *J.L. v. Mercer Island School Dist.* (9th Cir. 2009) 575 F.2d 1025, 1035-1038.)

There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Rowley, supra,* 458 U.S. at pp. 206-207.) Second, the

tribunal must decide whether the IEP developed through those procedures was designed to meet the child's unique needs, and was reasonably calculated to enable the child to receive educational benefit.

In determining whether these legal requirements have been met, an ALJ must give "appropriate deference to the decisions of professional educators." (*MM v. Sch. Dist. of Greenville County* (4th Cir. 2002) 303 F.3d 523, 533).

The more credible testimony was provided by District's professional educators. Each holds impressive educational credentials and work experience establishing them as "professional educators," thus entitling their testimony be given the "appropriate deference" afforded by the law. Accordingly, their opinions as to the appropriateness of Student's IEPs and proposed IEPs are given more weight in deciding this matter than are the opinions of retained experts who testified on behalf of Student, who had only hours of interaction with him, which consisted almost exclusively of administering tests. By contrast, Ms. Harris and Ms. Jones, both highly-qualified reading instructors, spent several hours per week with Student over the course of several years. Accordingly, these reading teachers held accurate insight into Student's needs and what was needed to develop and implement appropriate IEPs for him.

At base, this matter involved a young boy's struggle to read proficiently. District provided exceptionally well-qualified instructors to assist him with his struggles. Student's progress toward reading proficiency was slow, but he nonetheless progressed while under the tutelage of District staff who successfully taught hundreds of students to become proficient readers.

By contrast, Student's experts were knowledgeable in their given fields of expertise, but they were not experts in teaching children how to read. Accordingly, the appropriateness of Student's IEP is better gauged by the testimony of the educational professionals who worked with Student over the course of several years, than by the opinions of experts who essentially testified as latent, professional "assessors."

Student did not meet his burden of proof to establish that he was denied a FAPE at any time as alleged. The preponderance of the evidence showed that under *Rowley*, District provided Student with a "basic floor of opportunity."

*The "Snapshot" Rule*

· An IEP is not judged in hindsight; its reasonableness is evaluated in light of the information available at the time it was implemented. (*JG v. Douglas County School Dist.* (9th Cir. 2008) 552 F.3d 786, 801; *Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.)

Student's attempts to undermine the adequacy of District's assessments and IEPs by using later acquired assessments, is unpersuasive. The District's assessments, proposed

assessments, IEPs, and proposed IEPs , were adequate. Secondly, Student's experts' opinions that District should have recognized various "red flags" are not persuasive. These opinions, particularly in the instance of Dr. Guterman, ignore the fact that changing Student's disability to "dyslexia," would not have changed the intervention Student received and that District provided, which is to say an appropriately intensive reading program.

*Assessment and Reassessment*

In evaluating a child for special education eligibility, a district must assess him in all areas related to a suspected disability. (20 U.S.C. § 414(b)(3)(B)(i); Ed. Code, § 56320, subd. (f).) The IDEA provides for periodic reevaluations to be conducted not more frequently than once a year unless the parents and District agree otherwise, but at least once every three years unless the parent and District agree that a reevaluation is not necessary. (20 U.S.C. § 1414(a)(2)(B); Ed. Code, § 56381, subd. (a)(2).) A reassessment may also be performed if warranted by the child's educational or related services needs. (20 U.S.C. § 1414(a)(2)(A)(i); Ed. Code, § 56381, subd. (a)(1).) Reassessments require parental consent. (20 U.S.C. § 1414(c)(3); Ed. Code, § 56381, subd. (f)(1).) To obtain that consent, the District must develop and present an assessment plan. (20 U.S.C. § 1414(b)(1); Ed. Code, § 56321, subd. (a).)

If parents do not consent to a reassessment plan, the district may conduct the reassessment by showing at a due process hearing that it needs to reassess the student and it is lawfully entitled to do so. (20 U.S.C. § 1414(c)(3); 34 C.F.R. § 300.300(a)(3)(i), (c)(ii)(2006); Ed. Code, §§ 56381, subd. (f)(3), 56501, subd. (a)(3).) Parents who want their children to receive special education services must allow reassessment by the district, and cannot force the district to rely solely on an independent evaluation. (*Johnson v. Duneland Sch. Corp.* (7th Cir.1996) 92 F.3d 554, 558; *Andress v. Cleveland Indep. Sch. Dist.* (5th Cir.1995) 64 F.3d 176, 178-79; *Gregory K. v. Longview Sch. Dist.* (9th Cir. 1987) 811 F.2d 1307, 1315; *Dubois v. Conn. State Bd. of Ed.* (2d Cir.1984) 727 F.2d 44, 48.)

The assessments shall be conducted by trained and knowledgeable personnel, except that individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist. (Ed. Code, § 56320, subd. (b)(3).) In conducting an assessment, a district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student. This may include information provided by the parent that may assist in determining whether the student is a child with a disability, and the content of the student's IEP, including information related to enabling the child to be involved and progress in the general education curriculum. (34 C.F.R. § 300.304(b)(1)(i), (ii) (2006).) No single measure or assessment shall be used as the sole criterion for determining whether a student is a child with a disability or for determining an appropriate educational program for the student. (34 C.F.R. § 300.304(b)(2) (2006).) Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's native language or other mode of communication unless this is clearly not feasible. (Ed.

Code, § 56320, subd. (a); 20 U.S.C. § 1414(b)(2), (3); 34 C.F.R. § 300.304(c)(1)(i), (ii) (2006).)

Here, District prepared and/or proposed adequate assessment plans on each occasion. Initially, Ms. Charpentier and Ms. Jones assessed Student in broad areas of potential need that included each of the items listed in the Educational Code, with the exception of "career and vocational abilities and interests," which are not issues here. District's attempts to comprehensively reassess Student thereafter, were vitiated by Parents' unwarranted withholding of consent for District to do so.

*Requirements for IEPs*

*Present Levels of Performance, Goals, and Objectives*

Federal and State law specify in detail what an IEP must contain. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R.§ 300.320 (2006); Ed. Code, § 56345.) An annual IEP must contain, *inter alia*, a statement of the individual's present levels of academic achievement and functional performance, including the manner in which the disability of the individual affects his involvement and progress in the regular education curriculum. (20 U.S.C. § 1414(d)(1)(A)(i)(I); 34 C.F.R § 300.320 (a)(1)(2006); Ed. Code, § 56345, subd. (a)(1).) The statement of present levels of performance essentially creates a baseline for designing educational programming and measuring a student's future progress toward annual goals.

An annual IEP must also contain a statement of measurable annual goals designed to: (1) meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general education curriculum; and (2) meet each of the pupil's other educational needs that result from the individual's disability. (20 U.S.C. § 1414(d)(1)(A)(i)(II); Ed. Code, § 56345, subd. (a)(2).) Annual goals are statements that describe what a child with a disability can reasonably be expected to accomplish within a 12-month period in the child's special education program. (Letter to Butler, 213 IDELR 118 (OSERS 1988); Notice of Interpretation, Appendix A to 34 C.F.R., part 300, Question 4 (1999 regulations).) Those goals are then broken down into short-term objectives, if objectives are used.

Here, each of Student's IEPs or proposed IEPs had measurable goals. Student failed to produce sufficient evidence to establish otherwise.

*Requirement of Clear Written Offer*

An IEP must contain the projected date for the beginning of services and the anticipated frequency, location, and duration of those services. (20 U.S.C. § 1414(d)(1)(A)(VII); Ed. Code, § 56345, subd. (a)(7).)

Here, Student failed to produce sufficient evidence to establish that the offers District provided Student lacked clarity.

*Meaningful Participation in IEP Meetings*

A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meetings, expresses her disagreement with the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schs.* (6th Cir. 2003) 315 F.3d 688, 693.) A parent who has an opportunity to discuss a proposed IEP, and whose concerns are considered by the IEP team, has participated in the IEP process in a meaningful way. (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1036.)

Here, Student failed to produce persuasive evidence that District prevented Parents from meaningfully participating in the IEP process. Mother signed IEP documents attesting either to her assent and/or participation. Additionally, the weight of the evidence established that Parents were actively involved in Student's education, commencing with his enrollment. This finding is consistent with the finding made by ALJ Marson in the previous matter, for which official notice was taken, as noted on the record.

*Required Members of an IEP Team*

An IEP team must include at least one parent; a representative of the local educational agency; a regular education teacher of the child if the child is, or may be, participating in the regular education environment; a special education teacher or provider of the child; an individual who can interpret the instructional implications of the assessment results; and other individuals who have knowledge or special expertise regarding the pupil, as invited at the discretion of the district or the parent; and when appropriate, the student. (20 U.S.C. § 1414(d)(1)(B)(i), (iv-vi); Ed. Code, § 56341, subds. (b)(1), (5),(6).)

Here, each of Student's IEP meetings included all required attendees. Student failed to produce sufficient evidence to establish otherwise.

*Qualifications of School Psychologist Interns*

California Education Code section 56320 (b)(3) in pertinent part states:

Individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist.

California Education Code section 56324 (a) states:

Any psychological assessment of pupil shall be made in accordance with section 56320 and shall be conducted by a credentialed school psychologist.

The CCTC issues a credential titled "Internship Pupil Personal Services Credential, " in the "Authorized Subject" of "School Psychology." This credential states in pertinent part:

43

This credential authorizes the holder to perform the following services in grades 12 and below:

[¶...¶]

Conduct psycho educational assessments for purposes of identifying special needs.

Here, it is undisputed that Ms. Charpentier was issued this credential on May 21, 2006, and that the credential was not set to expire on until September 1, 2008. Ms. Charpentier was, therefore, legally qualified to conduct the psychoeducational evaluation of Student, dated April 18, 2007. Student failed to produce sufficient evidence to establish otherwise.

*Consequences of Procedural Error*

The Supreme Court has recognized the importance of adherence to the procedural requirements of the IDEA. (*Board of Educ. v. Rowley* (1982) 458 U.S. 176, 205-206 [73 L.Ed.2d 690](*Rowley*).) However, a procedural error does not automatically require a finding that a FAPE was denied. A procedural violation results in a denial of a FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child, or causes a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (j); *W.G. v. Board of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target Range*).)

Here, District committed no procedural errors. Assuming arguendo, that District committed procedural errors, such errors did not result in Parents being denied meaningful participation in the IDEA processes or in Student's loss of an educational benefit.

*Visual, Hearing and Motor Disability*

IEP teams are to reach a group determination regarding the effects that any "visual, hearing, or motor disability" may have on a student. (34 CFR 300.311(a)(6)). Cal. Ed. Code § 56320(f) requires school districts to assess students potentially in need of special education services "in all areas related to the suspected disability, including if appropriate, health and development, vision, including low vision, hearing, motor abilities, language function, general intelligence, academic performance, communicated status, self-help, orientation and mobility skills, career and vocational abilities and interests, and social and emotional status."

Here, District either conducted or proposed to conduct appropriate assessments in all areas, or accurately determined assessments were unnecessary. Student failed to produce sufficient evidence to establish otherwise.

44

*Parental Non-cooperation*

The Supreme Court has noted that the IDEA assumes parents, as well as districts, will cooperate in the IEP process. (*Shaffer v. Weast*, supra, 546 U.S. at p. 53 [noting that "[t]he core of the [IDEA] ... is the cooperative process that it establishes between parents and schools, " and describing the "significant role" that " [p]arents and guardians play ... in the IEP process"]; see also, *John M. v. Board of Educ. of Evanston Tp. High School Dist.* (7th Cir. 2007) 502 F.3d 708, 711, fn. 2; *Patricia P. v. Bd. of Educ. of Oak Park* (7th Cir. 2000) 203 F.3d 462, 486; *Clyde K. v. Puyallup School Dist., No. 3* (9th Cir. 1994) 35 F.3d 1396, 1400, fn. 5[rejecting a "my way or the highway" approach by parents' attorney].)

Courts frequently hold that parents who refuse to cooperate in a district's efforts to formulate an IEP are not entitled to full or partial reimbursement or compensatory education. (See, e.g., *Loren F. v. Atlanta Indep. Sch. Sys.* (11th Cir.2003) 349 F.3d 1309, 1312; *MM v. Sch. Dist. of Greenville Cty.* (4th Cir.2002) 303 F.3d 523, 535; *M.S. v. Mullica Tp. Bd. of Educ.* (D.N.J. 2007) 485 F.Supp.2d 555, 568 [denying reimbursement because parents failed to cooperate in completion of IEP]; *E.P. v. San Ramon Valley Unified School Dist.* (N.D.Cal., June 21, 2007, Case No. C05-01390) 2007 WL 1795747, pp. 10-11 [nonpub. opn.].)

Several courts have declined to grant relief to parents who conceal assessment results from the IEP team or prevent the district from assessing. (See, e.g., *Robert M. v. Hawaii* (D.Hawaii, Dec. 19, 2008, No. 07-00432) 2008 WL 5272779 [nonpub. opn.][parents withheld private assessment information, stopped district assessments]; *Glendale Unified School Dist. v. Almasi* (C.D.Cal. 2000) 122 F.Supp.2d 1093, 1109-1110 [parent withheld private assessment information].)

When parental non-cooperation obstructs the IEP process, courts usually hold that procedural violations in that process do not deny the student a FAPE. In *C.G. v. Five Town Community School Dist.* (1st Cir. 2008) 513 F.3d 279, for example, the Court of Appeals held that an IEP was incomplete only because of parents' obstruction of the IEP process, and if parents had cooperated, the IEP would have been adequate.

In *M.M. v. School Dist. of Greenville County* (4th Cir. 2002) 303 F.3d 503, 535, a school district's failure to have an IEP in place at the beginning of the school year was held harmless, in part because there was "no evidence that [student's] parents would have accepted any FAPE offered by the District that did not include reimbursement for [parents' preferred] program." (See also, *Miller v. San Mateo-Foster City Unified School Dist.* (N.D.Ca. 2004) 318 F.Supp.2d 851, 863 [no compensable injury from child find violation where parents had no intention of returning student to public school].)

Here, Parents refused to provide consent for assessments that they had asked for; signed assessment plans and IEPs only after cursory reviews; and withheld Dr. Loomos's report from the IEP team for their consideration. These facts establish "parental non-

45

cooperation." As such, this finding provides an additional and independent basis to deny Student's requests for reimbursement or compensatory education.

*Compensatory Education*

School districts may be ordered to provide compensatory education or additional services to a pupil who has been denied a free appropriate public education. (*Student W. v. Puyallup School District* (9th Cir.1994) 31 F.3d 1489, 1496.) The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Ibid.*) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

Here, Student was not denied a FAPE over the time alleged. Accordingly, District is not obligated to provide Student with compensatory education for this reason, as well.

*ESY*

California's standards for ESY eligibility are consistent with longstanding interpretations of federal law. (*Hoeft v. Tucson Unified School Dist.*, *supra*, 967 F.2d at p. 1301; *Cordrey v. Euckert* (6th Cir. 1990) 917 F.2d 1460, 1470; *Alamo Heights Independent School Dist. v. State Bd. of Educ.* (5th Cir. 1986) 790 F.2d 1153, 1158; *Battle v. Pennsylvania* (3d Cir. 1980) 629 F.2d 269, 275; Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed.Reg. 46540, 46582-46583 (Aug. 14, 2006).) The purpose of special education during the ESY is to prevent serious regression over the summer months. The mere possibility of regression does not entitle a student to an ESY placement, because all students may regress to some extent during lengthy breaks from school. A more specific showing is necessary to establish ESY eligibility.

In California, a student is eligible for ESY only if his IEP team finds that interruption of the student's educational programming may cause regression. The team must also find that the likely regression, when coupled with the student's limited recoupment capacity, would render it impossible or unlikely that, without a summer program, the student would attain the level of self-sufficiency and independence that would otherwise be expected in view of his disability. This regression and recoupment analysis must be done by the IEP team. If the analysis results in a decision that the student must have an ESY program to receive a FAPE, that decision must be recorded in the student's IEP.

46

Here, District IEPs or proposed IEPs offered summer programs consistent with ESY requirements. Student either participated in ESY or Parents declined District's offer for him to do so.

*Reimbursement*

Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when the school district has failed to provide a FAPE, and the private placement or services were proper under the IDEA and replaced services that the district failed to provide. (20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300.148(c)(2006); Ed. Code, § 56175; *School Comm. of Burlington v. Dep't of Educ.* (1985) 471 U.S. 359, 369-371 [85 L.Ed.2d 385].) Parents may receive reimbursement for the unilateral placement if it is in an appropriate private setting. (34 C.F.R. § 300.148(c); *Florence County Sch. Dist. Four v. Carter* (1993) 510 U.S. 7, 15-16 [126 L.Ed.2d 284].)

Here, Student failed to meet his burden of proof that District denied him a FAPE; therefore, he is not entitled to reimbursement.

*Res Judicata*

The Education Code contains a specific provision governing the finality of special education due process hearings in California. Education Code section 56505, subdivision (h), provides, "A hearing conducted pursuant to this section shall be the final administrative determination and binding on all parties."

As applied in OAH's decision in *Student v. Los Angeles Unified School Dist.* (2007) Cal. Ofc.Admin Hrngs. Case No. 2007010315, which states:

> The requirement that decision be final is interpreted less strictly for collateral estoppel than for res judicata. It is enough that the previous judgment includes any prior adjudication of an issue 'that is determined to be sufficiently firm to be accorded conclusive effect.' (*Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932;see, 7 Witkin, Cal. Procedure (4th ed. 1997) Judgments, § 312.) A decision in an IDEA due process hearing is entitled to conclusive effect. [Quoting Education Code section 56505, subdivision (h)].

The reimbursement to Parents for Dr. Guterman's report was fully litigated at a prior hearing. Accordingly, Student's request for further reimbursement is barred by the application of res judicata.

*Compliance Report*

The law requires the California Department of Education (CDE) to stay a compliance complaint when a due process complaint is filed in the same topic. (34 C.F.R. 300152 (c)).

Student failed to produce persuasive evidence that District acted improperly with respect to the compliance report.

ORDER[22]

1.    District provided Student with a FAPE for the time period of April 18, 2007, through June 2009.

2.    Student is not entitled to receive reimbursement or compensatory education.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that the hearing decision indicate the extent to which each party has prevailed on each issue heard and decided.  The District prevailed on all issues.

RIGHT TO APPEAL

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety days of receipt of this Decision. (Ed. Code, § 56505, subd. (k).)

DATED: June 21, 2010

/s/
GARY A. GEREN
Administrative Law Judge
Office of Administrative Hearings

---

[22]  On May 18, 2010, Student filed a motion requesting leave to file a brief that exceeded the page limit ordered at hearing; on May 24, 2010, District filed an opposition that included motions to strike Student's brief and a request that Student be sanctioned; that same day, Student filed a reply to District's opposition and motions.  Based on a review of the papers filed, the following order is issued: Student's leave to file a longer brief is granted; District's motion to strike Student's brief and requests for sanctions are denied.