LINA FOLTZ, Attorney-At-Law,  (SB# 167813)
11 Embarcadero West, Suite 230
Oakland, California  94607
Telephone: [510] 663-7199
Facsimile:  [510] 444-8102


Attorney for Plaintiffs M.M.
& E.M.


### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.M. & E.M.,  individually and on behalf of their minor son C. M., | Case No.   C10-04223 SI |
| Plaintiffs, | **SECOND AMENDED COMPLAINT TO REVERSE AN ADMINISTRATIVE DECISION & ORDER PURSUANT TO THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, TO DETERMINE CLAIMS FOR VIOLATION OF FEDERAL & STATE LAW, and TO DETERMINE ATTORNEY FEES & AWARD RELIEF** |
| vs. | |
| LAFAYETTE SCHOOL DISTRICT, a Local Educational Agency and  LAFAYETTE BOARD OF EDUCATION, | |
| Defendants. | |
| | **For Violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§1400-1482; Section 504 of the Rehabilitation Act of 1973;** |
| | **For Declaratory Judgment pursuant to 28 U.S.C. §§ 2201-2202;** |
| | **For Attorney Fees and Costs of Appeal;** |
| | **Demand for Jury Trial.** |

Plaintiff M.M. and E.M., individually and on behalf of their minor son C.M. (collectively, Plaintiffs), allege as follows:

### STATEMENT OF RELATED CASE

This case is  related to a pending complaint in case number C09-04624 SI, originally filed on September 30, 2009. Case C09-04624 SI concerns Plaintiffs' request for review of a final administrative order in an action brought by defendant Lafayette School District against Plaintiffs

herein and Plaintiffs' claims against defendants Lafayette School District and Lafayette Board of Education for violations of the IDEA, § 504 of the Rehabilitation Act and due process rights under the Fourteenth Amendment. The California Department of General Services (DGS) currently is an additional party in case C09-04624 SI. DGS is not a party in this case.

## JURISDICTION AND VENUE

This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, over claims arising under federal law, including, the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482 and § 504 of the Rehabilitation Act of 1973. Pursuant to the IDEA, § 1415(i)(2-3), this Court has original jurisdiction to review the final administrative order issued on June 21, 2010, by the Office of Administrative Hearings-Special Education Division (OAH), a division of the California Department of General Services (DGS), as designee for the California Department of Education (CDE). Plaintiffs are parties "aggrieved by the findings and decision," within the meaning of § 1415(i)(2) of the IDEA. This Court has original jurisdiction to grant declaratory relief requested pursuant to 28 U.S.C. §§ 2201-2202 upon claims for violation of the IDEA and § 504 of the Rehabilitation Act, federal regulations promulgated under the federal acts and for violations of California Education Code §§ 56000 et. seq., which implement the IDEA mandate.

This action seeks *de novo* review of the OAH decision and order, review of a prior OAH order which summarily dismissed some of Plaintiffs' claims as time barred, and determination of attorney fees pursuant to the IDEA. Plaintiffs also seek declaratory relief, compensatory damages and such other relief as the Court deems proper for defendants' violations of the IDEA, § 504 of the Rehabilitation Act.

Venue is proper in the Northern District of California because defendants are located in this district and the events which are the subject of this complaint occurred within this district.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure, Rule 38(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

**1.** Plaintiffs exhausted their administrative remedies by obtaining final adjudication of administrative claims brought under the IDEA in consolidated OAH Cases N2009040640 and N2009081105.

## CASE SUMMARY

**2.**   Plaintiffs filed a prior District Court complaint which sought review of an OAH administrative order that dismissed some of Plaintiffs' IDEA claims as time barred and alleging claims for violations of federal law.  The District Court dismissed that action without prejudice as to defendant Lafayette School District and Lafayette Board of Education.[1]  This action follows exhaustion of Plaintiffs' administrative remedies through final through administrative decision and order, issue on June 21, 2010, regarding Plaintiffs' IDEA claims which are subject to that administrative process.  The June 21, 2010, administrative decision and order did not address OAH's prior dismissal of Plaintiff's claims as time barred.  Plaintiffs reallege here that the hearing officer erred when OAH dismissed Plaintiffs' claims as time barred and Plaintiffs seek review of the final administrative decision and order as erroneous.  A copy of the OAH decision and order, and a copy of the OAH order dismissing claims as time barred, are attached hereto.

**3.**       Plaintiffs allege that the OAH and its hearing officers erred and violated Plaintiffs' rights to IDEA procedural safeguards and Plaintiffs' due process rights by employing OAH procedures during the administrative hearing that are inconsistent with express and mandatory IDEA procedures.  The hearing officer improperly excluded material evidence, committed multiple errors of law, made findings that were not supported by evidence and failed to give due weight to the evidence during approximately ninety hours of administrative hearing.  Plaintiffs request to supplement the administrative record with evidence, including evidence that the hearing officer improperly excluded, and seek *de novo* review of the administrative decision.  Plaintiffs request the Court to vacate the administrative decision and orders and to enter a new order, finding that the applicable law and the evidence establish Plaintiffs' material allegations, as set forth in their administrative complaint, including claims dismissed in error as time barred, and finding Plaintiffs are entitled to relief requested and attorney fees under the IDEA.

**4.**  Plaintiffs allege that the conduct of District Defendants violated § 504 of the Rehabilitation Act by failing to provide CM reasonable accommodations to address his learning disability, by failing to

---

[1]Claims against the California Department of Education and the California Department of General Services were also dismissed.

provide CM with a free and appropriate public education to meet his needs as adequately as the needs of non-disabled students are met.  Plaintiffs also allege that district defendants violated § 504 by retaliating against CM and his parents when defendants deviated from prescribed IDEA procedures by responding to CM's parents' IEE request for an independent educational evaluation (IEE) in bad faith, intending to obstruct Plaintiffs' rights to IDEA procedural safeguards because the family sought an IEE and advocated for the special education and related services to which CM was entitled.

## PARTIES

**5.**   Plaintiff C.M. (CM or the Student) is a minor, born on September 26, 1999.  At all relevant times, CM resided with his parents in the city of Lafayette and attended public school in the Lafayette School District service area.  On April 18, 2007, CM's individual education plan team (IEP team) found CM eligible to receive special education and related services from Lafayette School District as an individual with a disability within the meaning of 20 U.S.C. § 1401(3) and as an individual with exceptional needs within the meaning of California Education Code § 56026.

**6.**   Plaintiff, E.M. (Mother or EM) is CM's parent, and at all relevant times resided with CM in Contra Costa County, city of Lafayette, California.

**7.**   Plaintiff, M.M. (Father or MM) is CM's parent, and at all relevant times resided with CM in Contra Costa County, city of Lafayette, California.

**8.**   Defendant, LAFAYETTE SCHOOL DISTRICT (District), is a public school district and local educational agency (LEA), under the IDEA, duly organized and existing under California law, and located within Contra Costa County.  At all relevant times, IDEA required the District to locate, identify and evaluate children, including CM, who are in need of special education and related services regardless of the severity of their disability, an IDEA obligation commonly referred to as "child find."  At all relevant times, District was responsible for evaluating CM to identify his eligibility and unique needs for special education and related services and for providing him with a free and appropriate public education (FAPE), in conformity with requirements of the IDEA and corresponding California law.  District receives federal funding and financial assistance, including, but not limited to, funding under the IDEA.

**9.**   Defendant LAFAYETTE BOARD OF EDUCATION (Lafayette Board or District Board) is and was, at all relevant times, the duly constituted and acting governing board of the Lafayette School District and

is responsible for authorizing and overseeing District operations, ensuring that District complies with federal and State law, including the IDEA, and fulfils its obligations for education of students attending school, receiving and/or entitled to receive a public education within the District service area.

**10.** The Lafayette Board and District collectively are referred to herein as the "District Defendants."

## ALLEGATIONS & FACTS ESTABLISHED AT HEARING

KINDERGARTEN - CM's 2005-2006 school year

**11.** Beginning in Fall 2005, as part of District Defendants' obligation as a recipient of federal funding, District conducted "universal assessments" of CM and all students, kindergarten through fifth grade. The purpose of the assessments to identify students who were below expected proficiency levels in language arts, to provide intervention and to monitor students' progress as part of the federal "response to intervention" model.  District convened staff meetings for each grade-level where teachers, reading specialists and administrators discussed interventions to be employed for CM and other children who ranked well below grade-level or below benchmarks for grade level performance. District tracked CM's and other the students' progress toward proficiency State academic content standards.  District applied the same RTI model to identify, intervene and track CM's and other students' proficiency in mathematics, beginning in first grade.

**12.** CM began kindergarten in the District in 2005, at age six, and was one of the oldest children in class.  Although CM attended an educational preschool for two years before entering kindergarten, he displayed deficits in areas of reading, articulation and vision and fine motor skills.  CM was below basic State level standards for language proficiency in Kindergarten.  CM's known deficits manifested in kindergarten, in part, as severe dyslexia and constituted a learning disability which District Defendants knew or should have known at that time constituted a learning disability that qualified CM to receive special education and related services pursuant to the IDEA.

**13.** Beginning on August 31, 2005 in kindergarten, CM participated in District's universal assessments three times per year and District tracked his response to interventions.  During kindergarten, District provided reading, speech and language services and occupational therapy to CM as a "guest" but did not evaluate CM's eligibility for special education and related services under the IDEA.  CM continued to score significantly behind his grade-level benchmarks despite the interventions.

**14.** During kindergarten, District knew or should have known that CM required an evaluation[2] in conformity with IDEA to determine his eligibility and needs for special education and related services. Despite earlier referrals for evaluation from CM's parents and teacher, District did not initiate the evaluation until February 20, 2007, Spring of 2007.

**15.** District did not provide CM's parents with information regarding CM's universal assessment result. District did not inform CM's parents or provide documentation about the types of interventions being used for CM or the effectiveness of those interventions, from CM's kindergarten through his third grade year. District provided CM's tri-annual report cards to CM's parents that indicated CM was struggling in school.

**16.** District's failure to evaluate CM and to identify his eligibility and unique needs for special education and related services caused CM to lose educational benefit, beginning in kindergarten, CM's 2005-2006 school year and continuing until April 18, 2007.

**17.** District's failure to provide CM's parents with "response to intervention" information prevented CM's parents from knowing or having reason to know the extent and nature of CM's learning problems and the ineffectiveness of interventions that the District employed.

**18.** CM attended a District remedial summer school program between kindergarten and first grade because he had not achieved basic proficiency of kindergarten state level standards.

FIRST GRADE - CM's 2006-2007 school year

**19.** In first grade, CM continued to participate in universal evaluations that measured his response to interventions used by District.

**20.** On or about October 26, 2006, during CM's first grade year, CM's parents requested District to evaluate CM's learning difficulties. District did not provide an assessment plan within fifteen days of CM's parents' referral for evaluation, as is required by California Education Code § 56321, which implements IDEA requirements. Nor did District complete an evaluation or convene an individual education plan (IEP) team meeting within sixty days of CM's parents' referral, as was required by the IDEA.

**21.** In November 2007, District staff began a series of student study team (SST) meetings with CM's

---

[2] "Evaluation" is the term used in the IDEA to identify the statutorily prescribed evaluation. Assessment, under California law, sometimes refers to an evaluation under the IDEA and sometimes is used generally for other types of evaluations.

parents to discuss CM's poor school performance and his parents' concerns.  District did not provide CM's parents with notice of their rights under the IDEA or information about CM's response to intervention in conjunction with the SST meetings.

**22.**  On or about February 20, 2007, District's instructional support teacher, Ms. Jones, encountered CM's mother while she was at the school and presented CM's mother with an assessment plan to sign immediately.  Ms. Jones told CM's mother that she must sign the assessment plan to obtain an evaluation for CM. CM's mother signed the plan immediately and handed back to Ms. Jones and Ms. Jones gave CM's mother a carbon copy.  District did not provide CM's parents with notice of IDEA procedural or substantive rights when CM's mother received the assessment plan copy.

DISTRICT'S Initial Evaluation

**23.**  In or about March and April 2007, District staff conducted CM's initial evaluation of CM's eligibility and needs for special education and related services.

**24.**  The IDEA requires participating states, including California, to establish qualifications for individuals who conduct evaluations under the IDEA. 20 U.S.C.A. § 1412(a)(14). Accordingly, California Education Code § 56320 requires individually administered test of intellectual or emotional functioning under the IDEA to be conducted by a credentialed school psychologist.  California Education Code § 56324 further requires any psychological assessment under the IDEA to be conducted by a credentialed school psychologist.

**25.**  As part of District's initial evaluation of CM, Ms. Jones, CM's instructional support teacher for language arts interventions since kindergarten, administered tests to measure CM's academic achievement.

**26.**  Ms Jones reported CM's academic achievement test results, noting that CM spelled "six" as "xoe" and "are" as "ard."  Ms Jones reported that CM was able to write a basic 4-word sentence with "inventive spelling" and "had difficulty completing a sentence that required two words at the end." "When attempting to spell an unknown word [CM] said sounds while printing but often the sounds were not sounds found in the word." Ms. Jones did not report CM's academic achievement test results in relation to State academic standards.

**27.**  CM's reading fluency could not be tested by Ms. Jones because CM was unable to read simple

sentences.  Ms. Jones reported: "He was unable to read 'dog' as he reversed the 'd' for 'b' and read 'big' then 'boy.' . . . He did not display the ability to decode words, for example, 'as' was decoded first of all as 'es' and then 'aiz.' . . .  "When reading sentences with a picture prompt he relied heavily on the pictures, skipped words he could not read, and made guesses."  Ms. Jones concluded that CM displayed weakness in areas of reading, spelling and written language and a significant discrepancy between ability and academic performance that may require special services in the area of language arts.

**28.**  A student intern school psychologist administered and reported CM's individual tests of intellectual and emotional functioning and his psychological tests.  No credentialed school psychologist observed or supervised the student intern's administration of tests to CM.

**29.**  As part of a pattern and practice by District Defendants, District employed the student intern, who was working toward completion of her school psychologist credential, and directed her to independently administer CM's individual tests of intellectual and emotional functioning and psychological tests for CM's IDEA evaluation, in violation of California law and the IDEA.

**30.**  On April 18, 2007, District staff and CM's parents met for CM's first IEP team meeting to discuss District's initial evaluation results.  The student intern reported the results of her test administration and presented her written report.  The IEP team determined CM was eligible for special education and related services and developed a program and services based upon District's initial evaluation results.  The IEP team did not review documentation and District staff did not report CM's response to prior interventions.

**31.**  District staff who attended CM's initial IEP team meeting did not include persons who were required under the IDEA to attend the meeting.  The IEP team did not include a school psychologist, speech-language pathologist or reading specialist or "person qualified to conduct individual diagnostic examinations of children," as was required by the IDEA.  34 C.F.R. § 300.308.  District's school psychologist intern was not qualified to substitute as a "credentialed school psychologist" as a matter of law.

**32.**  District first provided C.M.'s parents with notice of their procedural and substantive rights under the IDEA at the April 18, 2007 IEP team meeting.  CM's parents did not know or have reason to know their rights to procedural safeguards under IDEA until they received the written notice at the IEP team meeting.

**33.**  CM's initial evaluation results indicated that CM had auditory processing deficits that should have

been further evaluated.  District's initial evaluation did not include an assessment of CM's auditory processing disorder and did not identify his severe dyslexia.  District's initial evaluation was inappropriate under the IDEA, in part, because it did not enable his IEP team to identify CM's unique needs for special education and related services.  District's test instruments were not in the form mandated under the IDEA and the form of District's tests significantly understated CM's cognitive ability. Because District's student intern was not qualified she administered psychological tests she failed to recognize the significance of CM's test responses in relation to his dyslexia and processing deficits.

**34.** CM's initial evaluation failed to accurately identify CM's ability and unique needs, in part, because an unqualified student intern administered CM's individual testing in domains of intellectual and emotional functioning but was unable to properly interpret important results.

**35.** Prior to the intern's presentation of District's initial evaluation report on April 18, 2007, CM's parents could not know or have reason to know that District's initial evaluation violated requirements of the IDEA and corresponding California law.

**36.** CM was found eligible for special education and related services based upon identification of his specific learning disability.[3]  District's evaluation did not identify CM's dyslexia or auditory processing disorder in relation to CM's type of specific learning disability or unique needs. District's general identification of CM's specific learning disability and phonological processing deficits was insufficient to identify CM's unique needs for special education and related services that would allow him to access his education or progress appropriately in the general curriculum at his ability level.  Therefore, CM's IEP team failed to design CM's IEP to meet his needs as adequately as the District meets the needs of non-disabled students.

**37.** District withheld information from CM's parents about rights to procedural and substantive rights under IDEA.  District misinformed CM's parents about CM's educational progress, deficits and needs both before and after April 18, 2007.

---

[3]The term "specific learning disability" means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell or do mathematical calculations.  Such term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.  20 U.S.C. § 1401(30).

**38.**  The IDEA required District Defendants, as part of its initial evaluation, to document and report to CM's parents interventions District used and the effectiveness of such interventions. 34 C.F.R. § 300.311(a)(7).[4]  District Defendants withheld material information from CM's parents regarding District's universal testing that showed CM's continuing failure to meet grade-level benchmarks and CM's failure to gain proficiency in response to District's interventions.

**39.**  If District Defendants would have provided response-to-intervention information to CM's parents, CM's parents would have questioned District's April 2007 evaluation report and service offer, which continued to provide interventions that were ineffective.  District Defendant's withholding of such material information prevented CM's parents from meaningfully participation in IEP team decisions regarding CM's educational program and needs.

**40.**  During the remaining two months of CM's first-grade year and during CM's second grade year, 2007-2008, CM's parents told District staff that the parents' had ongoing concerns that CM seemed to be falling farther behind at school and to have unidentified educational needs which prevented his educational progress. CM's parents sought additional evaluations concerning CM's speech-language needs and auditory processing, but District declined to provide those evaluations.

SECOND GRADE - CM's 2007-2008 school year

**41.**  Between November 2007 and March 2008, CM's parents obtained a private evaluation of CM's auditory processing from an audiologist and a processing assessment from a speech language pathologist.  CM's parents learned from those evaluations that CM had deficits that constituted an auditory processing disorder. District failed to identify or address CM's auditory processing disorder and dyslexia as material elements necessary to address his type of specific learning disability

---

[4]"For a child suspected of having a specific learning disability, the documentation of eligibility, as required in § 300.306(a)(2) must contain a statement of (1) whether the child has a specific learning disability; (the basis for making the determination . . . (7) *If the child has participated* in a process that assesses the child's *response to intervention* – (i) The instructional strategies used and the student-centered data collected; and (ii) The documentation that the child's parents were notified about – (A) The State's policies regarding the amount and nature of student performance data that would be collected and the general education services that would be provided;(B) Strategies for increasing the child's rate of learning; and (C) The parents' right to request an evaluation.   34 C.F.R. § 300.311(a)(7).

sufficiently to access the general curriculum at his grade and ability level.

**42.** In or about January 2008, CM's mother provided a District with copies of the audiologist's auditory processing evaluation report. The report identified deficits in CM's ability to process auditory information and recommended both therapeutic interventions and class-room accommodations necessary for CM to access his education. District did not timely implement the recommendations or convene an IEP team meeting to discuss the evaluation results.

**43.** The auditory processing evaluation report informed District that CM's auditory processing deficits impaired his ability to integrate sensory input across hemispheres of his brain and that CM's integration deficits were likely to adversely impact other areas of function related to learning, including integrative language tasks like reading and writing.

**44.** Dr. Loomos' auditory processing report stated: "Children displaying signs of poor integration skills on [central auditory processing] tests may also demonstrate deficits in auditory-visual and/or visual-motor integration skills (e.g. writing, reading recognition, spelling, etc.) or matching linguistic output with appropriate affect (pragmatics) because of difficulty coordinating multi-sensory input/output. . . . Weak integrators have those problems not because they hear the phonemes poorly, but because they have trouble recognizing and using the patterns or "wholes" necessary for word recognition and spelling."

**45.** Dr. Loomos' report recommended an evaluation by a speech-language pathologist of CM's "skills in key word extraction, nonverbal language, and abstract/figurative language."

**46.** On or about February 27, 2008, CM's parents obtained a "Processing Assessment" from Dr. Deborah Ross-Swain, a Speech-Language Pathologist and Ed.D. CM's parent discussed the evaluation results with Dr. Swain at a post-test meeting, immediately after testing. CM's mother promptly reported the oral report and discussion of CM's processing assessment with District staff.

**47.** On or about March 18, 2008, District convened CM's first annual IEP team meeting to review CM's educational program plan and needs. At the time of the IEP meeting, District had received the written report by Dr. Loomos, the audiologist, and CM's mother had relayed the preliminary findings reported by the speech language pathologist regarding CM's Processing Assessment. District did not discuss, offer or recommend any change CM's IEP services or class-room accommodations, despite

those recommended by CM's private evaluators.  District did not seek further evaluations.  District staff reported that CM was making progress when CM actually was falling farther behind in grade-level performance.

**48.**  CM's parents received a written "Processing Assessment" report from Dr. Swain, dated March 24, 2008, which confirmed CM's auditory processing deficits and recommended therapeutic interventions, environmental modifications and compensatory strategies for CM.  CM's parents promptly provided a copy of the written report to District staff. District did not implement recommendations or alter CM's services or class-room accommodations in response to the written Processing Assessment report.

**49.**  CM's parents asked District to conduct a speech-language evaluation in the areas recommended by Dr. Loomos. CM did not receive a speech-language in the areas of key word extraction, non-verbal language and abstract/figurative language, as Dr. Loomos recommended.  District did not conduct a speech-language evaluation to address CM's problems with reading and written language.[5]

THIRD GRADE - CM's 2008-2009 school year

**50.**  At the beginning of third grade, CM's parents requested an IEP team meeting.  On September 17, 2008, CM's parents met with District staff for an IEP team meeting to discuss the parents' request for District to conduct a speech-language evaluation and their request for revised goals and objectives, to incorporate grade-level criteria for objective measure of CM's academic progress.   The IEP team members discussed the family's concerns about CM's poor progress in school and CM's increasing anxiety about his school failures and inability to read.  District staff, for the first time stated that CM's low average cognitive ability accounted for CM's slow progress in developing functional skills for reading and written language.  District staff asserted that CM was making adequate progress for his ability level.

**51.**  At the IEP team meeting, CM's parents notified District that they disagreed with District's initial evaluation and requested an independent educational evaluation (IEE) pursuant to the IDEA.  District did not provide the IEE and did not file a timely hearing request as required by IDEA.

**52.**  At the September 17, 2008 IEP team meeting, District staff told CM's parents that they would draft

---

[5]District conducted a speech-language evaluation in September and November 2008, but only evaluated CM's oral language functioning which was an area of relative strength.

revised goals and objectives in two weeks, using District's universal assessment results for CM. District staff told CM's parents that CM's universal testing results were sufficient to identify CM's present levels of achievement and develop goals and objectives that included grade-level criteria for objective measure of CM's academic progress. No District IEP team member suggested that the District should reevaluate CM or that additional data were needed to revise the goals and objectives or for any other purpose.

**53.** When CM's parents disagreed with District's initial evaluation and requested an IEE at the IEP team meeting, the IDEA required District to file a due process complaint without unnecessary delay to demonstrate that its initial evaluation of CM was appropriate under the IDEA, unless District elected to provide CM with the IEE as his Parents requested. 20 U.S.C. § 1415(b), 34 C.F.R. § 300.502(b).

**54.** On or about September 25, 2008, District's Director of Student Services, Dana Sassone, Ph.D., instead issued a letter to CM's parents responding their request for an IEE and revised reading goals. Dr. Sassone wrote: " . . . it appears you believe that conditions have changed which warrant an assessment. You have also requested new goals be written in the area of reading. The district is therefore proposing an assessment which includes a vision and OT assessment . . . you have also requested." Enclosed with Dr. Sassone's letter was an assessment plan dated September 24, 2008, that Dr. Sassone prepared without an IEP team determination or parent participation in a decision of whether and why a reevaluation was needed. CM's parents did not request the District reevaluation that Dr. Sassone proposed as a substitute for an IEE.

**55.** The IDEA required CM's IEP team to determine whether reevaluation was needed and the data that was sought from reevaluation. 20 U.S.C. § 1414(a)(2), (b-c).

**56.** The IDEA required CM's IEP team "as part of any reevaluation . . . to review existing evaluation data on the child, including evaluations and information provided by the parents of the child; . . . current classroom-based or State assessments, and . . . observations . . .; and . . . on the basis of that review, and input the child's parents, identify what additional data, if any, are needed . . ." 20 U.S.C. § 1414(c).

**57.** CM's IEP team did not determine that additional data were needed or that reassessment was warranted for any reason as a basis for Dr. Sassone's assessment plan. Dr. Sassone had never attended an IEP team meeting for CM at the time she developed and submitted her assessment plan to CM's parents. District Defendants supported, endorsed and/or ratified Dr. Sassone's development of the assessment plan, without an IEP team determination of need or purpose, in order to coerce Plaintiffs into abandoning their IEE request.

**58.** Dr. Sassone submitted her assessment plan to CM's parents intending to compel a District reevaluation as a substitute for the IEE CM's parents requested. Dr. Sassone's proposed assessment plan was a pretext for District Defendants' intentional obstruction of Plaintiffs' IDEA right to seek an IEE under the IDEA.

**59.** District Defendants endorsed and approved Dr. Sassone's conduct in seeking a reevaluation to thwart CM's parents' IEE request and to retaliate against CM's parents their advocacy for CM to obtain necessary and appropriate special education and related services under the IDEA. District Defendants knew or should have know that Dr. Sassone's conduct violated the IDEA and Plaintiffs' rights to IDEA procedural safeguards. District Defendants' conduct violated the IDEA and constituted unlawful retaliation in violation of § 504 of the Rehabilitation Act.

**60.** On or about October 20, 2008, CM's parents obtained a private evaluation at Lindamood-Bell Learning Processes (LMB). CM's actual grade-level was 3.2, third grade and two months. CM's test results showed that CM had not made appropriate progress since his initial IEP date. CM's reading ability score was at grade-level 1.6, spelling at grade 1.7, his reading rate at grade 1.4, reading fluency at grade 1.2, and reading accuracy at below first grade level. CM's word attack ability score was grade-level 2.3 and his reading comprehension score was grade-level 2.4. In contrast, CM's picture vocabulary score was grade-level 3.8 and mathematical computation score was grade-level 3.0. CM's parents promptly provided the LMB evaluation results to District.

**61.** After CM's parents requested an IEE, District also initiated a process of multiple IEP team meetings that were "facilitated" by an agent of the Special Education Local Plan Area (SELPA). The SELPA is an educational agency that assisted the District to advocated District's position. The SELPA facilitator told CM's parents that they should withdraw their IEE request and permit District to conduct its proposed reevaluation if the parents planned to remain in the District's service area. Upon information and belief, the SELPA facilitator made the statement on behalf of District Defendants to intimidate Plaintiffs from seeking an IEE for CM. On or about November 18, 2008, CM's first facilitated IEP team met to develop CM's new goals and objectives and revise CM's IEP.

**62.** On or about November 18, 2008, CM's parents also filed a compliance complaint with California Department of Education, alleging that District failed to comply with IDEA procedures after the parents made their IEE request.

**63.** On or about December 1, 2008, CDE notified Plaintiffs that it had opened an investigation of Plaintiffs' allegations, including the allegation that District failed to either provide an IEE or seek an administrative hearing to defend District's initial evaluation without unnecessary delay.

**64.** CDE was obligated under IDEA and California law to complete its investigation of the parents' compliance complaint within 60 days of accepting Plaintiffs' complaint and to order corrective action, if CDE found a violation.  34 C.F.R. § 300.152(a), 5 Cal. Code of Regs. § 4662(b).[6]

**65.** Upon information and belief, District Defendants received notice of CDE's investigation and filed District's hearing request in response to CDE's notice that CDE had commenced an investigation, intending to prevent CDE's investigation.

**66.** On December 2, 2008, CM's parents commenced an independent evaluation of CM by Dr. Tina Guterman, Ph.D., a psychologist with extensive experience in diagnosis of learning disabilities.  Dr. Guterman conducted individual tests of CM's intellectual and emotional functioning, psychological processing tests and tests of academic achievement.

**67.** Dr. Guterman determined that District's initial evaluation significantly understated CM's intellectual ability and that District's failure to identify CM's dyslexia prevented District staff from providing interventions to address CM's unique educational needs.  Dr. Guterman confirmed that CM had not made appropriate academic progress since District's initial evaluation in early 2007.

**68.** On or about December 3, 2008, District filed a due process hearing complaint asserting that CM's parents were not permitted to request an IEE based upon their disagreement with District's initial evaluation reported April 18, 2007; that District was entitled to reassess CM if reassessment was warranted and that District's initial evaluation was appropriate.  District did not assert necessary delay or any facts regarding a reason for its delay in seeking an administrative hearing.

**69.** On or about December 19, 2008, attorney for the District requested CDE to stay its investigation of Plaintiffs' complaint, alleging that "the IEE issue" was pending before OAH.  District's representation that CM's parents' compliance complaint issue was part of District's due process issues was false.  District's violation of IDEA procedures regarding Plaintiffs' IEE request was not the same as the "IEE

---

[6]"An investigation will be completed within 60 days after receiving a request for direct intervention . . . ."  5 Cal. Code of Regs. § 4662(b).

issue" that District raised in its due process complaint and District knew or should have known that fact.

**70.**  In response to District's request and without appropriate review of whether its investigation must be completed as required by the IDEA, CDE closed its investigation of the parents' compliance complaint issue regarding District alleged failure to adhere to required procedures after CM's parents notified District that they disagreed with District's initial evaluation and requested an  IEE.

**71.**  On or about January 30, 2009, CDE issued its investigation report.  CDE's report notified CM's parents that CDE had closed its investigation of the parents' first allegation regarding District's failure to comply with IDEA procedures and obligation to ensure Plaintiffs received an IEE at public expense.  CDE ordered corrective action by District for violations established through CDE's investigation of the parent's second allegation.

**72.**  District Defendants' false statements to CDE, that District's due process issues included Plaintiffs' first compliance complaint issue, and request to stay CDE's investigation stopped CDE from completing its investigation of Plaintiffs' first complaint allegation and damaged Plaintiffs by causing them to incur expenses and injuries to defend against District's claims in a due process hearing.

**73.**  In or about February 2009, Plaintiffs pled that District was not entitled to an administrative hearing on whether District's initial evaluation was appropriate unless and until District demonstrated that it had sought a due process hearing on the issue without unnecessary delay.  OAH denied Plaintiffs' multiple written and oral requests for OAH first to determine whether District's unnecessary delay precluded District from obtaining an due process hearing to defend the appropriateness of its initial evaluation.

**74.**  In or about March 2009, CM suffered an emotional collapse and required emergency and ongoing psychological counseling regarding his severe depression over his inability to participate in the general curriculum and acquire academic proficiency at school.

**75.**  OAH conducted an administrative hearing on April 30, May 1 and May 18, 2009 in OAH Case # N2008120161.  On July 1, 2009, OAH issued its decision and order, finding District failed to timely seek a due process hearing to defend its initial evaluation.  The hearing officer did not make findings upon whether District's initial evaluation violated IDEA, even thought the statutory basis for District obtaining an administrative hearing on whether Plaintiffs were entitled to an IEE was District's obligation to establish that its evaluation was appropriate under the IDEA.

**76.** The hearing officer's failure to determine the necessary jurisdictional claim, upon which District was required to prevail in OAH case N2008-120161, violated the IDEA and improperly shifted the burden of proof to Plaintiffs to establish in Plaintiffs' subsequent hearing that District's initial evaluation was not appropriate under the IDEA and corresponding California law.

PLAINTIFFS' ADMINISTRATIVE COMPLAINTS

**77.** On or about April 16, 2009, Plaintiffs filed a due process complaint with the OAH alleging multiple denials of a FAPE to CM from kindergarten through first grade, CM's 2006-2007 school year. Plaintiffs alleged that District violated the IDEA by (1) failing to conduct child find to identify CM as eligible for special education and related services prior to April 18, 2007; (2) failing to timely evaluate CM and convene an IEP team meeting after his parents request; (3) failing to conduct District's initial evaluation in conformity with IDEA requirements; (4) violating IDEA procedural requirements, and (5) failing to provide necessary and appropriate services to address CM's unique need for special education and related services, through Summer 2007.

**78.** On or about August 28, 2009, Plaintiffs filed a due process complaint with the OAH alleging that District failed to evaluate CM in conformity with the IDEA from his 2007-2008 school year through his 2008-2009 school year. Plaintiffs' complaint also alleged that District violated the IDEA or denied CM a FAPE by conduct, including, (1) failing to convene an IEP team that included required team members; (2) failing to provide CM's parents with IDEA prescribed notice or an IEE after the parents request; (3) permitting a District administrator, rather than CM's IEP team, to seek reassessment of CM; (4) improperly causing closure of Plaintiffs' CDE complaint; (5) failing to identify CM's unique needs and provide appropriate services and accommodations; (6) failing to develop IEPs that complied with IDEA requirements.

IDEA STATUTORY FRAMEWORK

**79.** IDEA required the District to identify, locate and evaluate CM's need for special education and related services under "child find." Pursuant to the IDEA and California law.[7]

---

[7] "A State is eligible for assistance . . . if the State . . . has in effect policies and procedures to ensure that the State meets each of the following conditions . . . (3) Child Find. . . . All children with disabilities residing in the State, . . . and who are in need of special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a).

**80.** IDEA required District to evaluate CM in conformity with IDEA requirements. 20 U.S.C. § 1412(a)(7).[8]

**81.** The IDEA required District to conduct an initial evaluation of CM to determine whether CM was a child with a disability, and if so, to offer services to address his individual needs for special education and related services. 20 U.S.C. § 1414(b)(2). The IDEA required an appropriate evaluation to be conducted by qualified staff using technically sound test instruments in the form "most likely to yield accurate information on what [CM knew] and [could] do academically, developmentally, and functionally." 20 U.S.C. § 1414(b)(3). The IDEA required District to evaluate CM in all areas of suspected disability. 20 U.S.C. § 1414(b)(3). The IDEA authorized District to use a "response to intervention" process to determines if CM responds to scientific, research based interventions. 20 U.S.C. § 1414(b)(6).

82. The IDEA required District to provide CM's parents with data collected by District using the response to intervention model as part of District's initial evaluation report because CM's eligibility was based upon identifying his specific learning disability and CM had participated in a process that assessed his response to interventions. 34 C.F.R. § 300.311(a)(7). The IDEA required District to document that CM's parents were notified about State policies regarding the amount and nature of performance data collected, strategies for increasing CM's rate of learning and the Parents' right to request an evaluation. 34 C.F.R. § 300.311(a)(7). District withheld this material information from CM's parents when it provided District's initial evaluation report.

**83.** The IDEA also required, in part, that District provide special education and related services which were based upon peer-reviewed research according to an IEP that set forth the program and modifications or supports to be provided. 20 U.S.C. § 1414(b).

**84.** IDEA provides a two-year statute of limitations that begins to run from "the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint . . . ." 20 U.S.C. § 1415(f)(3)(C). California law adopts the federal limitations period, requiring a party to file within two years "from the date the party initiating the [administrative hearing] request knew

---

[8]"A State is eligible for assistance . . . if the State . . . has in effect policies and procedures to ensure that the State meets each of the following conditions . . . (7) Evaluation. Children with disabilities are evaluated in accordance with [20 U.S.C. § 1414]." 20 U.S.C. § 1412(a).

or had reason to know of facts underlying the basis for the request." Cal. Educ. Code § 56505(l).

**85.** The two-year statute of limitations time period does not apply to a parent if the parent was prevented from requesting the due process hearing due to the local educational agency's withholding of information from the parent that the IDEA required to be provided. 20 U.S.C. § 1415(f)(3)(D), *see also* Cal. Educ. Code § 56505(l)(2).

PLAINTIFFS' CLAIMS DISMISSED AS TIME-BARRED

**86.** The OAH hearing officer summarily dismissed Plaintiffs claims regarding, "the District's failure to timely find Student eligible to receive special education and related services and failure to timely and properly assess Student." (Order Granting Dismissal, in Part p. 2).[9]

**87.** The hearing officer erred when he dismissed, as time barred, Plaintiffs' claims that District violated IDEA "child find" requirements and failed to evaluate CM in conformity with IDEA requirements.

**88.** District's failure to fulfill its "child find" obligations and its failure to conduct its initial evaluation of CM in conformity with the IDEA and corresponding California law constitute the alleged actions which formed the basis of Plaintiffs' claims which the hearing officer dismissed as time barred.

**89.** The statute of limitations did not begin to run until Plaintiffs had both knowledge of their IDEA rights and knowledge of District's acts or omissions that violated those rights.

**90.** Plaintiffs did not know or have reason to know that District had a "child find" duty before April 18, 2007, at the earliest. Plaintiffs did not know or have reason to know necessary facts regarding the results of District's initial evaluation before District staff first presented its evaluation report findings at CM's first IEP team meeting on April 18, 2007.

**91.** District also withheld information from CM's parents, including, information regarding CM's response to intervention and Plaintiffs' rights to an IDEA evaluation. The IDEA and corresponding California law required District to provide CM's parents with such information. Plaintiffs did not know or have reason to know the facts underlying their claims of District's failure to conduct child find duties or defects in District's

---

[9]"Student alleges, . . . claims against the District that occurred before April 16, 2007, regarding the District's failure to timely find Student eligible to receive special education services and failing to timely and properly assess Student. . . . The fact that Student's parents were not aware and had no reason to know that the District violated the [IDEA] is not grounds to toll the two-year statute of limitations." (Dismissal Order p. 2).

initial evaluation and report prior to April 18, 2007 when District first provided CM's parents with notice of their IDEA procedural safeguards.

**92.** IDEA required District to provide written notice of procedural safeguards when CM's parents requested an evaluation of his learning problems in October 2006.  District did not.

**93.** IDEA required District to provide written notice of procedural safeguards in February 2007 when District provided Plaintiffs with the initial assessment plan.  District did not provide the notice.

**94.** The hearing officer erred when he dismissed Plaintiffs' claims in the absence of any evidence to demonstrate Plaintiffs knew or should have know either their IDEA rights concerning "child find" or to an evaluation under the IDEA.

**95.** District's withholding of mandatory written notice of procedural safeguards prevented CM's parents from seeking an administrative hearing and the limitations period did not commence until District provided written notice of procedural safeguards to Plaintiffs on April 18, 2007.

**96.** District also consistently withheld information regarding CM's response to interventions that District had used and misrepresented that CM was progressing appropriately.

**97.** District's failure to conduct CM's initial evaluation pursuant to his parents' request in October 2006 violated IDEA by failing to provide an assessment plan within fifteen days and failing to conduct an evaluation and report results timely.  District's delays caused CM lose educational benefit. District's failure to provide Plaintiffs with notice of their IDEA rights until April 18, 2007, prevented Plaintiffs' requisite knowledge of their IDEA rights to commence the limitations period to run.

**98.** Each of District's IDEA procedural violations resulted in a substantive denial of CM's right to a FAPE, within the meaning of the IDEA, significantly impeded CM's parents' opportunity to participate in the decision making process regarding provision of a FAPE and caused denials of educational benefit to CM.

### FIRST CLAIM FOR RELIEF

### FOR REVERSAL OF THE OAH DISMISSAL ORDER
### (AGAINST ALL DEFENDANTS)

**99.** Plaintiffs re-allege and incorporate by reference paragraphs 1-98 of this complaint as though fully set forth herein.

**100.** Plaintiffs did not know or have reason to know that they should seek an administrative hearing or

remedies for District's violation of "child find" provisions of the IDEA and corresponding California law prior to April 18, 2007. The administrative record in this case and in OAH case N2008120161 established, District did not provide Plaintiffs with notice of their IDEA rights until April 18, 2007 and District withheld necessary information from Plaintiffs that prevented the statute of limitations from commencing to run prior April 18, 2007.

**101.** District's failure to provide Plaintiffs with written notice of IDEA provided procedural safeguards constituted a waiver or exempts Plaintiffs from commencement of the two-year statute of limitations.

**102.** Plaintiffs are entitled to determination that their claims that District's acts and omissions that occurred prior to April 18, 2007, violated "child find" and denied CM a FAPE and that District's initial evaluation was inappropriate. District had the burden of proof to establish that its initial evaluation was appropriate and failed to satisfy its burden.

**SECOND CLAIM FOR RELIEF**

**FOR REVERSAL OF THE OAH HEARING DECISION & ORDER**
**(AGAINST ALL DEFENDANTS)**

**103.** Plaintiffs reallege and incorporate by reference, as though fully set forth herein, paragraphs 1-102, inclusive, of this Complaint.

**ALLEGED ERROR:**

**104.** The hearing officer erred when he concluded that District did not deny CM a free appropriate public education (FAPE) from April 18, 2007 through March 18, 2008.

**105.** The hearing officer erred when he concluded that District did not deny CM a FAPE from March 18, 2008 through March 16, 2009.

**106.** The hearing officer erred when he concluded that District did not deny CM a FAPE from March 16, 2009 through June 2009.

**107.** The hearing officer erred when he concluded District was not required to reimburse CM's parents for educational services and evaluations they obtained privately and was not required to provide CM with compensatory education.

THE HEARING OFFICER IMPROPERLY EXCLUDED EVIDENCE

**108.** The hearing officer erred when he excluded witness testimony and evidence which was disclosed and provided in conformity with IDEA requirements, five business days before hearing. The hearing

officer excluded the evidence finding that Plaintiffs were required to disclose any witnesses and evidence in a prehearing conference statement, submitted on January 15, 2010, over two weeks, or eleven business days, before the first scheduled day of hearing on February 2, 2010.

**109.** On January 25, 2010, Plaintiffs submitted a revised witness list to attorney for District, adding Dr. Judy True as an expert witness within the IDEA-prescribed timeline.  Dr. True would have provided material evidence to prove Plaintiffs administrative claims.

**110.** IDEA regulations authorize the hearing officer to "prohibit the introduction of any evidence at the hearing that has not been disclosed to that party <u>at least five business days</u> before the hearing." 34 C.F.R. § 300.512, *emphasis added*. California Education Code § 56505(e)(6) parallels the IDEA requirement for parties to disclose witnesses five days before hearing.

**111.** The hearing officer prohibited direct testimony by Dr. True even though Plaintiffs provided notice of her testimony timely, in conformity with the IDEA requirements.  The hearing officer held that OAH had authority to promulgate differing deadlines in order to control the orderly conducting of hearings.  Therefore, the hearing officer excluded Dr. True's testimony because Plaintiffs did not disclose Dr. True in their pre-hearing conference statement, eleven business days before hearing.  The hearing officer erred when he reduced the time within which the IDEA and California law authorize parties to disclose evidence and prohibited Plaintiffs from introducing Dr. True's testimony.

**112.** The hearing officer further erred when he excluded Dr. True's rebuttal testimony which was admissible and relevant.

<u>DENIAL OF A FAPE April 18, 2007 through March 17, 2008</u>

**113.** The hearing officer erred as a matter of law when he held that District was not required to conduct its initial evaluation in conformity with the assessment plan to which CM's parent consented. The assessment plan specified that CM's evaluation would be conducted by a psychologist and that CM's motor/perceptual development would be evaluated.  District's initial evaluation was not conducted by a psychologist and did not include evaluation of CM's motor/perceptual development.

**114.** The hearing officer erred as a matter of law when he concluded that District was not required to provide documentation and information to CM's parents regarding District's use of the IDEA "response-to-intervention," including CM's universal testing results,  interventions District employed,

and CM's measured response to such interventions.

**115.** The hearing officer erred when he concluded that District provided adequate information to CM's parents at CM's initial IEP team meeting.  District breached its duty to provide required documentation and information regarding CM's response-to-intervention in conjunction with District's initial evaluation report and failed to notify CM's parents of other required information, including Plaintiffs' right to an evaluation and strategies for increasing CM's rate of learning.

**116.** An IEP team discussion of CM's needs and District's observations about CM's academic progress did not satisfy District's obligation to provide response-to-intervention documentation that the IDEA required and such information would have affected CM's parents' educational planning decisions.

**117.** District's failure to provide information and documentation of CM's response-to-intervention, in conjunction with its initial evaluation report, deprived CM's parents of material information they needed to participate meaningfully in the IEP team decision making for CM and denied CM a FAPE.

**118.** The hearing officer erred when he concluded that the passage of time between District's and Plaintiffs' independent evaluations and CM's maturation in the interim supported an inference that CM may not have had an auditory processing disorder when District conducted its initial evaluation. No evidence supported an inference that CM acquired an auditory processing disorder or corresponding deficits in the intervening period.

**119.** The hearing officer erred when he concluded that CM's auditory processing disorder or dyslexia were addressed in CM's IEP as a subcategory of phonological processing deficit.  District did not identify CM's needs related to the auditory processing deficits or his dyslexia, regardless of the terminology used.  The evidence established that District provided only ineffective general interventions for struggling reader that did not address CM's dyslexia or his underlying processing deficits.

**120.** The hearing officer erred when he concluded that Plaintiffs' experts' lack of "experiential knowledge" in observing CM's struggles at school prevented their accurate measure and identification of CM's auditory processing disorder and dyslexia or prevented accurate identification of CM's resulting educational needs.

**121.** The hearing officer erred when he concluded that District's bare identification of CM's deficits in reading was sufficient to identify CM's unique educational needs.

**122.** The hearing officer erred when he concluded that, despite CM's parents' agreement to the assessment plan that stated a motor/perceptual development evaluation would be conducted, District was not required to conduct an evaluation of CM's motor/perceptual development if District staff believed it was not necessary.

**123.** The hearing officer erred when he concluded that District was not required to evaluate CM's need for assistive technology as part of its initial evaluation of his educational needs because the IDEA required CM's IEP team to consider his need for assistive technology. 20 U.S.C. § 1414(d)(3)(B)(v).

**124.** The IDEA required CM's IEP team to consider and address CM's need for assistive technology, regardless of whether CM's teacher recognized CM's need for it.  Undisputed evidence established that CM was unable to progress academically at his grade or ability level and that CM needed assistive technology to access and participate in the general curriculum.

**125.** CM's independent evaluations identified multiple types of assistive technology, including books on tape, that CM needed to participate in the general curriculum and access contend for reading. District's failure to consider CM's assistive technology needs, because it did not evaluate it, does not support the finding that CM did not require an evaluation of his assistive technology needs.

**126.** The hearing officer erred when he concluded that District's use of general reading interventions satisfied IDEA requirements to identify CM's unique needs related to his severe dyslexia and to include specific services to address CM's dyslexia and auditory processing deficits in his IEP.

**127.** Undisputed evidence and District's own evaluation report confirmed that the District's methodologies, which relied upon repetition, were not appropriate to address CM's dyslexia and reading deficits.  No evidence supported an inference that CM's IEP addressed his unique needs.

**128.** The IDEA required District to provide special education and related services for CM using scientifically based peer-reviewed interventions which were demonstrated to be effective to address CM's unique needs. Undisputed evidence established that District's interventions were not supported by peer-review or research to demonstrate effectiveness.  Nor were District's instructional support services demonstrated include curriculum adopted within the District.

**129.** Undisputed evidence established that scientifically based, peer-reviewed interventions were available to address CM's dyslexia and auditory processing deficits.  And, CM's private providers

who used such interventions effectively to address CM's auditory processing deficits and dyslexia.

**130.** The hearing officer erred when he found that the IDEA assumes "meaningful parent participation" is required to enable District to conduct its initial evaluation of CM in conformity with the IDEA or that CM's parents lacked in effort in attempting to participate in decision making for CM.

**131.** The hearing officer's finding that CM's mother's "cursory review" of District's assessment plan somehow lessened District's obligation or ability to conduct its initial evaluation in conformity with the IDEA was error as a matter of law.

**132.** No evidence suggested that CM's mother engaged in any conduct or neglect or that CM's parents acted other that by fully cooperating with the District and seeking an appropriate initial evaluation of CM and development of an appropriate IEP.

**133.** Undisputed evidence demonstrated that CM's parents sought and anticipated a comprehensive initial evaluation of CM's learning disability and believed his initial assessment plan specified such an evaluation.

**134.** Undisputed evidence demonstrated that CM's mother and father did everything they possibly could to be involved in and contribute to the accurate identification of CM's unique needs.

**135.** The evidence established that CM's parents relied upon District staff as experts to properly conduct CM's initial evaluation as specified in the assessment plan the parents approved. The hearing officer erred as a matter of law in concluding that a parent's supposed "nominal involvement" lessened District's obligation to identify CM's unique needs through an appropriate evaluation.

**136.** The undisputed evidence demonstrated that District failed to conduct its evaluation in conformity with its proposed assessment plan, in part, by failing to conduct the specified testing and failing to have a "psychologist" conduct the psychological portions of the evaluation.

**137.** The evidence established that District's evaluation also violated IDEA requirements for a sufficiently comprehensive and accurate evaluation of CM's disability "to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304. District's evaluation revealed CM's unmet emotional needs.

**138.** California law implementing the IDEA required CM's IDEA evaluation to be conducted, at a minimum, by a credentialed school psychologist. Cal. Edu. Code § 56320(b)(3), § 56324(a).

**139.** The hearing officer erred as a matter of law when he concluded that a school psychologist intern

was qualified to administer individual tests of CM's intellectual and emotional functioning and to conduct psychological assessments when the IDEA and California law require such evaluations to be conducted by a qualified, credentialed school psychologist.

**140.** The hearing officer erred as a matter of law when he concluded that the student intern's "intern" credential permitted District to substitute a student intern for a credentialed school psychologist when conducting testing under the IDEA and that the student intern satisfied requirements for a credentialed school psychologist to attend CM's initial IEP team meeting.

**141.** The evidence at hearing established that the student intern committed material errors in her test administration that led to erroneous measures of CM's intellectual functioning and knowledge, and that her lack of expertise impaired the IEP team's ability to identify CM's unique needs.

**142.** The hearing officer erred when he concluded that CM's mother's education, intelligence or consent to CM's initial IEP precluded District from denying CM's parent of meaningful participation in CM's initial IEP team meeting.  CM's parents' knowledge did not qualify CM's parents to determine the sufficiency of CM's IEP and CM's parents' understanding of CM's unique needs was based upon inaccurate and incomplete information that District provided at CM's initial IEP team meeting.

**143.** The IDEA required District to include IEP team members who were qualified to administer and interpret CM's psychological tests and tests of intellectual functioning.  20 U.S.C. § 1414(b)(4)(6), 34 C.F.R. § 300.308, Cal. Edu. Code § 56341(c).  District's student intern was not qualified to fulfil this duty.

**144.** The evidence established that CM's parents attended the initial IEP team meeting and that CM's initial IEP team did not include persons qualified to conduct CM's evaluation as required by the IDEA, District team members were not qualified to explain the implications of CM's psychological testing results.  Undisputed evidence demonstrated that District substituted a student intern for a credentialed school psychologist and that the intern was not qualified to conduct or explain the implications of CM's initial evaluation results to CM's IEP team.

**145.** The hearing officer erred when he concluded that CM's goals and objectives for his April 2007 IEP satisfied IDEA requirements. Dispositive evidence established that the goals and objectives did not meet IDEA requirements.  The goals and objectives lacked objective baseline measures and objective criteria to measure CM's educational progress.

**146.** The hearing officer also erred when he excluded Dr. True's material direct and rebuttal testimony on the appropriateness of CM's initial IEP, including her testimony on the sufficiency of CM's initial goals and objectives. Dr. True's would have provided material evidence to prove CM's goals and objectives were inadequate under the IDEA and corresponding State law.

**147.** Dr. True had the expertise in development of objectively measurable goals and objectives and identify appropriate special education and related services for CM and would have competently testified on the deficiencies in CM's IEP.

**148.** The hearing officer erred when he concluded that CM's April 2007 IEP was reasonably calculated to provide CM educational benefit or address CM's unique needs, as required by the IDEA.

**149.** The evidence established that CM's IEP failed to identify or provide services to allow CM to participate in the general curriculum and meet state standards for grade-level performance consistent with his ability.

**150.** Substantive evidence did not support a finding that District's instructional support services were designed to or were appropriate to meet CM's unique educational needs related to his severe dyslexia and specific processing deficits.

**151.** The hearing officer erred when he concluded that the instructional support teacher's opinion was competent evidence to support finding that CM made adequate yearly progress between March 2007 and March 2008 and when he excluded Dr. True's competent contrary testimony.

**152.** The IDEA required District to establish goals and objectives for CM to enable him to master statewide standards for his grade-level. Undisputed evidence established that CM was able to learn at a rate to meet those standards with appropriate educational services and supports.

**153.** The evidence established that District staff's subjective opinion, that CM made adequate progress, was based upon District's inaccurate initial assessment report and District staffs' corresponding underestimation of CM's intellectual and academic ability. District staff members' erroneous belief that CM's low average intellectual ability limited his ability to acquire grade-level academic proficiency in reading and written language precluded their competent testimony that CM made adequate progress.

**154.** The hearing officer erred when he concluded that CM's IEP of April 2008 *sic* (2007) included an adequate statement of CM's disability by stating: "During oral discussion [CM's] knowledge and

comprehension are good but when struggling to read comprehension often suffers." The IEP statement, on its face, provides inadequate information to identify the special education and related services CM needed to learn and progress in the general curriculum at his ability level. The evidence conclusively established that CM's IEP failed to identify CM's dyslexia or auditory processing disorder and therefore failed to identify CM's disability sufficiently to identify necessary interventions, as required by the IDEA.

**155.** The hearing officer erred when he concluded that CM's teachers' observations or discussions between teachers satisfied or negated IDEA requirements for CM's IEP to identify accommodations that he required in the class-room and for statewide testing.

**156.** Undisputed evidence established that District failed to provide accommodations that CM needed to access his educational instruction and progress in the general curriculum at his ability level. CM's IEPs of April 2007 and March 18, 2008 did not include accommodations that District Defendants knew or should have known were necessary under the IDEA.

**157.** Undisputed evidence established that District failed to include the accommodations that the independent audiologist recommended in January 2008 and the recommended accommodations were necessary under the IDEA at all relevant times.

**158.** The hearing officer erred when he concluded that District provided CM with appropriate special education and services between April 2007 and March 2008 based upon finding Plaintiffs' experts less credible regarding CM's needs because the teachers had history and experience in providing interventions to CM.

**159.** The evidence conclusively established that District's teachers knew CM was struggling to learn to read but did not know or understand the nature of CM's learning disability, in part, because District failed to appropriately evaluate CM or identify his educational needs. The evidence established that CM's teachers were unable identify CM's needs related to severe dyslexia and his auditory processing disorder.

**160.** Undisputed evidence established that CM's deficits in integrating auditory information with tasks of reading and writing made specific scientific peer-reviewed types of intervention appropriate and District's alternative special education services did not address CM's specific educational needs.

**161.** The hearing officer erred when he found District's instructional support class provided appropriate

special education services to address CM's unique needs during second grade by using the "Metra Companion Reader." No evidence supported an inference that the "Metra Companion Reader" was developed or recommended to address dyslexia or the type of reading disability that CM exhibited.

**162.** No evidence suggested that the "Metra Companion Reader" was based upon scientific peer-reviewed research or adopted by the District for use.

**163.** The District's use of the Metra Companion Reader program to address CM's inability to read and write at his ability level violated IDEA requirements and was not appropriate to meet CM's individual needs for special education and related services.

**164.** Undisputed evidence established that District's instructional support teacher provided instruction to CM by combining various techniques she believed would help a struggling reader, independent of CM disability or underlying causes. The use of the instructional support teacher's improvised combination of programs to address CM's inability to read and write at his ability level violated IDEA requirements and was inappropriate to meet CM's needs for special education and related services.

**165.** The evidence established that District did not provide a program of "Visualizing and Verbalizing" for 45-minute intervals, a format that is supported by scientific research on efficacy. Instead, District's instructional support class intermittently provided CM with approximately five minutes exercises based upon concepts from the program that she improvised. The evidence established that the instructional support teacher's derived methodology had no scientific support or research demonstrating effectiveness and it was not effective to address CM's unique needs.

DENIAL OF A FAPE March 18, 2008 through March 16, 2009

**166.** The hearing officer erred when he concluded that CM's March 18, 2008 IEP goals and objectives satisfied the IDEA requirements.

**167.** The evidence established that CM's goals and objectives were not objectively measurable and violated IDEA requirements for goals to be designed for achievement of adequate yearly progress.

**168.** The hearing officer erred when he concluded that District provided appropriate special education and related services for CM using the "Project Read" program in his third-grade instructional support class.

**169.** The hearing officer erred when he concluded that District's use of the Project Read program was appropriate to address CM's individual needs for special education and related services and satisfied

IDEA requirements because it was devised for use for struggling readers and was derived from the Orton-Gillingham program.

**170.** Although the Orton-Gillingham program was scientifically based and supported by peer-reviewed research on effectiveness, as required by the IDEA, the Project Read program was not.  No evidence supported a conclusion that the Project Read program was adopted for use in the District, was designed or intended to address dyslexia or auditory processing disorders or that it was otherwise appropriate to address CM's unique needs.

**171.** The IDEA required District to include an IEP team members who can interpret the instructional implications of evaluation results. 20 U.S.C. § 1414(d)(1)(B)(v), 34 C.F.R. § 300.321(a)(5), Cal. Edu. Code § 56341(b)(5). Undisputed evidence established that CM's second IEP team did not include this necessary IEP team member.

**172.** The hearing officer erred as a matter of law when he concluded that it was unnecessary to include an individual who was qualified to interpret educational implications of CM's evaluations at CM's IEP team on March 18, 2008 because no assessments were reviewed at the meeting.  The IDEA does not condition its requirement for the IEP team to include such an individual upon the need to review new evaluations.  The evidence also established that CM's parents had provided District with Dr. Loomos' evaluation.  That evaluation should have been considered by the IEP team with the assistance of a team member to interpret its instructional implications.

**173.** The IDEA required District to consider the auditory processing evaluation that CM's parents had provided to District and the family's information obtained from the private speech-language pathologist when the IEP team met to consider CM's individual needs and develop his new IEP. 20 U.S.C § 1414(d)(3)(A)& (d)(4)(A).

**174.** No District staff who was qualified to interpret or consider CM's needs in light of the auditory processing evaluation and District's initial evaluation attended the meeting as was required by the IDEA. District's failure to consider the private evaluation violated the IDEA.

**175.** The hearing officer erred when he concluded that District did not conduct an undocumented IEP team meeting in or about April 2008 which violated the IDEA.

**176.** The evidence established that CM's IEP team members attended the undocumented meeting.

District's principal, CM's teacher, CM's instructional support teacher and District's speech-language pathologist attended the meeting with CM's mother where they discussed CM's private evaluations.

**177.** The evidence established that necessary IEP team members met and discussed the family's request for services and accommodations to be added to CM's March 18, 2008 IEP.

**178.** The evidence established that the meeting was an IEP team meeting and that it was an untimely review of CM's private evaluation results which CM's parents provided to District to assist in identifying CM's individual needs for special education and related services.

**179.** The hearing officer erred when he concluded that CM's parents first shared Dr. Loomos' report with District at the September 17, 2008.

**180.** Undisputed evidence established that CM's parents provided District with a copy of Dr. Loomos' report in January 2008 and that CM's mother discussed the report on multiple occasions with District staff including District's instructional support teacher, CM's general education teacher and District's speech-language pathologist.

**181.** The hearing officer erred when he concluded that District's IEP team members prepared the September 24, 2008 assessment plan that was consistent with the parent's request for IEE at the September 17, 2008 IEP team meeting.

**182.** Undisputed evidence established that District's Director of Student Services prepared the assessment plan; that she was not a member of CM's IEP team; and, that the plan was developed to prevent and IEE through a process that violated the IDEA.

**183.** The hearing officer erred when he concluded that CM's parents requested District to provide a comprehensive reassessment of CM.

**184.** Undisputed evidence established that CM's parents requested District to provide an independent educational evaluation (IEE) because the parents disagreed with District's assessment and that they did not seek a comprehensive evaluation by the District.

**185.** Undisputed evidence established that no IEP team member told CM's parents that they believed CM's initial evaluation report was out of date or that additional data was needed to develop the revised goals and objectives as CM's parents requested.

**186.** The evidence supported Plaintiffs' contention that if CM's parents had not requested an IEE,

District would not have sought to reevaluate CM before his mandatory tri-annual review in March 2010.

**187.** The hearing officer erred as a matter of law when he failed to conclude that District's development of an assessment plan to compel a District reevaluation as a condition, before CM's parents could seek an IEE, violated the IDEA.

**188.** The hearing officer erred when he concluded that CM's parents did not consent to the addition of accommodations to CM's September 17, 2008 IEP.

**189.** The evidence established that District and CM's parents did not agree upon revised IEP goals and objectives until June 2009 and CM's parents did not agree to continue District's instructional support services, but CM's parents requested and agreed to the accommodations, which were those Dr. Loomos recommended in December 2007.

**190.** The hearing officer erred when he concluded that CM's parents withholding of consent to District's September 24, 2008 assessment plan was unreasonable and that CM's mother requested District to assess CM's social emotional functioning. The evidence established that CM's parents did not request District to assess CM's social-emotional functioning, but sought an independent educational evaluation of CM's intellectual and social-emotional functioning, based upon their disagreement with District's evaluation in those areas.

**191.** The hearing officer erred when he concluded that District's speech and language evaluation was appropriate to determine CM's need for speech-language services.

**192.** The undisputed evidence at hearing established that District's speech-language evaluation was limited to oral language. District did not evaluate CM's processing of written language or his non-verbal language function that were related to his processing deficits.

**193.** The hearing officer erred when he based findings regarding CM's needs for occupational therapy services entirely upon hearsay evidence constituted by District's occupational therapy evaluation report or improper opinion evidence.

**194.** Dr. Loomos' undisputed testimony established that CM was at risk for motor integration deficits which impact written language because he exhibited integration deficits in auditory processing.

**195.** The evidence established that CM exhibited deficits in written language ability that adversely impacted his ability to perform written language tasks and that CM exhibited related deficits on

District psychological testing, which District failed to recognize or address through necessary educational services

**196.** The hearing officer erred when he concluded that the neutral facilitator's conduct was appropriate when she submitted a letter to CM's parents arguing District position, that it had the "right and responsibility to update [CM's] assessment information prior to agreeing to an [IEE]." The law and evidence established that the facilitator's opinion was incorrect and her conduct was coercive.

**197.** The hearing officer erred when he concluded that District's series of facilitated IEP team meetings was appropriate.

**198.** The hearing officer erred when he determined that District's proposed IEPs in December 2008 and January 2009 were appropriate when the documents failed to identify or offer any type of research-based or peer-reviewed interventions to address CM's individual needs.

**199.** Undisputed evidence established that District did not identify and program of services to be provided in its instructional support class or to address CM's ongoing and deepening skill deficits in reading and written language.

**200.** The hearing officer erred when he concluded that CDE dismissed Plaintiffs' compliance complaint "on its own volition following [Plaintiffs'] filing of [a] request for due process hearings." The conclusive undisputed evidence refutes the finding.

**201.** Undisputed evidence established that CDE closed its investigation after District's request and District's untimely filing of a due process request to defend its initial evaluation.

**202.** Undisputed evidence established that Plaintiffs filed their first due process complaint months after CDE's investigation report was due and that IDEA required Plaintiffs to seek a due process hearing by April 18, 2009, to preserved their right to assert denial of a FAPE claims against District.

DENIALS OF A FAPE March 16, 2009 through June 15, 2009

**203.** The hearing officer erred when he concluded that CM's March 16, 2009 IEP satisfied IDEA requirements or provided CM a FAPE.

**204.** The evidence established that District's instructions, described as "based upon Lindamood-Bell strategies," were not appropriate to meet CM's individual needs and were not yet available.

**205.** The evidence established that District had failed to provide effective or appropriate interventions

for CM for years.  The evidence did not support an inference that District's derived program was supported by research or peer-review to demonstrate efficacy as required by the IDEA.

**206.** The evidence established that District had not established the program it proposed to offer and had not previously provided it using the proposed staff. District's proposed program did not satisfy IDEA requirements.

**207.** The evidence established that CM's parents had commenced CM's private Lindamood-Bell instruction and had incurred the obligation to complete a series of services before District offered vague substitute services.  The Lindamood-Bell instruction CM received had been proven effective to address severe dyslexia and was supported by scientific, peer-reviewed research and CM achieved rapid growth in reading skills through those services.

**208.** The evidence established that CM increased his reading skills in all categories and achieved years of grade-level growth after receiving LMB instruction and remedial therapy for a few months.

**209.** The hearing officer erred when he concluded that CM's parents were not entitled to reimbursements for the Lindamood-Bell services they obtained to address CM's severe dyslexia.

**210.**  The hearing officer erred when he concluded that CM's parents were not entitled to reimbursement for Tomatis remedial therapy they purchased to address CM's auditory processing disorder.  The therapeutic services were supported by peer-reviewed research that demonstrated the effectiveness and CM made substantial gains from the therapy.

**211.** The hearing officer erred when he concluded that Plaintiffs' conduct frustrated the IEP process or Plaintiffs acted inappropriately to warrant a denial of compensatory education to CM.

**212.** The hearing officer erred when he based findings upon evidence of the September 17, 2008 IEP team meeting provided by District's administrator who relied entirely upon hearsay to form her understanding and was not present at the meeting.

### THIRD CLAIM FOR RELIEF

### FOR ATTORNEY FEES & COSTS PURSUANT TO 20 U.S.C. § 1415(i)(3)(B) (AGAINST ALL DEFENDANTS)

**213.** Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1-212, inclusive, of this complaint.

**214.** This Court is authorized to award reasonable attorney fees to Plaintiffs' as prevailing parties.

Plaintiffs lacked of knowledge sufficient to trigger commencement of IDEA's two-year statute of limitations before April 18, 2007 and Plaintiffs should be deemed prevailing parties upon their claims that District denied CM a FAPE in each of the alleged periods.  The Court should award reasonable attorney fees to Plaintiffs.

**FOURTH CLAIM FOR RELIEF
FOR VIOLATION OF § 504 OF THE REHABILITATION
(AGAINST ALL DEFENDANTS)**

**215.** Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1-214, inclusive, of this first amended complaint.

**216.** Defendants engaged in a pattern of retaliatory conduct, including, seeking the reevaluation of CM outside the IEP process; failing to comply with IDEA regulation 34 CFR § 300.502(b)(2) to delay and prevent Plaintiffs from obtaining an IEE for CM; conducting adversarial IEP Team meetings, prompting closure of Plaintiffs' pending CDE investigation through false statements to CDE and repeatedly refusing to acknowledge the validity of Plaintiffs' IEE request.

217. Defendants engaged in multiple acts of retaliation for CM's parents' advocacy for CM's to receive an IEE and educational services to which he was entitled under the IDEA and § 504 of the Rehabilitation Act, as set forth in title 34 of the Code of Federal Regulations § 104.33 and to intimidate, punish and discourage Plaintiffs from asserting such rights.

**218.** Defendants, and each of them, retaliated against Plaintiffs in violation of § 504 for their advocacy to obtain an IEE for CM when District submitted a written request to CDE to stay its investigation and represented that Plaintiffs' issue which CDE was investigating was  the subject of District's administrative hearing request in case N2008-120161, knowing the statement was false.

**219.** Defendants, and each of them  knowingly or with conscious disregard for the consequences to CM and his parents violated the IDEA, corresponding State law, District policies and anti-retaliation provisions of § 504 of the Rehabilitation Act when District staff and Defendant's agents argued during IEP team meetings that Plaintiffs' IEE request was not valid and that District was entitled to reevaluate CM.  These arguments were used to coerce CM's parents into abandoning their IEE request as CM's parents were attempting to work toward modifying CM's IEP to meet his needs at IEP meetings.

**220.** Defendants, and each of them, engaged in a pattern and practice of discouraging parents of

disabled students from advocating for their child's IDEA rights and appropriately seeking an IEE.

**221.** Defendants, and each of them, endorsed, enabled and/or facilitated the actions of the other in seeking the suspension of CDE's investigation of Plaintiffs' CDE complaint and seeking to compel a reevaluation of CM in violation of the IDEA as part of a concerted effort to chill CM's parents' advocacy for CM to obtain procedural and substantive IDEA rights.

**222.** Defendants acted in concert with each other, through District staff and through Defendants' agents in the pattern of conduct to intimidate to coerce CM's parents into abandoning their IEE request and advocacy for appropriate evaluation and educational services for CM.

**223.** After CM's parents requested an IEE, Defendant's board policies, in conformity with the IDEA and State law, required District to "either initiate a due process hearing to show that its evaluation is appropriate or provide the parent an opportunity to obtain an independent educational evaluation by arranging for the independent education evaluation." Defendants failed to follow their own board policies for responding to a parent's request for an IEE and instead sought to obstruct, delay, discourage and prevent CM from receiving the IEE to which he was entitled.

**FIFTH CLAIM FOR RELIEF**

**FOR VIOLATION OF § 504 OF THE REHABILITATION**
**(AGAINST ALL DEFENDANTS)**

**224.** Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, paragraphs 1-223, inclusive, of this first amended complaint.

225. Section 104.33 of title 34 Rehabilitation Act regulations states: "A recipient who operates a public elementary . . . program shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." Section § 504's federal regulations define an appropriate education as "the provision of regular or special education and related aids an services that are (i) designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1).

**226.** Defendants are recipients of federal education funding and are required to comply with 34 C.F.R. § 104.33(b)(i) but failed to do so for CM.

**227.** CM required educational services that specifically addressed his severe dyslexia and central auditory processing disorder (CAPD) in order to meet his educational needs as adequately as the educational needs of non-disabled student were met and to access his grade-level curriculum with his peers.

**228.** CM's dyslexia and CAPD are qualifying disabilities under the Rehabilitation Act and IDEA.

**229.** Provision of such services to CM was a reasonable accommodation to enable CM to access the benefits of public education.

**230.** Defendants, and each of them, knew or should have known that CM would have been able to access the benefits of public education as adequately as his non-disabled peers if he received dyslexia-specific and CAPD-specific special education services and accommodations.  CM had been in the District receiving general interventions for slow readers for years and continued falling farther behind his age and grade peers and failing to progress in reading and written language skills at his ability level since kindergarten.  CM is intelligent and capable of learning grade level language arts skills and progressing in the general curriculum with appropriate classroom accommodations, like preferential seating and audio books, and special education and related services.

**231.** Defendants and each of them knew or should have known that dyslexia specific special education services, curriculum and accommodations were available to Defendants to provide within the District's service area and would allow CM to access the benefits of public education by addressing CM's needs caused by severe dyslexia and his auditory processing disorder.

**232.** Defendants and each of them intentionally or with deliberate indifference failed to provide such special education accommodations, in part, because Defendants have policy and practice of refusing to acknowledge specific special education needs related to a student's disabling condition of dyslexia and/or central auditory processing disorders.

**233.** Defendants knew or should have known that appropriate accommodations through dyslexia-specific interventions and auditory processing therapies were available for Defendants to provide to CM and that such services met state standards for scientifically based instruction which were supported by peer reviewed research that demonstrated efficacy. Defendants did not provide such accommodations or services to CM.

**234.** Defendants acted with intent or deliberate indifference when they failed to develop an IEP that

provided CM with necessary special education services and accommodations to address CM's severe dyslexia and his type of auditory processing disorder because such services were available and CM needed such services and accommodations to access the benefits of public education as adequately as the educational needs of non-disabled students were met.

**235.** CM was entitled to receive dyslexia-specific and CAPD-specific special education and related services as a reasonable accommodation under § 504 of the Rehabilitation Act and 34 C.F.R. § 104.33(b)(i). CM's IEP was not designed to enable CM to access the benefits of public education.

**236.** Defendants, and each of them, violated § 504 of the Rehabilitation Act with deliberate indifference by failing to develop an IEP that included reasonable accommodations of special education services specifically designed to address CM's needs caused by his auditory processing deficits and severe dyslexia and thereby excluded CM from accessing the benefits his public education and participation in the general education curriculum at his ability level with his non-disabled peers.

**237.** CM would have made significant gains in acquiring literacy skills if District had provided CM with specific educational services to address his dyslexia and his central auditory processing disorder before second grade.

**238.** CM suffered emotional injuries as a result of District Defendants' failures to provide reasonable accommodations, including appropriate and necessary educational services to meet his needs caused by dyslexia and his auditory processing disorder.

**239.** Defendants, and each of them, knew or should have known that the failure of District to provide specific educational services to address CM's dyslexia and auditory processing disorder would cause CM emotional injury and prevent him from accessing his education.

**240.** Defendants, and each of them, violated § 504 of the Rehabilitation Act by failing to develop an IEP that included dyslexia-specific services to address CM's educational needs as adequately as the needs of non-disabled students were met.

**241.** Defendants, and each of them, violated § 504 of the Rehabilitation Act by failing to develop an IEP that included class-room accommodations that allowed CM to access his education and participate in the general curriculum at his ability level as adequately as his nondisabled peers.

///

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs respectfully pray that this Court:**

**On Plaintiffs' First Claim for Relief**:

**1.**   That this Court enter Judgment finding Plaintiffs' claims against District for violations of IDEA "child find" requirements regarding District's acts or omissions that occurred prior to April 16, 2007 are not barred by the statute of limitations  and that the hearing evidence established that CM prevailed upon those claims that District Defendants violated the IDEA child find requirements.

**2.**   That this Court enter Judgment finding that District's initial evaluation of CM violated IDEA requirements, that Plaintiffs claims to this effect are not barred by the statute of limitations and that the hearing evidence established that CM prevailed upon those claims.

**3.**   For attorney fees and costs of appeal and reasonable attorney fees as authorized by law.

**4.**   For such other relief as the Court finds appropriate.

**On Plaintiffs' Second Claim for Relief**:

**5.**   For Judgment finding the hearing officer erred, that District denied CM a FAPE in each of the time periods as alleged and that Plaintiffs are entitled to reimbursement for Lindamood-Bell services and Tomatis remedial therapy as compensatory education for CM.

**6.**   For Judgment declaring that the OAH policy and practice of exclusion of evidence that is disclosed and submitted not less than five days before hearing violates the IDEA

**7.**   For Judgment declaring that the hearing officer's exclusion of evidence submitted in conformity with IDEA requirements was error, and that the hearing officer's exclusion of such evidence from Plaintiffs violated the IDEA.

**8.**   For Judgment declaring District's use of a student school psychologist intern to conduct CM's initial evaluation for eligibility pursuant to the IDEA, rather than a credentialed school psychologist, violated IDEA and State law requirements.

**9.**   For Judgement declaring District's use of a student school psychologist inter to attend CM's initial IEP team meeting, in place of a credentialed school psychologist, violated IDEA and corresponding State law.

**10.** For Judgment declaring District's pattern and practice of using student school psychologist

interns as a substitute for a credentialed school psychologists violated IDEA and corresponding State law.

**11.** For Judgment declaring that District was required to provide CM's parents with documentation and information regarding CM's response to interventions as part of District's initial evaluation and report and its failure to do so violated the IDEA and denied CM a FAPE.

**12.** For an order for reimbursement and reasonable compensatory education.

**13.** For attorney fees and costs of appeal and reasonable attorney fees as authorized by law.

**14.** For such other relief as the Court finds appropriate.

**On Plaintiffs' Third Claim for Relief**:

**15.** For Judgment declaring Plaintiffs were prevailing parties in OAH consolidated case N2009-040640 and N2009081105.

**16.** For attorney fees and costs of appeal and reasonable attorney fees as authorized by law.

**17.** For such other relief as the Court finds appropriate.

**On Plaintiffs' Fourth Claim for Relief:**

**18.** For compensatory damages, declaratory judgment finding Defendants' conduct in seeking reevaluation of CM, imposing a coercive facilitated IEP process, and seeking a stay of CDE's investigation of Plaintiffs' IEE allegation by false representations to CDE constituted retaliation that violated § 504 of the Rehabilitation Act, and attorney fees authorized by law, according to proof.

**19.** For such other relief as the Court finds appropriate.

**On Plaintiffs' Fifth Claim for Relief:**

**20.** For compensatory damages, declaratory relief that Defendants' failure to provide appropriate and necessary educational services to CM violated § 504 of the Rehabilitation Act, and attorney fees authorized by law, according to proof.

**21.** For such other relief as the Court finds appropriate.

Dated: March 21, 2011                      Respectfully submitted,


_____/s/_____
Lina Foltz, Attorney for Plaintiffs