1

2

3

4

5                        IN THE UNITED STATES DISTRICT COURT

6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  M.M. & E.M.,                              No. CV 09-4624 and 10-04223 SI

9          Plaintiffs,                       **ORDER RE: PARTIES' CROSS
                                             MOTIONS FOR SUMMARY
10    v.                                     JUDGMENT; DEFENDANT'S MOTION
                                             TO STRIKE**
11  LAFAYETTE SCHOOL DISTRICT,

12          Defendant.
    _____/

13

14         Before the Court are five motions concerning appeals from three administrative decisions: cross-

15  motions for summary judgment in each of two consolidated cases, and defendant's motion to strike

16  plaintiffs' declarations in support of one of plaintiffs' oppositions.  A hearing was held on all of the

17  motions on January 13, 2012.  Having considered the arguments of counsel and the papers submitted,

18  and for good cause shown, the Court rules as follows.

19

20                                   **BACKGROUND**

21         This action, brought under the Individuals with Disabilities Education Act ("IDEA") and Section

22  504 of the Rehabilitation Act, concerns a dispute over the educational opportunities provided to C.M.,

23  a child who has been identified as an individual with learning disabilities.  These are two consolidated

24  cases that collectively involve the appeals from three administrative decisions.  M.M. and E.M.

25  ("Parents"), individually and on behalf of their son C.M, are suing the Lafayette School District

26  ("District") and the Lafayette School Board ("School Board").

27         The facts and procedural history of these consolidated cases are complex.  As an introduction,

28  the Court repeats a conclusion provided by one of the Administrative Law Judges involved below: "At

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

base, this matter involved a young boy's struggle to read proficiently."  OAH II/III Decision, at 40.[1]

The fundamental question is whether the District responded appropriately to C.M.'s needs, as required

by the IDEA.

Plaintiff C.M. is an 11-year old child who enrolled in the District at the beginning of his

kindergarten year in 2005-2006 .[2]  His kindergarten year coincided with the District's adoption of the

Response-To-Intervention ("RTI") model, used as an intervention strategy to assist struggling learners.

Early in C.M.'s kindergarten year, through RTI, the District identified C.M. as in need of reading

intervention, and thus began providing additional instruction.  At the conclusion of kindergarten, C.M.

attended a summer class where he continued to work on developing his reading skills.

C.M.'s need for support continued in the first grade.  The District conducted an initial

psychoeducational assessment of C.M. in April 2007 (the "April 2007 Assessment").  In September

2008, seventeen months later, M.M. and E.M. requested an independent educational evaluation ("IEE")

of C.M.  Then, in December 2008, rather than granting the IEE at public expense, the District filed a

due process complaint requesting a hearing before the Office of Administrative Hearings ("OAH").[3]

This initial OAH case ("OAH I") asked the Administrative Law Judge ("ALJ") to determine the validity

of the District's April 2007 assessment, determine whether it was liable to reimburse C.M.'s parents for

the IEE, and determine whether the District had a right to conduct its own reassessment of C.M.[4]  After

holding a hearing, ALJ Charles Marson issued a decision on July 1, 2009, finding that the District

unlawfully delayed granting the IEE at public expense, but that Parents were entitled to reimbursement

of only half the expenses associated with the IEE because they themselves had delayed 17 months

before voicing their disagreement with the April 2007 Assessment.  The ALJ also determined that the

District had a right to proceed with a new assessment.  The ALJ did not rule on whether the 2007

Assessment was valid, finding the issue unnecessary because he had determined that the parents were

---

[1]The Court explains the citation mechanisms *infra*, note 7.

[2]The facts presented here are undisputed, and found variously in the parties' briefs and the various ALJ's recitations of the facts.  The facts are described in more detail where relevant to the issues presented.

[3]The 2008 OAH Case was filed as OAH CASE NO. 2008120161.

[4]Among the many other disputes presented here, one is whether the ALJ improperly restated the issues raised in the due process complaint and thus did not have authority to determine the restated issue, specifically, whether the District had the right to reassess C.M.  That argument will be addressed below.

United States District Court
For the Northern District of California

due reimbursement regardless of the merits of the 2007 Assessment.  This decision forms the basis of plaintiffs' complaint in *M.M., et al., v. Lafayette School District, et al.*, No. 09-4624 (the "OAH I Appeal").

Meanwhile, on April 16, 2009, E.M. (Mother) and M.M. (Father) of C.M. ("Parents") filed their own administrative complaint requesting a separate due process hearing ("OAH II") to address (1) whether the District timely identified and evaluated C.M. for possible disabilities, (2) whether the District's April 2007 assessment was appropriately conducted and identified all of C.M.'s educational needs, and (3) whether the individualized education program ("IEP") formulated as a result of the April 2007 assessment was developed and maintained in accordance with IDEA mandates.[5]  On May 13, 2009, ALJ Peter Paul Castillo determined that the first two categories of claims were time-barred and granted the District's motion to dismiss those claims.  The ALJ's dismissal order forms the basis of plaintiffs' complaint in *M.M., et al. v. Lafayette School District, et al.*, No. 09-3668 SI ("2009 OAH Interim Appeal").

Then, on August 28, 2009, Parents filed a third complaint (their second) with OAH ("OAH III"), which was consolidated with the then-pending OAH II Case (hence, as consolidated, "OAH II/III").[6] On June 21, 2010, ALJ Gary Geren, after eleven days of hearing, issued a 48-page decision in favor of the District on all issues in the consolidated due process hearing.  In OAH II/III, ALJ Geren ruled that (1) the District provided C.M. with a free and appropriate public education ("FAPE") for the time period of April 2007 through June 2009, and (2) C.M. was not entitled to receive reimbursement or compensatory education. *See* First Am. Compl., Ex. 1 at 48.  This decision forms the basis of plaintiffs' complaint in the second case before this Court, *M.M., et al. v. Lafayette School District, et al.*, No. 10-4223 ("OAH II/III Final Appeal").

On June 2, 2010, this Court granted the District's motion to dismiss the 2009 OAH Interim Appeal without prejudice to refiling once the ALJ had issued a final decision in the underlying

---

[5]OAH II was filed as OAH CASE NO. 2009040640.

[6]OAH III was filed as OAH CASE NO. 2009081105.  In his June 21, 2010 Order, ALJ Geren notes that "Student filed for a due process hearing in case number 2009040640 (First Case).  Student filed for a second due process hearing in case number 2009081105 (Second Case).  On September 22, 2009, Student's cases were consolidated for hearing: the decision timelines are calculated using the Second Case."

administrative proceedings.  Case 09-3668 SI, Doc. 53.  Plaintiffs have since appealed that order to the Ninth Circuit Court of Appeals.

On December 6, 2010, the Court granted in part a motion, filed by the District, the School Board, and several other defendants, to dismiss the OAH I Appeal.  The Court dismissed with prejudice two claims that alleged violations of IDEA procedural safeguards in connection with specific actions taken by the District, because the IDEA does not provide a private right of action to enforce these procedural safeguards outside of an administrative hearing and appeal of an administrative determination.  Case 09-4624 SI, Doc. 83, 4-6.  The Court also dismissed with prejudice a procedural due process claim brought under Section 1983, granted the District's motion to strike plaintiffs' request for expert fees, and dismissed certain claims against another defendant not named in this case.  Id.  Shortly thereafter, the Court consolidated the OAH I Appeal and the OAH II/III Appeal.  *See* Doc. 10.

On March 3, 2011, the Court granted in part defendants' motion to dismiss the OAH II/III Appeal.  The Court dismissed with prejudice plaintiffs claims that alleged violations of IDEA procedural safeguards, for the same reasons similar claims were dismissed in the OAH I Appeal - the IDEA does not provide a private right of action to enforce these procedural safeguards.  Case 09-4223 SI, Doc. 28 at 6.  The Court dismissed with leave to amend plaintiffs' claim alleging discrimination under Section 504 of the Rehabilitation Act.

C.M. thereafter filed a Second Amended Complaint ("SAC"), the operative complaint in the OAH II/III Appeal.  The SAC brings five claims for relief against all defendants.  The first is for reversal of the ALJ's May  2009 dismissal order in the 2009 OAH Case finding certain claims time barred.  The second is for reversal of the final June 2010 ALJ order in the 2009 OAH Case finding the District did not deny C.M. a free appropriate public education.  The third is for attorney's fees and costs. The fourth claim is a retaliation claim brought under Section 504 of the Rehabilitation Act, and the fifth is a discrimination claim brought under Section 504.

On October 25, 2011, the Court granted the District's motion to supplement the administrative record in the OAH I Appeal.  *See* 09-4624, Doc. 105.  The District supplemented the record with evidence that they have since paid the entire amount of C.M.'s IEE - which was the issue before the ALJ in OAH I.  The District also provided evidence that the assessment at issue in OAH I has already been

completed.  On October 31, 2011, the Court granted in part and denied in part plaintiffs' motion to supplement the administrative record in the OAH II/III Appeal.  *See* 10-4223, Doc. 56.  The plaintiffs supplemented the record with evidence they had gathered during discovery that was otherwise unavailable to them during the OAH proceedings.

Now before the Court are cross motions for summary judgment in both the OAH I and OAH II/III Appeals.  The Court recognizes the complexity of the procedural posture of this case.  In order to assist in untangling this case's history, and to flesh out pertinent facts on the procedural skeleton, the Court sets forth the following timeline (litigation dates in bold):

September 2005:   C.M. enrolls in the District as a kindergartner.

March - April 2007:   Near end of First Grade.  The District conducts its initial assessment of C.M., with school intern psychologist Michelle Charpentier and school psychologist Patrick Gargiulo (the "April 2007 Assessment").

April 18, 2007:  Individualized educational program ("IEP") Meeting held wherein District present findings of April 2007 Assessment. Parents approve the proposed IEP (the "April 2007 IEP Meeting").

March 18, 2008:  Near end of Second Grade.  Another IEP meeting held. Parents again approve IEP.

September 17, 2008:   Beginning of Third Grade.  Another IEP meeting. For the first time, the parents inform the District that they disagree with the April 2007 Assessment, and request an independent educational evaluation (IEE). Confirmed in writing the next day (the "September 2008 IEP Meeting").  Parents do not consent to the proposed IEP.

September 24, 2008:   Instead of agreeing to IEE, District proposes a new assessment of C.M.

Parents reject proposed reassessment.

November 18, 2008:   C.M. files a compliance complaint with the California Department of Education ("CDE"), alleging that the District had unnecessarily delayed in responding to Parents' IEE request, and failed either to fund an IEE or file for a due process hearing.

**December 3, 2008:  OAH Case I:** District files a complaint seeking a due process hearing. Issues are whether the April 2007 Assessment was appropriate; whether C.M. was eligible to receive IEE at public expense; and whether District had right to reassess C.M.

January 26, 2009: A "Facilitated" IEP meeting is held.

March 16, 2009: The second annual IEP revision meeting is held.  Parents do not consent to proposed IEP.

**April 16, 2009:  OAH Case II:** C.M. files due process complaint against District; alleges that District did not timely and properly assess Student for eligibility to receive special education services; did not assess Student in all areas of suspected disability; and that its assessments were not properly conducted. District thereafter files a motion to dismiss.

United States District Court
For the Northern District of California

**May 13, 2009:  OAH Case II:** ALJ Castillo rules on District's motion to dismiss: C.M.'s claims that occurred before April 26, 2007, are barred by the statute of limitations. Claims otherwise not barred by res judicata or collateral estoppel.

**May 2009:   OAH Case I:** ALJ Marson holds three days of hearings in this Case I.

June 4, 2009:  Another IEP meeting held. Parents consent to the proposed IEP.

**July 1, 2009:  OAH Case I:** ALJ Marson rules: District must pay for IEE because District unnecessarily delayed following parents disagreement with the April 2007 Assessment and request; however, because parents waited 17 months to disagree with April 2007 Assessment, equitable considerations require that they only receive half the expense. Second, District is permitted to conduct a new assessment.  Does not decide on appropriateness of April 2007 Assessment.

**September 22, 2009:  OAH Case II/III:** The surviving claims of OAH Case II are consolidated with OAH Case III. Issues are whether C.M. was denied a free and appropriate public education (FAPE) from April 2007 through June 2009; and whether District must make reimbursement or provide compensatory education to C.M..

**Feb-March 2010:  OAH Case II/III:** ALJ Geren hears holds eleven days of hearing in this case.

**June 21, 2010:  OAH Case II/III:** ALJ Geren rules: the District provided C.M. with a FAPE for the time period of April 18, 2007 through June 2009, and student is not entitled to receive reimbursement or compensatory education.

Both parties filed motions for summary judgment in the OAH I Appeal and OAH II/III Appeal. Because the cases are consolidated and the issues between them clearly overlap, the Court will rule on the four motions together.  The District also moves to strike two declarations and a number of exhibits plaintiffs' attached to one of their oppositions.  That motion will be addressed in turn as well.

### STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [a 'FAPE'] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).  The IDEA provides for a cooperative process between parents and schools which culminates in the creation of an IEP for every disabled student.  *Id.* § 1414; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer*, 546

U.S. at 53.  The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982).  Schools are obligated to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.'" *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1033 (9th Cir. 2009) (quoting *Rowley*, 458 U.S. at 197 n. 21, 200).

The Supreme Court has recognized the importance of adherence to the procedural requirements of the IDEA.  *Rowley*, 458 U.S. at 206-07.  However, not all procedural violations deny the child a FAPE.  *R.B., ex. rel. F.B. v. Napa Valley Unified School Dist.*, 496 F. 3d 932, 938 (9th Cir. 2007).  A child is denied a FAPE only when the procedural violation "results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." *Id.* (*citing W.G. v. Bd. of Trustees of Target Range School Dist. No. 23,* 960 F.2d 1479, 1484 (9th Cir. 1992).

**LEGAL STANDARD**

## I.      Summary Judgment Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence

on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. Rule 56(c)(2).

## II.     Standard of Review under IDEA

A court reviewing the decision made after an administrative due process hearing under the IDEA, "shall receive the record of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Because the district court may supplement the record below with new evidence and make its decision based on a preponderance of the evidence, judicial review in IDEA cases "differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

Despite the lower standard of deference, when reviewing state administration decisions, "courts must give due weight to judgments of educational policy." *Id.* (*citing Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). Therefore, the IDEA does not empower courts to "substitute their own notions of sound educational policy for those of the school authorities which they review. How much deference to give state educational agencies, however, is a matter for the discretion of the courts." *Id.* (*citing Gregory K.*, 811 F.2d at 1311.)

The Ninth Circuit has clarified the due weight the district court should give the hearing officer's findings. "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of

deference accorded the hearing officer's findings increases where they are "thorough and careful." *Capistrano Unif. Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 2001) (*citing Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994)).  A hearing officer's findings are thorough and careful "when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B., ex rel. F.B. v. Napa Valley Unified School Dist,* 496 F.3d 932, 942 (9th Cir. 2007).

# DISCUSSION

**I.      OAH I Appeal (09-4624)**[7][8]

The facts of the OAH I Appeal are as follows.  C.M.'s initial psychoeducational assessment was conducted in March and April of 2007.  Parents received a copy of the assessment on April 17, 2007,

---

[7]The parties' papers will be cited according to the appeal at issue.  Plaintiffs' motion for summary judgment in OAH I Appeal will therefore be cited as "Pl.'s MSJ App. I."  The District's opposition to that motion will be referred to as "Def.'s Opp. App. I".  By the same token, the District's motion for summary judgment in the OAH I Appeal will be referred to as Def.'s MSJ App. I, while the plaintiff's opposition will be cited as Pl.'s Opp. App. I.

[8]In their OAH I MSJ Notice of Motion, plaintiffs request that the Court find that:
1. Plaintiffs prevailed on all issues raised under the IDEA by the District's administrative complaint.
2. The ALJ erred when he failed to award plaintiffs the full cost of the independent educational evaluation, including the evaluator's attendance at an IEP Team meeting to review the findings.
3. The District's student intern was not qualified to conduct C.M.'s initial evaluation and therefore the District's evaluation was inadequate as a matter of law.
4. The ALJ erred in finding that the District could reassess C.M. pursuant to an assessment plan created by the District's Administrator in contravention of the IEP process.
5. The District failed to satisfy its burden of proof to show its initial evaluation of C.M. was appropriate under the IDEA.
6. The ALJ erred as a matter of law to the extent he added or altered issues decided in his decision that were not raised in the District's administrative complaint, and those determinations are void as exceeding the ALJ's jurisdiction.
In its OAH I MSJ Notice of Motion, defendant requests that the Court finds that:
1. The ALJ correctly determined parents were only entitled to half of the costs of Dr. Tina Guterman's IEE of C.M. and the District had the right to reassess C.M. pursuant to its assessment plan dated Sept. 24, 2008.  Therefore, the decision dated July 1, 2009 should be affirmed in its entirety.
...
3. The decisions of each ALJ demonstrate careful and thoughtful analysis of the evidence, testimony and issues, and plaintiffs have failed to meet their burden of proving the decisions were incorrect.

and the first IEP meeting was held the next day.  The IEP team members agreed that C.M. was eligible for special education in the category of Special Learning Disability.  The parents approved the IEP, and did not express any disagreement with the 2007 Assessment at that meeting, nor at a subsequent IEP meeting in February of 2008.

At the September 17, 2008 IEP meeting, Parents informed the District for the first time that they disagreed with the April 2007 Assessment, and requested that the District fund an IEE.  Pursuant to 34 C.F.R. § 300.502(b)(2)(2006), the District was then required, without unnecessary delay, to either fund the IEE or file a due process complaint to find that the 2007 Assessment was appropriate.  Instead, District offered to conduct a new assessment on C.M., which the parents refused.  Parents continued to request an IEE, and when approval was not forthcoming, on November 18, 2008, filed a compliance complaint with the California Department of Education.  On December 3, 2008, 74 days after the parents voiced disagreement with the April 2007 Assessment, the District eventually filed a request for a due process hearing to declare that the April 2007 Assessment was appropriate  The District also sought to determine whether it was liable to reimburse C.M.'s parents for an IEE, and determine whether the District had a right to conduct its own reassessment of C.M.

The ALJ determined that the District unnecessarily delayed in filing its due process complaint, holding that "the District's delay in responding to Parents' IEE request was unnecessary, unreasonable, and unjustifiable."  OAH Decision I, at 9.  Unnecessary delay in filing for a due process hearing can waive the right to contest a student's request for an IEE at public expense.  *Pajaro Unified Sch. Dist. v. J.S.*, 2005 U.S. Lexis 90840, *10 (N.D. Cal. 2006).  Relying on *Pajaro*, the ALJ determined that the District was liable for the expense of the IEE, which totaled $4,800.  Neither party appeals that decision.

The ALJ also engaged in a secondary analysis.  Concerned that the parents waited 17 months before expressing disagreement with the April 2007 Assessment, the ALJ had the parties brief the issue of whether the OAH had the equitable authority to reduce an IEE reimbursement based on parents' delay.  The ALJ then found that (1) he did indeed have the equitable authority to reduce the IEE award, and (2) due to parents' 17-month delay, equitable considerations counseled such a reduction.  The ALJ awarded plaintiffs half of the IEE expense - $2,400.

The ALJ also determined that the District had a right to proceed with a new assessment.  The

United States District Court
For the Northern District of California

1    ALJ did not rule on whether the 2007 Assessment was valid, finding the issue unnecessary because he

2    had determined that the parents were due reimbursement regardless of the merits of the assessment.

3         Plaintiffs appeal the OAH I Decision.  They argue that the ALJ erred by equitably reducing the

4    parents' right to full reimbursement for the cost of the IEE; that the District was not entitled to reassess

5    C.M.; and that the April 2007 Assessment was not appropriate.  In the operative complaint in the OAH

6    I Appeal, plaintiffs are seeking declaratory relief that they were the prevailing party on all of these

7    issues, and that the ALJ erred by reducing the award and granting the reassessment.[9]

8         During the pendency of plaintiffs' appeal to this Court, the District conducted the reassessment

9    at issue.  *See* Def.'s Mot. to Supp. Record, OAH Appeal I, Doc. 101, Egnor Decl. Ex. C (Sept. 09, 2011)

10   ("Egnor Decl.").  The District also sent parents a check for the remaining balance of the IEE, an

11   additional $2,400.  Egnor Decl., Ex. B.  The District argues that both issues are therefore moot.

12        A separate issue exists as to whether the District is liable for the costs of the evaluator's

13   presentation of the IEE results at an IEP meeting.  The ALJ found that the statute covers only the cost

14   of the evaluation, not the presentation of its results.  Plaintiffs appeal that decision as well.

15        As mootness is a threshold jurisdictional issue, *see United States v. Strong*, 489 F.3d 1055, 1059

16   (9th Cir. 2007), the Court will address it first.

17

18

19   _____

        [9]Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must

20   indicate the extent to which each party has prevailed on each issue heard and decided.  Under the IDEA, the court may award attorney's fees to the prevailing party.  20 USC § 1415(I).

21        In their complaint and throughout their motions, plaintiffs seek declarations that they were the prevailing party below.  They also argue that the Court should find that they were the prevailing party

22   on an issue the ALJ in OAH I specifically declined to decide - whether the 2007 Assessment was appropriate.  Pl.'s MSJ App. I at 17-18.

23        The Court finds that it need not decide whether plaintiffs were the prevailing party below.  The relevant question is whether plaintiffs finally prevail, in this appeal.  "An appellee is no longer a

24   'prevailing party' when a favorable judgment on the merits in a lower proceeding is reversed on appeal." *Rodarte*, 127 F. Supp. 2d at 1115 (D. Haw. 2000) (*citing Lovell v. Poway Unified Sch. Dist.,* 90 F.3d

25   367, 373-74 (9th Cir. 1996) (directing award of attorneys' fees in district court to be vacated once appeleees lost on their appeal).  The Court will engage the merits of the parties' arguments, reviewing

26   the administrative record and admissible supplemental evidence.  It will determine the prevailing party based on the outcome of that analysis.

27        However, even that need not be decided at this juncture.  The dispute over who prevailed in this appeal is more appropriately discussed in a motion for attorney's fees.  The Court therefore declines to

28   disturb the ALJ's statutorily required findings regarding the prevailing party in the OAH hearings; it will engage the analysis of who prevailed in *this* appeal where appropriate at a later date.

**A.      Mootness of IEE Reimbursement and District's Reassessment**

The jurisdiction of federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *See PUC v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim is moot if it has lost its character as a present, live controversy, and if no effective relief can be granted: "Where the question sought to be adjudicated has been mooted by developments subsequent to filing of the complaint, no justiciable controversy is presented." *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). A claim also may be considered moot if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *See Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998).

Under general principles derived from the "case or controversy" requirement of Article III, Section 2, of the United States Constitution, a federal court may not issue advisory opinions. *See United States v. Cook*, 795 F.2d 987, 994 (Fed. Cir. 1986) (district court erred in tolling statute of limitations as to future claims by persons not party to the case before the court). Federal courts do not "'sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before [them].'" *Id.* (quoting *Princeton University v. Schmid*, 455 U.S. 100, 102 (1982)).

The Court finds that plaintiffs' claims were rendered moot by subsequent events. Plaintiffs seek a declaration that the District was not entitled to reassess C.M. The District has already conducted the reassessment; the issue is therefore moot. *See Marple Newton Sch. Dist. v. Rafael N.*, 2007 WL 2458076, *11 (E.D. Pa. 2007) (in challenge to administrative order authorizing evaluation, "the District has performed this evaluation and the court therefore considers the issue moot.") Similarly, plaintiffs seek reimbursement of the $4,800 cost of the IEE; that amount has since been provided rendering the issue is moot as well. The Court cannot issue advisory opinions on the merits of the ALJ's reduction of costs. In both cases, there is no effective relief that the Court can grant to plaintiffs.

Even if an issue would otherwise be moot, if it fits into one of a few exceptions, a party can avoid dismissal. *See Dept. of Education, State of Hawaii v. Rodarte*, 127 F.Supp. 2d 1103 (D. Haw. 2000). One exception bars a finding of mootness if a petitioner would suffer "collateral legal consequences" if the actions appealed were allowed to stand. *Id.*, *citing Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 799 (9th Cir. 1999). Another exception allows that an otherwise moot case will

12

still be heard if it presents an issue that is capable of repetition while evading review.  *Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1459 (9th Cir. 1996).  Plaintiffs argue that their claims fit under both exceptions.

First, plaintiffs argue that "when C.M.'s parents to incurred [sic] costs to defend against [the District's] due process claims and defend against the ALJ's error, plaintiffs acquired a present and real interest in recovering their costs for engaging in [the District's] due process hearing and the cost of establishing the ALJ's error in nearly three years of protracted litigation."  Pl.'s Reply App. I at 4.  Plaintiffs argument is essentially that their presumably forthcoming requests for attorney's fees and other costs of litigation render the issues live.  However, the Ninth Circuit has explicitly held that "the existence of an attorneys' fees claim does not resuscitate an otherwise moot controversy."  *Cammermeyer v. Perry*, 97 F.3d 1235, 1238 (9th Cir. 1996) (finding that attorneys' fee claim was "ancillary" to underlying issues).  Elsewhere, the Ninth Circuit has held that a pending question of attorney's fees for the prevailing party in an administrative hearing does not create "collateral consequences" that implicate the exception to the mootness doctrine.  *United States v. Ford*, 650 F.2d 1141, 1144 n.1 (9th Cir. 1981) (stating that "there is no right to review or redetermine any of the issues in the underlying action solely for the purpose of deciding the attorney's fees question.")

Plaintiffs' position was directly addressed in another IDEA case, *Dept. of Education, State of Hawaii v. Rodarte*, 127 F.Supp. 2d 1103 (D. Haw. 2000).  There, plaintiff Department of Education ("DOE") appealed a hearing officer's award of compensatory education.  The merits were rendered moot by the fact that the child had received the education.  *Id.* at 1112 (noting that student "cannot give the three months of compensatory education back.")  The *Rodarte* court analyzed numerous opinions both within the Ninth Circuit and without, and determined that questions of attorney's fees and costs do not create the collateral legal consequences necessary to avoid mootness.  *Id.*, *citing S-1 v. Spangler*, 832 F.2d 294, 297 & n.1 (4th Cir. 1987) (finding that a rule that averted mootness  because of assertions of attorney's fees and costs "would largely nullify the mootness doctrine with respect to cases brought under the myriad federal statutes that authorize fee awards"); *Associated Gen. Contractors of Conn., Inc., v. City of New Haven*, 41 F.3d 62, 68 & n.9 (2d. Cir 1994) (finding that case became moot on appeal despite fact that determination of attorneys' fees for prevailing party in lower court had not yet

occurred).

The Court therefore determines that the existence of questions regarding attorney's fees and costs do not resuscitate plaintiff's claims regarding the IEE reimbursement and the District's reassessment of C.M.

Plaintiffs alternatively argue that the ALJ's "error" in reducing the IEE reimbursement is capable of repetition yet would evade review. Pl.'s Reply App. I at 2. The Ninth Circuit applies a two part test to determine whether an otherwise moot issue is capable of repetition yet evades review: (1) whether the challenged action is of limited duration, and (2) whether there is a reasonable expectation that the complaining party will be subjected to the same action again. *Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985).

The Court need not address the first prong because it finds that plaintiffs fail to meet the second. Plaintiffs argue that they are likely to be subject to the same denial of an IEE because the District "has conducted and will conduct additional evaluations of C.M.'s IDEA eligibility and to identify his unique needs." Pl.'s Reply App. I at 3. However, whether or not the District conducts additional evaluations, plaintiffs do not suggest that they will again fail to disagree with any assessments of their son for 17 months - the circumstances that led to the reduction of the award.

In sum, the Court will not address the merits of the ALJ's decisions regarding reduction of the IEE reimbursement nor the District's right to reassess to C.M. On these issues, both parties' motions are DENIED as MOOT.

### B.     Adequacy of the 2007 Assessment

ALJ Marson determined that one of the "District's Issues" in OAH Case I was whether the April 2007 Assessment of C.M. complied with legal requirements. OAH Decision I at 1. However, ALJ Marson did not address the issue; instead, he found that "[b]ecause the District is liable to reimburse Parents for the IEE they obtained regardless of the merits of the April 2007 assessment, it is unnecessary to decide here whether that assessment was appropriate." *Id.* at 10.

In their Second Amended Complaint in the OAH I Appeal, plaintiffs claim that "the hearing officer erred when he failed to reach the issue and determine that District's initial evaluation of C.M.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

was inappropriate under IDEA.  Failure to reach this primary issue for hearing violated Plaintiffs' due process rights guaranteed by the IDEA and California law."  OAH I Appeal, Second Amend. Compl., ¶ 98.  However, in their MSJ I, plaintiffs provide no further argument on this point.  Instead, plaintiffs argue (1) that because ALJ Marson did not address an issue raised by the District, plaintiffs are the prevailing party[10], and (2) that the 2007 Assessment was not appropriate.  In the District's MSJ I, it argues that the 2007 Assessment was appropriate.

Plaintiffs appear to have abandoned their initial claim that failure to reach the appropriateness of the 2007 Assessment violated due process.  In any event, the claim is moot since ALJ Geren, in OAH II/III, did address the appropriateness of the 2007 Assessment.  The issue now before this Court, as raised in the cross motions for summary judgment, is whether the 2007 Assessment was appropriate, not whether ALJ Marson violated due process in failing to reach that issue.  Though the parties brief the issue in their OAH I Appeal, the Court will address the issue below in its analysis of the OAH II/III Appeal, where it can properly engage ALJ Geren's findings on the issue.

### C.     Reimbursement for IEE Presentation

Another issue appealed by plaintiffs is whether the District is liable for the costs of the evaluator's presentation of the IEE results at an IEP meeting.  In ordering the District to reimburse plaintiffs the cost of the IEE, the ALJ found that the statute covers only the cost of the evaluation, not the presentation of its results.  Plaintiffs appeal that decision as well.

Under certain conditions a student is entitled to obtain an IEE at public expense.  20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(a)(1)(2006); Cal. Ed. Code, § 56329, subd. (b).  "Independent education assessment means an assessment conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question."   30 C.F.R. § 300.502(a)(3)(i)(2006).  To obtain an IEE, the student must disagree with an assessment obtained by the public agency and request an IEE.  34 C.F.R. § 300.502(b)(1), (b)(2)(2006).

In December 2008, parents had C.M. evaluated by an independent evaluator named Dr.

---

[10]As noted *infra*, footnote 7, the Court will not address the prevailing party arguments in this Order.

United States District Court
For the Northern District of California

Guterman.  ARI 320.[11]  The results of that evaluation were discussed at the March 2009 IEP meeting.  *See* OAH Decision II at 33.  The cost of the evaluation, as presented by checks in the record, was $4,800.  ARI 455.  The plaintiffs contend that the presentation of the IEE results by Dr. Guterman at the March 2009 IEP meeting cost $800.  *See* OAH Decision I at 33.  While ALJ Marson awarded plaintiffs reimbursement of a portion of the IEE, he stated in a footnote that,

> Parents also seek reimbursement for $800 they paid Dr. Guterman to attend an IEP meeting and discuss her assessment.  However, the District's liability is only for the cost of the assessment, not its later presentation by the assessor.

OAH I Decision at 9.  According to plaintiffs, IDEA requires that both the actual evaluation and its presentation be covered at public expense.  As the District has not reimbursed the plaintiffs for any of the cost of the IEE presentation, the issue is not moot, and will be addressed here.

The regulation at issue is 34 C.F.R. § 300.502 (entitled "Independent education evaluation"), which states that "a parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency . . ." § 300.502(b)(2).  "Public expense means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent . . ." § 300.502(a)(3)(ii).  The regulatory scheme clearly contemplates that parents can receive the benefits of an independent evaluation at no expense to themselves.  According to the Supreme Court, the purpose of the IEE is to ensure that parents, in contesting a District's assessment, "are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition."  *Schaffer v. Weast*, 546 U.S. 49, 60 (2005).  It would  be difficult for many parents to "match the firepower" of the government if they could not afford to pay the evaluator to present her findings at an IEP meeting that necessarily includes the District's assessment team.[12]  *See* 34 C.F.R.

---

[11]The administrative record for the appeals is cited as "AR" for pleadings, correspondence, and other exhibits; ARI refers to the pleadings and correspondence in OAH Case I.  Transcripts are cited as "TR."

[12]*See also* Fagen, Friedman & Fulfrost, LLP, "IDEA Due Process Survival Guide: A Step-by-Step Companion for Administrators and Attorneys", 1:23, LRP Publications 2008. ("If the parent already as obtained an IEE, how should I [as administrator] prepare for the IEP team meeting that is scheduled to review it?" "Answer: Invite the private evaluator to the IEP Team Meeting.  It is best practice to invite the private evaluator to the team meeting.  This is beneficial because the evaluator can explain his or her evaluation directly to the team.  It also gives the team a chance to ask any questions they may have about the evaluation."

§ 300.501.  The Court therefore determines that the ALJ erred in not awarding the costs of presentation as part of the "full cost" of the independent IEE.

On this issue, plaintiff's motion for summary judgment is GRANTED.

**D.      Whether ALJ Erred In "Introducing Issues"**

Plaintiffs seek summary judgment on their claim that "the ALJ erred as a matter of law to the extent he added or altered issues decided in his decision that were not raised in [the District's] administrative complaint, and those determinations are void as exceeding the ALJ's jurisdiction." Pl.'s MSJ I, Notice of Motion, at 1.  Plaintiffs point to the fact that the District's due process complaint in OAH I stated, as one issue, that, "When conditions warrant reassessment, the District has the right to conduct that assessment using its own personnel.  Therefore, if reassessment is warranted, the District has the right to conduct that assessment pursuant to the assessment plan proposed on September 24, 2008."  The issue ALJ Marson inquired into was whether reassessment was warranted.  According to plaintiffs, this alters the question that was initially presented: the question was not *whether* reassessment was warranted, but rather if reassessment is warranted, *how* it was to be conducted.  In other words, according to plaintiffs, the District was not entitled to an OAH hearing on potential justifications for a reevaluation.  Pl.'s MSJ App. I, at 17 (*citing* 20 U.S.C. § 1415(f)(3)(B)) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise."))[13]

The Court disagrees.  In its phrasing, the due process complaint contemplated an analysis of whether conditions warrant reassessment.  Moreover, as the District points out, the issues were clarified at the prehearing conference.  The Order Following Pre-Hearing Conference stated the issue as: "Does District have the right to assess Student as described in the September 24, 2008, assessment plan in the areas of social/emotional, educational, and intellectual development?"  AR I 51.  Plaintiffs were therefore put on notice as to the issues to be decided.  Even if plaintiffs' argument that they only "litigated the issues raised by the District in its OAH complaint" is true, that is not for lack of notice from the ALJ.

---

[13]Though the reassessment issue is moot, the Court engages plaintiff's argument because it goes to the ALJ's jurisdiction, itself a threshold issue.

United States District Court
For the Northern District of California

Where proper notice is given, ALJ's have the authority to reorganize issues to properly address the underlying issues of a due process complaint.  *See J.W. ex rel. J.E.W. v. Fresno Unified School Dist.*, 626 F.3d 431, 442-443 (9th Cir. 2010) (where student argued ALJ improperly "restated" an issue, court found "the ALJ's reorganization was inconsequential to student.")  Plaintiff was aware of the issue to be decided at the hearing.  The Court therefore DENIES plaintiff's MSJ on this issue.

With respect to the OAH I Appeal, the Court rules as follows: the Court DENIES plaintiff's motion for summary judgment on plaintiffs' issues 1 and 4 as MOOT.  The Court DENIES the motion on issue 6.  The Court GRANTS IN PART and DENIES IN PART plaintiff's motion for summary judgment on issue 2.  The Court DENIES issues 3 and 5 here, though will address the issue of the appropriateness of the 2007 Assessment in this Section II.

The Court DENIES defendant's motion for summary judgment on defendants' issue 1 as MOOT.

## II.     OAH II/III Appeal (10-4223)

OAH II/III emerged from the two due process complaints filed by C.M.  The questions before ALJ Geren in consolidated OAH II/III were as follows:

I.     Did District deny Student a free and appropriate public education (FAPE) from April 18, 2007, through March 18, 2008?
II.    Did District deny Student a FAPE from March 18, 2008 through March 16, 2009?
III.   Did District deny Student a FAPE from March 16, 2009, through June 2009?
IV.    Must District make reimbursements or provide compensatory education to Student?

*See* OAH Decision II/III at 2.  Within these four issues, plaintiffs raised 35 contentions regarding the District's failure to provide a FAPE to C.M.  *See id.*, at 2-5.

ALJ Geren found for the District on all issues.  Though it was not raised explicitly as an issue, ALJ Geren first determined that the 2007 Assessment was adequate.  He then determined that the District provided C.M. with a FAPE for the time period between April 18, 2007 and June 2009.  He also found that the District was not required to make reimbursements or provide compensatory education to C.M.

United States District Court
For the Northern District of California

The parties filed cross motions for summary judgment.[14]   The Court will first address the

deference standard;  then turn to the adequacy of the 2007 Assessment;  and then whether C.M. received

_____

[14]In their OAH II/III MSJ Notice of Motion, plaintiffs request this Court to find that:

1. The ALJ erred when he determined plaintiffs' claims that occurred before April 16, 2009 were time barred. [sic - the Court assumes plaintiffs meant 2007].
2. The District violated its IDEA child-find obligation when it failed to assess C.M.'s eligibility for special education and related services by first grade.
3. The District's initial evaluation of C.M. violated the IDEA and denied C.M. a FAPE.
4. The ALJ erred when he determined that a student intern in school psychology was qualified to act as a school psychologist at C.M.'s initial IEP team meeting and that the District's use of an intern as a school psychologist violated IDEA requirements and denied C.M. a FAPE.
5. The ALJ erred by failing to determine that the District violated the IDEA by withholding necessary and accurate information at C.M.'s initial IEP team meeting, thereby preventing their meaningful participation in educational decisions regarding C.M.'s eligibility for special education and related services under the IDEA and C.M.'s unique needs from April 2007 through June 2009.
6. That the ALJ erred by failing to determine that C.M.'s initial IEP, dated April 18, 2007, denied C.M. a FAPE, was not developed in conformity with IDEA procedural requirements and was not reasonably calculated to provide meaningful educational benefit.
7. That the ALJ erred when he failed to determine that the District denied C.M. a FAPE because his IEP, of March 18, 2008, initially and as amended, was not reasonably calculated to provide meaningful educational benefit.
8. That the ALJ erred when he failed to determine that C.M.'s parents were entitled to reimbursement from C.M.'s audiology and processing assessments and assessment by Lindamood-Bell Learning Processes.
9. The ALJ erred when he failed to determine that C.M.'s parents were entitled to reimbursement for educational services they provided to C.M., including Tomatis therapy and Lindamood-Bell reading interventions.
10. That the ALJ erred when he failed to determine Plaintiffs prevailing parties on all issues raised by their OAH complaint.

The District states its request for disposition in its Notice of Motion in the OAH I Appeal:
...
2. The ALJ in OAH Case No. 2009040640/2009081105 correctly determined the District's initial assessment of C.M. was appropriate. The assessment met all legal requirements and was conducted by qualified staff. The assessment further evaluated C.M. in all areas of suspected disabilities. The ALJ also correctly determined that the District had the right to reassess pursuant to its assessment plan dated September 24, 2008 and parents thwarted this process and, as such, parents were not entitled to reimbursement for Dr. Dimitri Loomis and Dr. Tina Gutermann's outside assessments of C.M. Finally, the ALJ was correctly [sic] in finding that 34 C.F.R. § 300.152(c) requires the California Department of Education to stay a compliance complaint when a due process complaint is filed in the same topic. According, [sic] the Court should affirm the findings and conclusions of law set forth in pages 8-16, 29-30, 36, 42-44 and 47 of the decision dated June 21, 2010.
3. The decisions of each administrative law judge demonstrate careful and thoughtful analysis of the evidence, testimony and issues, and plaintiffs have failed to meet their burden of proving the decisions were incorrect.

1    a FAPE for each of the relevant time periods.

2

3           **A.      Deference Due ALJ in OAH II/III**

4           As noted above, the amount of deference accorded the hearing officer's findings increases where

5    the officer is "thorough and careful." *Capistrano*, 59 F.3d at 891.  An officer's findings are thorough

6    and careful when "the officer participates in the questioning of witnesses and writes a decision

7    containing a complete factual background as well as a discrete analysis supporting the ultimate

8    conclusions." *Napa Valley*, 496 F.3d at 942.  In *Napa Valley*, the Ninth Circuit found that the hearing

9    officer's were thorough and careful where the officer had asked follow up questions of many witnesses,

10   included several pages of factual background in the decision, and discretely analyzed all the issues

11   presented. *Id.*  "To this extent, the [officer's] findings deserve particular deference." *Id; see also K.S.*

12   *v. Fremont Unified School Dist.,* 545 F. Supp. 2d 995, 1000 (N.D. Cal. Feb. 22, 2008) (Illston, J.) (ALJ's

13   decision afforded considerable deference where ALJ heard a great deal of evidence, held hearings over

14   eight days with thirteen witnesses, and produced a carefully considered 40-page order), *aff'd* 426 Fed.

15   Appx. 536, 537-38 (9th Cir. 2011).

16          Here, the underlying hearings in OAH Case II/III before ALJ Geren took place over eleven days

17   - February 2-4, 8-10, 17-18, and 25, and March 4 and 5, 2010.  The judge heard sixteen witnesses: Jane

18   Jones, Deborah Ross-Swain, Dimitra Loomos, Tina Guterman, Heather Dugan, Carol Harris, Mary

19   Maddux, Patrick Gargioulo, Jane Gebers, Dana Sassone, Karin Kelley, Lauryn Boyle, Jody Carlson,

20   E.M., and M.M. for the student; and Joan McClure for the District (along with a number of recalled

21   witnesses).  Many of the witnesses were called more than once.  The hearings produced over 3,000

22   pages of transcripts and 1,200 pages of exhibits.  ALJ Geren was thoroughly engaged in the hearings,

23   asking numerous follow-up and clarifying questions of the witnesses throughout. *See, e.g.,* TRII 1213-

24   16, 2105, 2340-2350, 2406 -2407, 2439.  ALJ Geren then issued a highly detailed 48-page order that

25   engaged every one of plaintiffs' 35 contentions.  Both the factual and legal analysis evince a thoughtful

26   analysis.  Therefore, while the Court will review issues of law *de novo*, the Court will afford substantial

27   deference to the opinion written by ALJ Geren. *See Amanda J. v. Clark County Sch. Dist.*, 267 F.3d

28   877, 887 (9th Cir. 2001) (Under IDEA, questions of law and mixed questions of fact and law are

1    reviewed *de novo*, unless the mixed question is primarily factual).  The decision below is thorough and

2    careful as that term has been defined by the Ninth Circuit.  *Napa Valley*, 496 F.3d at 942.

3

4           **B.     Adequacy of the 2007 Assessment**

5           C.M. enrolled in Lafayette Elementary School in the beginning of his kindergarten year.  As

6    noted previously, this was also the first year the District began using a Response to Intervention (RTI)

7    model as an intervention strategy to assist struggling learners.  At the hearings, the RTI model was

8    explained by Mary Maddux, whom ALJ Geren found credible.  She testified that at the beginning of

9    each year, students are given a battery of universal screenings, after which the District prepares an

10   "assessment wall" card for each student that identifies his or her grade level; test scores, and other

11   biographical information; results of the screenings; and teachers' classroom observations.  *See* OAH

12   Decision II/III at 5.  Assessment wall meetings are then held, at which students are placed in the

13   "intensive," "strategic," or "benchmark" categories.  "Intensive" students are those who perform well

14   below grade level; "strategic" fall within the instructional range, and "benchmark" are those students

15   performing at or above grade level.  *See* TR II1209-15.

16          Based on these categories, the District determines the level of intervention the students receive.

17   "Tier 1" intervention includes extra in-classroom support; "Tier 2" services are provided by specialists,

18   such as a reading specialist; and "Tier 3," the highest level of intervention, provides small-group

19   instruction in the Instructional Support Program ("ISP").

20          In his kindergarten year, the District began providing C.M. with Tier 1 and Tier 2  intervention,

21   including  additional  instruction  and  support  from  a  reading  specialist.   At  the  conclusion  of

22   kindergarten, C.M. attended a summer class, where he continued to work on his reading skills.  In the

23   first grade (the 2006-2007 school year), C.M. continued to receive Tier 1 support.  A Student Study

24   Team ("SST")  meeting was held on November 8, 2006,which recommended that C.M. work in the

25   Reading Lab as a "guest" of the ISP program.  In February of 2007, a second SST meeting was held.

26   At  that  meeting,  the  SST  recommended,  and  C.M.'s  mother  consented  to,  a  comprehensive

27   pscyhoeducational assessment to determine if C.M. was eligible for special education services and

28   supports.

**United States District Court**
For the Northern District of California

The 2007 Assessment took place over the next two months.  It was conducted by two District employees: Jane Jones completed her assessment report on March 23, 2007; and Michelle Charpentier, a school psychologist intern working under the supervision of Patrick Gargiulo, school psychologist for the District, completed her comprehensive pscyhoeducational report on April 17, 2007.  The report was presented at the April 18, 2007 IEP meeting.

Plaintiffs argue that the 2007 Assessment was inadequate for two reasons: first, that an intern is not qualified to conduct an IDEA evaluation as a matter of law, and second, that the testing done was defective and inadequate.

### 1.    Whether an Intern is Qualified to Conduct Psychoeducational Assessment

California Education Code § 56324 provides that "Any psychological assessment of pupils shall be made in accordance with Section 56320 and shall be conducted by a credentialed school psychologist who is trained and prepared to assess cultural and ethnic factors appropriate to the pupil being assessed."  Plaintiffs argue that because Michelle Charpentier was an intern school psychologist, she was not a "credential school psychologist" as required  under § 56320.

The Court disagrees.  The California Commission on Teacher Credentialing ("CTC") had issued Ms. Charpentier an "Internship Pupil Personnel Services Credential" in the authorized subject of "School Psychology."  *See* ARII 967 (printout of Ms. Charpentier's Credential).  The credential "authorizes the holder to perform the following services in grades 12 and below . . . consult with other educators and parents on issues of social development, behavioral and academic difficulties; *conduct psycho-educational assessments for purposes of identifying special needs . . .*"  *Id.* (emphasis added). Moreover, Education Code § 44454 provides that "[a]n internship credential authorizes the same services at the same levels as the regular credential authorizes."  The CTC credential thus authorized Ms. Charpentier to conduct the assessment.

Importantly, Ms. Charpentier's assessment was conducted under the supervision of an experienced school psychologist, Patrick Gargiulo.  *See* TR180:8-10, 81:22-25, 293-305. Both ALJ Marson and ALJ Geren analyzed the close supervision Gargiulo provided to Ms. Charpentier.  *See* OAH I Decision at 3; OAH II/III Decision at 16-17 (also noting that Mr. Gargiulo "easily recalled the central

facts surrounding this matter and did not provide evasive answers when asked pointed questions.  Mr. Gargiulo provided persuasive testimony that Ms. Charpentier was not only appropriately credentialed, but exceptionally well-qualified.")   Mr. Gargiulo helped develop the testing battery, oversaw its implementation, and analyzed and discussed the results with parents. TR1 293:19-294:6, 294:14-240:4, 241:4-241:17.  The Court finds that, as a matter of law, a state credentialed intern working under the close supervision of an experienced credentialed psychologist meets the requirements of Cal. Ed. Code § 56324.

The Court therefore AFFIRMS the OAH finding on the issue and DENIES plaintiff's motion for summary judgment on plaintiffs' issue 4.

## 2. Whether the 2007 Assessment was Adequate[15]

Ms. Charpentier administered the following tests:  the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV); the Comprehensive Test of Phonological Processing (CTOPP); and the Wide Range Assessment of Memory and Learning (WRAML-2).  As ALJ Geren found, she also reviewed the Student's health and developmental history, his educational history, conducted classroom observations of C.M., and obtained teacher comments about their observations of C.M.  Finally, she noted his test-taking behavior, measured his cognitive function, analyzed the assessment results, and included all of this information in her assessment report.  OAH II/III Decision at 8.  Based on the assessment, the April 18, 2007 IEP team concluded that C.M. was eligible to receive special education services under the qualifying category of Specific Learning Disability ("SLD"), more specifically identified in the IEP eligibility documents as a "Processing Disorder," and then "further refined as a problem with "Phonological Processing."  *Id.*

Parents argue the Assessment was inadequate based on the testimony of their own experts. Between eight and twenty-one months after the 2007 Assessment, parents had three experts assess C.M.

[15]The Court finds *infra* that the plaintiffs' claims prior to April 16, 2007 are time barred by the statute of limitations. Nonetheless, the Court addresses the issue of the adequacy of the 2007 Assessment because (1) that assessment sets the stage for the subsequent educational support C.M. received, and its adequacy plays a role in determining whether C.M. received a FAPE, (2) it is unclear whether the challenge to the Assessment itself would be time barred, as parents did not have knowledge of its results until April 18, 2007, within the statute of limitations, and (3) in the interest of thoroughness.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Dr. Dimitra Loomos, a Doctor of Audiology, assessed C.M. in November 2007 and prepared a "Central Auditory Processing Evaluation," dated December 30, 2007.  Dr. Deborah Ross-Swain, a speech and language pathologist, assessed C.M. in March 2008 and prepared a report, dated March 24, 2008.  And Dr. Tina Guterman, a pediatric neuropsychologist, assessed C.M. in December 2008 and January 2009, and prepared her report in January of 2009.

Based on the results of their own experts, plaintiffs argue that the 2007 Assessment was inadequate for a number of reasons.  First, they argue that the assessment "significantly" understated C.M.'s cognitive ability.  Pl.'s MSJ App. I at 23.  Second, they argue that the District failed to evaluate C.M. in all areas of suspected disability (as they must) despite "red flags."[16]  *Id.*  Finally, they argue the assessment failed to properly diagnose C.M. with an "auditory processing disorder" rather than a phonological processing disorder.  *Id.*

ALJ Geren found that each of the plaintiffs' experts was well-qualified to render opinions following their respective assessments.  However, he also found that their testimony did not support a finding that the District's assessment was flawed.  He found particularly influential the fact that the plaintiffs' experts did not conduct their own assessments until at least eight, and up to twenty one months after the District's assessment.  Moreover, "the fact that District did not label the Student's disability as an 'auditory processing disorder,' choosing instead a 'phonological processing disorder,' at least in this instance, is a distinction with no meaningful consequence.  Student's core problem was with reading, and characterizing his eligibility as a 'phonological processing disorder' adequately identified Student's needs, such that District was able to devise and implement appropriate reading intervention strategies."  OAH Decision II/III at 12.

The Court agrees.  Whether or not the plaintiffs' experts were as credible as the District's psychologists, plaintiffs' experts' evaluations were conducted long after the assessment at issue.  In evaluating IEPs, the Ninth Circuit uses a "snapshot" rule.  "Actions of the school systems cannot be judged exclusively in hindsight.... [A]n individualized education program is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not,

[16]In evaluating a child for special education eligibility, a district must assess him in all areas related to a suspected disability.  20 U.S.C. § 414(b)(3)(B)(I).

objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). The relevant "snapshot" here was of C.M.'s abilities in early 2007, not the later assessments done by plaintiffs' experts. Eight to twenty months is a long time in the life of a first grader. At the time of the assessment, according to the evidence in the record and the District's experts, the District appropriately tested C.M.'s suspected disabilities.

The Court also agrees with ALJ Geren's conclusion that the labeling of the diagnosis was, in this case, irrelevant. The important question is whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). The administrative record includes the Special Education Local Plan Area ("SELPA"), a form used by the District to assess students' special education ability. In the "Specific Learning Disability Eligibility Summary," it lists under the heading "Processing Disorder," eight types of such disorders, including "phonological processing" and "auditory processing." AR1 269. There is a check mark next to the former rather than the latter. *Id.* The Court need not decide whether C.M.'s precise disorder was phonological or auditory in early 2007, because the District has shown by a preponderance of the evidence that what was required was intensive reading assistance. "The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [Student's] multiple disabilities." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1995). Changing the name of the disability attributed to C.M. would not have changed the necessary intervention, which was intensive reading assistance - precisely what the IEP recommended. *See* ARI271 (SELPA Form recommending ISP for language arts, four times per week at 45 minutes each).

The Court finds that the 2007 Assessment was adequate. The Court addresses below whether the IEP resulting from that assessment was adequate. The Court DENIES plaintiffs' motion for summary judgment on the adequacy issue, and GRANTS defendant's motion for same.

### 3.     Whether ALJ Castillo in OAH II erred in dismissing C.M.'s claims as time barred

In the OAH II decision, ALJ Castillo dismissed plaintiffs' claims that accrued prior to April 16, 2007 as time barred. Plaintiffs appeal that decision here. The outcome of that decision is pertinent to

United States District Court
For the Northern District of California

plaintiffs' argument that the District violated IDEA's Child Find provisions by failing to evaluate C.M. under the IDEA prior to providing him special education in kindergarten and first grade, and by failing to notify C.M.'s parents of their rights to obtain an evaluation of C.M.'s educational needs prior to the April 18, 2007 IEP meeting. Because the Court agrees that both issues are time-barred, it need not address the underlying merits of those claims.

The statute of limitations for due process complaints in California precludes claims that accrued more than two years prior to the date of filing the request for due process. Cal. Edu. Code § 56505(l) (A due process hearing "shall be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request"); 20 U.S.C. § 1415(f)(3)(C). The IDEA, in 20 U.S.C. § 1415(f)(3)(D), and Cal. Ed. Code § 56505 establish exceptions to the statute of limitations if the parent was prevented from filing a request for due process hearing due to specific misrepresentations by the district that it had resolved the underlying problem addressed by the due process complaint, or where the district withheld information from the parent that was required to be provided to the parent.

Plaintiffs filed a due process complaint against the District on April 16, 2009. ALJ Castillo found that all claims which accrued prior to April 16, 2007, were barred by the statute of limitations. He stated that,

> The fact that Student's parents were not aware and had no reason to know that the District violated the [IDEA] is not grounds to toll the two-year statute of limitations. The language in § 56505(l) refers to a parent's knowledge of the underlying facts, which Student's parents knew about when they occurred, according to the complaint. [Furthermore], the complaint and Student's response contain no allegation that the District made specific misrepresentations that it had resolved the problem or that it withheld information required to be provided, which prevented Parents from filing a complaint.

OAH II Decision at 2-3. He found that C.M.'s claims that accrued before April 16, 2007 were therefore outside of the two-year statute of limitations.

Plaintiffs argue that (1) the ALJ erred by assuming plaintiffs knew or had reason to know facts underlying the basis for the due process request, and (2) that the District withheld pertinent information from them that was required to be disclosed, and thus the statute of limitations was tolled. The basis of plaintiffs' argument is that the District did not provide them with a Notice of Procedural Safeguards until

**United States District Court**
For the Northern District of California

1   the April 18, 2007 IEP meeting, and that the District did not provide them with RTI information

2   regarding C.M.

3   The Court disagrees on both counts. The evidence in the record suggests that parents were given

4   a Notice of Procedural Safeguards as early as the February 17, 2007 meeting. Ms. Jones testified that

5   at that meeting, "along with the assessment plan, [E.M.] would have been given a copy of parents'

6   procedural safeguards." TRII 499. It is true that she also stated that she did not have a "present

7   recollection" of giving her that exact document, but that is unnecessary for the Court to find her

8   testimony credible. *See, e.g.,* FRE 406 ("Evidence of a person's habit or an organization's routine

9   practice may be admitted to prove that on a particular occasion the person or organization acted in

10   accordance with the habit or routine practice.")[17]

11   Moreover, even had parents not received the Notice, it is unclear that the limitations would

12   necessarily be tolled. The statute requires that a due process request "shall be filed within two years

13   from the date the party initiating the request knew or had reason to know of the facts underlying the

14   basis for the request." Cal. Edu. Code § 56505(l). The "facts underlying the basis" for the request were

15   the educational activities of the District with respect to C.M. C.M.'s parents were actively involved in

16   overseeing the education of their son. *See, e.g.,* OAH Decision II/III at 17. The parents had sufficient

17   knowledge of the educational goings-on inside and outside the classroom to be put on notice for their

18   underlying claims. *See Bell v. Bd. of Educ. of the Albuquerque Pub. Schs.*, 2008 WL 4104070, at *17

19   (D. N.M. 2008) ("The IDEA's plain language states that the limitations period is two years from the date

20   that the parents knew of the complained of action, not two years from the date the parents knew the

21   action was wrong.") The Court finds that the circumstances here do not warrant tolling.

22   Nor does plaintiffs' contention that they did not receive all of the District's RTI data regarding

23   C.M. toll the statute. As discussed in more detail below, the IDEA allows districts to determine

24   eligibility for a specific learning disability using either a "response to intervention" model or a "severe

---

25   [17]The Court recognizes that there was competing testimony from E.M. that she had not received

26   the parental rights notice at the February 17, 2007 meeting. TR2601:1-25. ALJ Geren found that E.M.'s testimony "about what documents she did and did not receive from District was sketchy. For example,

27   on cross-examination Mother [E.M.] testified that she had not seen several documents, until it was pointed out to her that she had, in fact, signed them. Also Mother testified that she maintained a file of all documents received from the District, which she kept in chronological order. However, Mother did

28   not produce this file." OAH Decision II/III at 19. The Court defers here to ALJ Geren's findings.

United States District Court
For the Northern District of California

discrepancy" model.  *See* 20 U.S.C. § 1414(b)(6).  The IDEA only requires disclosure of RTI data if the RTI model is used for eligibility determinations.  *See* 34 C.F.R. § 300.311(a)(7)(i)-(ii).[18]  C.M.'s eligibility was determined using the severe discrepancy model, not the RTI model.  TRII 2961:4-11 (Question: "So in April 2007 how was Lafayette School District determining the presence of a specific learning disability?" Dr. Sassone, District's Director of Student Services: "We were using a discrepancy model, which meant we looked at the discrepancy between ability and achievement.  We looked at identifying a processing disorder.")[19]  There was therefore no legal requirement to disclose RTI data under 34 C.F.R. § 300.311(a)(7)(i)-(ii).[20]

Because plaintiffs have not shown by a preponderance of the evidence that the statute of limitations warrants tolling, any claims regarding occurrences prior to April 16, 2007 are time barred.  The Court therefore DENIES plaintiffs' motion for summary judgment on plaintiffs' issues 1 and 2, the pre-April 16, 2007 claims.

### C. Whether the April 18, 2007 IEP Provided C.M. with a FAPE

One key issue under the IDEA is whether the child receives an appropriate individualized education program ("IEP").  The IDEA provides for a cooperative process between parents and schools which culminates in the creation of an IEP for every disabled student.  20 U.S.C. § 1414; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the

---

[18]Specifically, 34 C.F.R. § 300.311 requires disclosure of "the documentation *of the determination of eligibility*."  If the § 1414(b)(6)(B) RTI model is not used for the eligibility determination, the disclosure requires of § 300.311 are inapplicable to any collected RTI data.

[19]Further evidence that the District relied on the severe discrepancy model is provided is Ms. Jones' March 23, 2007 Assessment Report.  ARII 895-898.  In her summary, Ms. Jones concludes that "[C.M.] was referred to Special Education testing due concerns regarding academic progress in the area of language arts . . . There is a significant discrepancy between ability and academic performance."  *Id.*

[20]In any event, Parents were provided with a large quantity of data regarding C.M.'s levels of performance and progress, some of which was derivative of the RTI data.  The record contains report cards (ARII 528-532), notes from parent teacher conferences (ARII 537), assessment reports (ARII 895-898), as well as the information discussed in multiple Student Study Team ("SST") meetings. (ARII 538-540).  As ALJ Geren noted, the notes from the February 8, 2007 SST meeting address C.M.'s evaluations ("Speech services have been discontinued - articulation; does well in small group, overwhelmed in large group") as well as areas of need ("memory, reading consolidation, math . . .") and modifications/actions to his educational program ("continue in reading (ab. 4x weekly ½ hour), continue as guest in resource 4x weekly).  ARII 540.

United States District Court
For the Northern District of California

nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53. The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Schools are obligated to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.'" *J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1033 (9th Cir. 2009) (quoting *Rowley*, 458 U.S. at 197 n. 21, 200).

Plaintiffs raised (and lost on) 27 contentions in the OAH II/III Case related to whether C.M.'s IEPs denied him a FAPE, all of which they appeal. *See* OAH II/III Decision, at 2-5 (Contentions re: Issue 1(A)-(O); 2(A)-(I); 3(A)-(C)). From their MSJ II, it becomes clear that many of plaintiffs' contentions can be addressed by answering three related questions: (1) whether the IDEA incorporates the requirements of the No Child Left Behind Act of 2002 ("NCLB"), 20 U.S.C. § 6301, *et seq.*; (2) whether the District violated IDEA requirements by not considering C.M.'s RTI data in their IEPs; and (3) whether C.M.'s IEPs otherwise meet the requirements of 20 U.S.C. § 1414(d). The Court will address the three questions in turn. Supplemental questions also raised that are not answered by those three analyses -- such as whether the District ensured the attendance of necessary staff at IEP meetings -- will be addressed separately.

### 1.    Whether IEPs under the IDEA are bound by the NCLB requirements

Plaintiffs attack C.M.'s IEPs for failing to "identify a relationship to C.M.'s overall reading ability or to State achievement standards applicable to all children in the state." Pl.'s MSJ App. II at 17, 23, *citing* 20 U.S.C. § 6311. Plaintiffs here are not referencing the requirements of the IDEA, but rather those of the No Child Left Behind Act of 2002 ("NCLB"), 20 U.S.C. § 6301, *et seq.* Plaintiffs' argument is that the IDEA IEP requirements incorporate the NCLB standards, *sub silientio*, and that the District failed to account for those standards in C.M.'s IEPs. Plaintiffs contend that the "NCLB requires coordination between implementation of NCLB and IDEA requirements and that children be assessed and parents and educators can monitor their academic progress toward meeting the same state level standards for all children." Pl.'s MSJ App. II at 11.

The Court disagrees. Plaintiffs provide no legal authority for their contention that the IDEA IEP requirements incorporate NCLB standards. Courts that have considered the issue have uniformly

rejected that argument. *See Leighty ex. rel. Leighty v. Laurel School Dist.*, 457 F. Supp. 2d 546, 561 (W.D.Pa. 2006) (finding that "[t]he NCLBA contains no specific language which purports to alter the IDEA's FAPE and IEP requirements"); *see also Board of Ottawa Tp. High School Dist. 140 v. U.S. Dept. of Educ.*, 2007 WL 1017808, at *6 (N.D. Ill. 2007), *aff'd sub nom., Dist. 140 v. Spellings*, 517 F.3d 922 (7th Cir. 2008) ("The evidence demonstrates that not one provision of the NCLBA ultimately requires Plaintiff school districts to change the IEPs of its disabled students. The text of both the NCLBA and the IDEA actually suggest the exact opposite conclusion."); *Fisher v. Stafford Tp. Bd. of Educ.*, 2007 WL 674304, at *13 (D. NJ 2007) ("There is absolutely no support in the statutes or case law for Fisher's attempt engraft [sic] the achievement standards referenced in the NCLB Act onto the IDEA.") Plaintiffs do not re-raise the argument in their reply, and the Court is hesitant to make any pronouncements about whether one federal statutory scheme incorporates another based solely on out-of-Circuit authorities and the slight briefing on the issue before it. It is sufficient for the purposes of the instant motion that plaintiffs have failed to meet their burden of persuasion on summary judgment to show that C.M.'s IEPs should be held to anything but IDEA standards.

### 2.    Whether the IEPs required consideration of C.M.'s RTI data

In its discussion of the statute of limitations above, the Court found that the District was not statutorily required to disclose C.M.'s RTI data to Parents, because C.M.'s eligibility was determined by a severe discrepancy model. *See* Section II.B.3. In addition to their failure-to-disclose argument to toll the limitations period, plaintiffs contend that C.M.'s IEPs were "fatally defective" because the District itself failed to include and consider C.M.'s RTI data in developing the IEPs. *See* Pls.' MSJ App. II, at 15. Plaintiffs' RTI arguments run throughout the motions, and essentially have two prongs - one procedural and one substantive. Procedurally, plaintiffs argue that the District was statutorily required to consider the RTI data in developing the IEP. Second, and more substantively, parents argue that they could not meaningfully participate without all of the available RTI data, thus denying C.M. a FAPE.

The dispute around the RTI information implicates the fifth motion at bar, defendant's motion to strike. The Court will first address that motion, and then proceed to the merits of the RTI arguments.

### a.    District's Motion to Strike Supplemental Testing Data

Along with plaintiffs' opposition to defendants' MSJ II, plaintiffs attached two declarations and a number of exhibits.  The declarations and exhibits concern RTI testing data collected about C.M. from September 2, 2005 (Foltz Decl., Ex. A at 4) through November 17, 2008 (*id.* at 38).   In their declarations, E.M. and Foltz contend that the testing data was withheld from Parents and not provided to them until late in discovery in the instant case, rather than when the data was relevant to developing C.M.'s IEP's.  *See* E.M. Decl., Doc. 65, Ex. 8, ¶¶ 1-9.  The District argues that the evidence should be stricken because plaintiffs did not seek to supplement the administrative record as ordered by this Court, and that the evidence is hearsay, lacks foundation, contains improper opinion testimony, and is not properly authenticated.  *See* Def.'s Mot. to Strike, Doc. 112, CV 09-4624 SI, at 2.

The Court recognizes the District's argument that plaintiffs are unfairly seeking to supplement the administrative record through an attached declaration, as opposed to requesting leave to file a motion.  On May 9, 2011, the Court ordered the parties to file motions to supplement the record by September 9, 2011.  Doc. 34, 10-4223.  Both parties did so, a hearing was held, and the Court issued two opinions granting in part and denying in part the parties' motions to supplement.  *See* 09-4624, Doc. 105, and 10-4223, Doc. 56.  This was the proper procedure by which to supplement the record.

Nonetheless, the Court finds that the material provided in the declarations and attached exhibits is admissible.  The IDEA allows a party to request that the court hear "additional evidence."  20 U.S.C. § 1415(i)(2)(C)(ii).  The IDEA does not set forth a specific procedure by which the Court may hear additional evidence.  The Ninth Circuit recently affirmed that "under our precedent, evidence that is non-cumulative, relevant, and otherwise admissible constitutes 'additional evidence' that the district court shall consider pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)."  *E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1005 (9th Cir. 2011).  Here, the RTI data is non-cumulative and is relevant to plaintiffs' substantive argument that Parents could not meaningfully participate in the IEP process.  Moreover, they were produced as part of the District's discovery.  The Court finds that the data is otherwise admissible, and thus meet the *Pajaro Valley* standard for admission as additional evidence.

Defendant's motion to strike is DENIED.

**b.**        **Whether IDEA requires consideration of RTI data by the IEP team**

Plaintiffs argue that "as part of C.M.'s initial evaluation, the IEP team was required to consider RTI evaluation data." Pls.' MSJ App. II, at 15, *citing* 20 U.S.C. § 1414(c). The Court disagrees. Plaintiffs rely on § 1414(c), which sets forth the requirements for reviewing "existing evaluation data" in the creation of a child's IEP. Section 1414(c) states that, "as part of an initial evaluation (if appropriate) . . ." the IEP team should review data "including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers."        § 1414(c)(1)(A)(i)-(iii). Nowhere does § 1414(c) specifically require consideration of RTI data. Even § 1414(b), which does address the usage of RTI data, states only that a District "may use" RTI processes to determine if a child has a specific learning disability. Moreover, by its annotation that data should be considered "if appropriate", the statute expressly contemplates using a limited set of data - not all of the information the District has acquired regarding the student.   Nor does plaintiffs' reliance on 34 C.F.R. § 300.311(a)(7)(B) support their contention that RTI documentation must be considered in an IEP. *See* Pls.' Opp. App. II. As the Court stated above, *see* Section II.B.3, that regulation's requirement is only applicable where the RTI model was used to determine eligibility in the first place; here, the District used the severe discrepancy model to determine C.M.'s eligibility as described in § 1414(b)(6)(A). *See* Section II.B.3. The regulation does not require the disclosure or use of RTI data where it was not used in eligibility determinations. *Id.*

In developing the IEP, the IEP team considered data from the WISC IV, WRAML-11 and CTOPP, and the "relevant classroom behavior observed and relationship to academic functioning" described in a separate "Psych Report."  *See* ARII 553 ("Special Learning Disability Eligibility Summary," April 18, 2007); *see also* ARII 895-898 (March 23, 2007 Assessment Report by Ms. Jones). The Court finds this sufficient to meet § 1414(c) standards, and finds unavailing plaintiffs' arguments that consideration of RTI data was statutorily required.

United States District Court

For the Northern District of California

1

2

### c.     Whether Parents meaningfully participated in April 18, 2007 IEP Meeting

3      The ALJ found that plaintiffs "failed to produce persuasive evidence that District prevented

4  Parents from meaningfully participating in the IEP process.  Mother signed IEP documents attesting

5  either to her assent and/or participation.  Additionally, the weight of the evidence established that Parents

6  were actively involved in Student's education, commencing with his enrollment."  OAH II/III Decision,

7  at 43.  On appeal, plaintiffs argue that the District's "withholding" of the RTI data prevented their

8  meaningful participation in the IEP process.  Pls.' Opp App. II at 17.

9      A procedural violation of the IDEA, if it denies a parent meaningful participation in the decision-

10  making process of the IEP team, is a denial of a FAPE.  *See Bell v. Board of Educ. of Albuquerque Pub.*

11  *Schools*, 2008 WL 5991062, at *30 (D. NM, Nov. 28, 2008).  A parent has meaningfully participated in

12  the development of an IEP when, for example, she is informed of her child's problems, attends the IEP

13  meetings, expresses her disagreement with the IEP team's conclusions, and requests revisions in the IEP.

14  *N.L. v. Knox County Schs.*, 315 F.3d 688, 693 (6th Cir. 2003).

15      One preliminary question as to whether Parents meaningfully participated in the IEP is whether

16  the April 18, 2007 meeting had the necessary attendees.  Plaintiffs argue that the "lack of proper IEP team

17  members violated the IDEA and denied C.M. a FAPE because the [District's] student intern was not

18  qualified to attend an IEP team meeting to explain test results . . ."  Pls.' MSJ App. II at 16.  Federal

19  regulations require that the team include "at least one person qualified to conduct individual diagnostic

20  examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading

21  teacher."  34 C.F.R. § 300.308(b).  The April 2007 IEP meeting included Mary Maddux (administrative

22  designee); Joan McClure (C.M.'s first grade teacher); Jane Jones (special education teacher); Michelle

23  Charpentier (the school psychologist intern); and E.M.  Plaintiffs argue that the meeting lacked the

24  required school psychologist because Michelle Charpentier was not qualified to explain test results, since

25  she was not qualified to administer the tests in the first place.  Pls.' MSJ App. II at 16.  The Court has

26  already rejected the underlying premise that Ms. Charpentier was not qualified to administer the tests;

27  *a fortiori* she could explain the results as well.  The Court finds that the necessary attendees were at the

28  meeting.

33

As to the substantive argument, the Court has reviewed the record, including the recently supplemented materials. The Court finds that parents meaningfully participated in the IEP process. Prior to the April 2007 IEP meeting, parents had a number of meetings with C.M.'s teachers. *See* TRII 2439 (Ms. McClure: "At the beginning of [first grade], we had many meetings with mom and dad regarding some of the playground behavior and then probably we do an early conference I think that year in September . . ."). E.M. then participated in Student Study Team meetings on November 8, 2006 and February 8, 2007. *See* ARII 538-540. Those meetings discussed C.M.'s strengths, background information, modifications tried, areas of need, and modifications/actions developed by the team. ARII 538-39. At the April 18th meeting itself, to the extent the attendees remembered the meeting, the hearing transcripts show that C.M.'s performance and goals were discussed. *See* TR II 2107-8 (Jones recommended her services for C.M.); 2422-2424 (McClure found Charpentier's reports consistent with C.M.'s classroom behavior). E.M. signed the IEP summary, including a statement that "I have received copies of the Individualized Education Plan, assessment reports, Parent's Right/Procedural Safeguards and the information and decisions indicated above have been explained to me. I participated in the development of this IEP and I give my consent to the IEP as written and the services required to implement the program." ARII 551. As noted above, parents were provided with extensive data regarding C.M., some of it derivative of the RTI data. *See* note 20. Finally, in the months and years following, the record shows continuous correspondence between the District and the parents, particularly where the parents raised concerns. *See* ARII 555-560, 1093-1116. The sum of this evidence shows meaningful participation in the IEP process.

Plaintiffs argue that the District's "withholding" of the recently-discovered RTI data prevented Parents from being able to meaningfully participate. Citing that material, plaintiffs contend:

> For example, C.M. made relative progress on DIBELS ["Dynamic Indicators of Basic Early Literacy Skills"] measures through [the District's] intervention class after kindergarten and while attending reading lab in first grade, but continued to struggle with oral reading fluency. C.M.'s DIBELS data showed that C.M. had exceeded benchmark performance on measures of "phonemic segmentation fluency" prior to his initial IEP team meeting. C.M.'s parents would have wanted to know the relationship of C.M.'s DIBELS score to [the District's] assessment data that identified phonemic processing as his primary area of need.

Pl.'s Opp. App. II at 17. Plaintiffs contend that without the data, they "could not ask questions" at the

IEP meetings that would otherwise be generated.  *Id.*

It is possible that provision of the data may have allowed for greater or different participation in developing the IEP.  However, maximum participation is not the standard under the IDEA.  The standard is meaningful participation, and the Court finds that occurred.  *See J.L. v. Mercer Island Sch. Dist.*, 575 F.3d 1025, 1033 (9th Cir. 2009) (quoting *Rowley*, 458 U.S. at 197 n. 21, 200) ("Under the IDEA, schools are obligated to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.'")  Numerous meetings were held, IDEA procedural requirements were met, and all statutorily-required materials were disclosed.  With respect to the parents' participation in the development of the IEP, the District acted in compliance with the IDEA's mandates.

**3.      Whether C.M.'s April 18, 2007 IEP met the requirements of 20 U.S.C. § 1414(d)**

Plaintiffs also argue that C.M.'s April 18, 2007 IEP did not satisfy the requirements of IDEA 20 U.S.C. § 1414(d).  Pls.' MSJ App. II at 17-18.  Section 1414(d) requires an IEP to include, in part:

> (I) a statement of the child's present levels of performance . . .
> (II) a statement of measurable annual goals . . .
> (III) a description of how the child's progress toward meeting the annual goals . . . will be measured . . ., [and]
> (IV) a statement of special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child . .

20 U.S.C. § 1414(d).  Plaintiffs contend that the IEP failed to meet any of these requirements.  Pls.' MSJ App. II at 17-18.

The Court disagrees.  A reading of the April 18, 2007 IEP shows that it meets all of the § 1414(d) requirements.  *See* ARII 544-554.  For example, in the analysis of the "Curriculum Content Area: Reading", ARII 546, the IEP states: "Present level of performance: [C.M.] is able to identify letters of the alphabet and their sounds.  He has difficulty decoding words as he reverses 'b' and 'd' and incorrectly identifies sounds in words.  He most often will look at the first letter of a word and guess at the remainder . . . During oral discussion [C.M.]'s knowledge and comprehension are good but when struggling to read comprehension often suffers."   AR II 546 (thus meeting the "present level of performance" requirement.)  Under "Annual goals" it states, *inter alia*, that "[C.M.] will decode words with 80% accuracy in 2 of 3 trials *as measured by* informal tests and work samples by 4/18/08."  ARII

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

546 (thus meeting the "annual goals" as well as the "description of measurement" requirements). The IEP further states that C.M. is to receive "ISP, language arts, pull-out small group" four times a week for 45 minutes. ARII 551 (thus meeting the "statement of special education" requirement). The Court highlights these excerpts of information provided in the IEP to demonstrate that the IEP meets the requirements of the IDEA as required by § 1414(d). More thorough data is provided in the IEP documents themselves. *See* ARII 544-554.

In sum, the April 18, 2007 IEP met all relevant IDEA procedural requirements.

### 4.      Whether the April 18, 2007 IEP was reasonably calculated to provide C.M. meaningful educational benefits

Beyond the procedural requirements of the IDEA, the IEP must also be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). Plaintiffs argue that the IEP failed to provide C.M. with a FAPE because it "did not identify appropriate services to address his unique needs, including his need for research-based interventions [RTIs] to address his dyslexia and his CAPD, as a hearing impairment." Pl.'s MSJ App. II at 17. Plaintiffs argue that this led to C.M.'s "growing anxiety about his school performance" and to losing ground in second grade (fall 2007 - spring 2008) relative to his own scores. Pls.' MSJ App. II at 17-18.

It was during C.M.'s second grade year that Parents sought the assistance of outside experts. The first of such experts was Dr. Loomos, who diagnosed C.M. with CAPD in December 2007.[21] *See* ARII 510-517 (the "Loomos Report"). The record contains Dr. Loomos' "Central Auditory Processing Disorder Evaluation," in which Loomos found that "C.M. demonstrated good auditory discrimination in quiet, good auditory decoding (phonemic awareness), good auditory closure and good auditory figure/ground ability (pulling speech out from background noise) . . . Conversely, his performance on [certain tests] indicated a deficit for integrating auditory information within the central auditory nervous

---

[21]According to the Loomos Report, central auditory processing is the execution and coordination of specific auditory mechanisms in an interactive manner. CAPD "will act like an acoustic filter that distorts the reception and/or interpretation of verbal language. This process of differential diagnosis is very important because verbal information processing problems can result from: an auditory processing problem; a language processing problem; a combination of both types of processing problems; and.or deficits in cognitive decision making or memory or attention or emotional factors." ARII 511.

system."  ARII 512.  Dr. Loomos recommended a number of exercises (such as jigsaw puzzles and charades to link auditory and non-auditory cues) as well as employing the Lindamood-Bell "Visualizing and Verbalizing" program.  ARII 514.  Plaintiffs argue that they delivered the Loomos report to District staff, but "nothing changed for C.M.'s educational services."  Pls." MSJ App. II at 20.

In March of 2008, parents also obtained a processing assessment from Dr. Ross-Swain to evaluate C.M.  Dr. Swain tested three types of processing skills: auditory, auditory-language and information processing.   ARII 492-506.  The test battery found that C.M. "experiences a range of average ability to significant difficulty with specific skills of auditory-based language processing." ARII 494.  It further found that C.M. has a "deficit in the processing of auditory input, which may be exacerbated in unfavorable acoustic environments and is associated with difficult listening, speech understanding, language development, and learning."  ARII 492.  The report recommended a number of environmental modifications (such as reducing extraneous background noise), compensatory strategies (such as using "multisensory learning"), and the use of a number of programs, such as the Tomatis Method Sound-Based Therapy, Lindamood-Bell, and PACE.

Plaintiffs argue that the 2007 IEP did not address C.M.'s potential CAPD despite substantial evidence that he had it, such as the fact that C.M. had "failed to achieve grade-level performance at the end of kindergarten and remedial summer school" and continued to make "insignificant progress" through the end of second grade.  Moreover, plaintiffs' "IEP team did not convene to consider the information provided from Loomos or Dr. Swaim, or to discuss C.M.'s universal assessment data."  Pls.' MSJ App. II at 21.  Therefore, plaintiffs conclude, "C.M.'s defective 2007 IEP denied C.M. a FAPE." *Id.*

The Court disagrees.  The Court has already addressed the crux of plaintiffs' argument-- a missed or mis-diagnosis -- in its analysis of the adequacy of 2007 Assessment.  *See* Section II.B.2.  As noted there, the IEP was not fatally defective because it listed "phonological processing" rather than "auditory processing."  *Id.*  The question here is whether the application of the IEP denied C.M. a FAPE, not the precise label the District applied.  *See Heather S.,* 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the student]'s multiple disabilities.").  The Court turns to that question, rather

United States District Court
For the Northern District of California

1  than the appropriate label.

2  ALJ Geren made undisputed factual findings as follows.  Ms. Carson, C.M.'s second grade

3  teacher, considered C.M.'s needs for accommodation, and assigned him to in the front row so that she

4  could observe him as he read and reread passages to her.[22]  OAH Decision II/III at 22.  Ms. Carson

5  "noted that at the beginning of the school year, [C.M.] took longer than other students to complete his

6  assignments.  However, by the end of the year, he completed assignments sooner and more accurately.

7  He told Ms. Carson he was no longer becoming fatigued when doing his assignments."  *Id.*  At his

8  special education classes, Ms. Jones (C.M.'s special education teacher) used a program entitled the

9  "Metra Companion Reader."  This program "is a sequential curriculum developed by culling out the best

10 components from older, more established reading remediation programs.  The aim . . . is to help

11 struggling readers."  *Id.*  Finally, in addition to the "Metra Companion Reader" program, C.M. received

12 what was prescribed in the IEP – four day per week, 45-minute services in a program called "Visualizing

13 and Verbalizing."  *Id.*[23]

14 The parties dispute C.M.'s progress from these programs.  As noted, Ms. Carson found that by

15 the end of second grade, C.M. completed assignments sooner and more accurately, and was no longer

16 fatigued when doing his assignments.  Plaintiffs argue that C.M. actually regressed in second grade,

17 pointing to his SORT scores, in which he achieved a reading level of 1.3 (first grade, third month level)

18 at the beginning of second grade and 1.2 by the end.[24]  Pl.'s Reply App. II at 6.  Plaintiffs agree that

19 C.M. improved in stamina and listening, but attribute that instead to the outside Tomatis therapy they

20 enrolled him in (discussed below).  *Id.*

21 After review of the evidence, the Court agrees with ALJ Geren that the District provided C.M.

22

23 _____

   [22]The Court notes that this matches one of Dr. Loomos' recommendations, to "read aloud daily at home while emphasizing rhythm, stress, and intonation patterns."  ARII 514.

24 [23]However, as plaintiffs state, at the end of second grade, "C.M.'s parents declined to place C.M. into the District's reading lab with first-grade students because they were concerned about C.M.'s

25 embarrassment and anxiety over not being able to read and being placed in a pull-out class with first graders who were two years younger than C.M."  Pl.'s MSJ App. II at 20.  Plaintiffs then brought C.M.

26 to Dr. Swain.  *Id.*

   [24]On the other hand, in a contemporaneous email sent by E.M. to Ms. Carson at the end of

27 C.M.'s second grade, E.M. wrote that "Your [Ms. Carson's] ability to apply the recommendations that help [C.M.] have had such a positive effect on his learning and his desire to learn.  In addition to that

28 your sensitivity to his challenges have really helped to develop such a positive foundation for him."  ARII 1114 (May 15, 2008).

with a FAPE following his April 18, 2007 IEP.  The Court has already found that the 2007 Assessment was appropriate and that the April 18, 2007 IEP met all procedural IDEA requirements.  *See* Sections I.B and II.C.3.  The District has proven by a preponderance of the evidence that implementation of the IEP was adequate and appropriate as well.  The programs that were designed and implemented to assist C.M. addressed his reading and writing skills, which were undisputably his core problems (particularly the former).  The teachers that spent their time with C.M. through second grade -- Ms. Carson and Ms. Jones -- had extensive training and experience in teaching dyslexic students.  *See* TRII 2483-2485; 2025-2031.  As the Ninth Circuit has held, the pertinent question is not whether the IEP was adequate in light of the student's progress, but whether the IEP was appropriately designed and implemented so as to confer the student with a meaningful benefit.  *See Adams v. State of Oregon*, 195 F. 3d 1141, 1149 (9th Cir. 1999); *see also* Cal. Educ. Code § 56345(c) ("the Legislature recognizes that some pupils may not meet or exceed the growth projected in the annual goals and objectives of the individualized education program of the pupil.")  The record, along with ALJ Geren's extensive analysis, shows that the IEP team, including the District and Parents, designed and implemented an IEP that was calculated to provide meaningful benefit to C.M.  It therefore satisfied the requirements of the IDEA.

On the issue of whether C.M. was given a FAPE between April 18, 2007 and March 18, 2007, plaintiffs' motion is DENIED and the District's motion is GRANTED.

**D.    Whether the District Provided C.M. with a FAPE from March 18, 2008 through March 16, 2009**

The next issue on which the parties cross-move for summary judgment is whether C.M. received a FAPE from his first annual IEP review on March 18, 2008 through the following year.  The March 18, 2008 IEP is provided at AR 927-933.  ALJ Geren's analysis of this period spans eleven pages and 19 topics.  *See* OAH II/III Decision at 23-33.  The Court again defers to his thoughtful and careful analysis where appropriate.  Plaintiffs raise a number of contentions here that will be addressed in turn.

**1.    Necessary Attendees**

Plaintiffs argue that the March 18, 2008 IEP meeting did not have the necessary attendees,

particularly in light of Dr. Loomos' report.[25]  Pls.' MSJ App. I at 21.  They contend that the District "should have had a qualified professional at C.M.'s first IEP review meeting to discuss the information C.M.'s parents provided and to consider whether additional data or assessment was warranted."  *Id.*

California Education Code § 56341 requires an IEP team to include one or both parents or representative, a regular education teacher, a special education teacher or provider, a district representative, and an individual qualified to interpret assessment results.  The meeting was attended by E.M. (Mother), Ms. Carson (regular education teacher), Ms. Jones (special education teacher) and Ms. Maddux (District representative).  All of the statutorily required members were at the meeting.

Plaintiffs point to the § 56341 requirement that the meeting also include "an individual who can interpret the implications of assessment results."  Cal. Educ. Code. § 56341(b)(5).  However, no recent assessment had been conducted by the District, and no such results were discussed.  It is true that Dr. Swain had conducted a private assessment, but the results had not yet been provided to the District.  As the Court stated in its Order supplementing the record,"while [that] assessment may have been 'discussed' at the meeting, the District could not have been expected to invite to the meeting a speech pathologist to interpret plaintiff's lay interpretation of an unwritten report."  CV 10-4223 SI, Doc. 56, at 8.  The § 56341(b)(5) requirement is inapplicable.

### 2.    Whether the 2008 IEP Met § 1414(d) Requirements

As with the April 2007 IEP, the Court finds that the March 2008 IEP met the IDEA requirements set forth in § 1414(d).  It describes C.M.'s present level of performance.  *See* ARII 930 ("[C.M.] is able to spell consonant, vowel, consonant words with short vowel sounds . . . When he is not sure of the sounds in a word he will ask for the word to be repeated.  He is continually building his bank of high frequency sight words that he can spell correct [sic] and use in his writing.")  It sets forth nine goals, five for writing and four for reading.  *See* ARII 930-933 (for example, "C.M. will spell words with 80% accuracy in 2 of 3 trials as measured by work samples by 6/08.")  It describes measuring tools, using

---

[25]For the sake of context, the Court notes that this meeting took place still six months before Parents made any objection to C.M.'s IEP process.

United States District Court
For the Northern District of California

1   informal tests and work samples over three trials.[26]  *Id.*  It contains a program description summary and

2   recommendations, including "pull out" sessions for ISP services four times a week for 45 minutes.  ARII

3   927.  The IEP thus meets IDEA requirements under § 1414(d).[27]

4

5   **3.     Whether "Undocumented" IEP Meetings were held**

6          Following the March 18, 2008 meeting, on May 15, 2008, parents sent Ms. Carson an email,

7   requesting a meeting to discuss Dr. Swain's and Dr. Loomos's reports.  *See* ARII 1114.  A number of

8   meetings were then held between E.M., Jane Gebers (District's speech pathologist), and Ms. Jones, to

9   discuss C.M.'s CAPD and potential speech and language assessments.  *See* ARII 1212.  Plaintiffs argue

10  that these were "undocumented" IEP meetings in violation of the IDEA.  Pls.' MSJ App. II at 22.  ALJ

11  Geren disagreed, finding that "Student mischaracterizes the nature of these meetings.  There is no legal

12  prohibition forbidding educators from meeting informally to discuss the educational needs of students

13  among themselves or with a parent."  OAH II/III Decision at 25.

14         The Court agrees with ALJ Geren.  The IDEA requires a meeting to "determine whether any

15  additions or modifications to the special education and related services are needed to enable the child

16  to meet the measurable annual goals set out in the individualized education program of the child and to

17  participate, as appropriate, in the general education curriculum."  20 U.S.C. § 1414(c)(1)(B)(iv)

18  (emphasis added).  No determinations were made at the meetings.  They were informal discussions held

19  at E.M.'s request.  *See* 34 C.F.R. § 300.501(b)(3) ("A meeting does not include informal or unscheduled

20  conversations involving public agency personnel and conversations on issues such as teaching

21  methodology, lesson plans, or coordination of service provision.")  Moreover, though the meetings were

22  held in response to E.M.'s request for an assessment, after the District proposed a potential assessment,

23  E.M. refused consent.  TRII 2939.[28]  Plaintiffs have not demonstrated that they were harmed by any lack

24         [26]Plaintiffs' object to the 2008 IEP because "the scores [contained in the objectives] do not
25  identify a relationship to C.M.'s overall reading ability or to State achievement standards applicable to
    all children in the state."  Pl.'s MSJ App. II at 23 (*citing* § 6311).  Plaintiffs are relying on NCLB
26  standards, which the Court has held are not applicable to IEPs under the IDEA.  *See* Section II.C.1.
           [27]As with the April 2007 IEP, E.M. signed this IEP, including the same statement that she
27  "participated in the development of this IEP."  ARII 927.
           [28]Indeed, according to her testimony, Ms. Gebers spoke with Dr. Loomos on the telephone after
28  the May 20, 2008 meeting, informing Dr. Loomos that E.M. was hesitant to consent to the assessment
    Dr. Loomos herself had proposed and the reason for which E.M. called the meeting.  TRII 2939.  Dr.

of documentation or insufficient attendance at the meetings. *See* § 1415(f)(3)(E)(iii) (procedural violations of IDEA result in a denial of a FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate, or causes a deprivation of educational benefits).

### 4.      The September 17, 2008 IEP Meeting, resulting Assessments and subsequent facilitated IEP Meetings

A third IEP meeting was held on September 17, 2008, early in C.M.'s third grade, pursuant to parents' request. ARII 937-939.  The meeting was attended by Ms. Maddux, Ms. Lauren Bole (C.M.'s third grade teacher), Ms. Gebers (the speech pathologist), Ms. Jones, Dr. Loomos, parents, and Linda Geller (C.M.'s special education advocate).  It was at this meeting that parents first objected to the April 2007 assessment.  OAH Decision II/III at 26.  It was also at this meeting that Dr. Loomos presented her report from the IEE. *See* Section I.C.

An IEP was not agreed upon at the meeting.  OAH Decision II/III at 26.  Instead, the meeting "ended acrimoniously." *Id.*  Parents objected to the 2007 assessment conclusion that C.M. had "low-average cognitive ability," and requested a  binocular vision assessment, and a speech and language assessment.  AR II 939 (IEP "Comments and Clarification").  The IEP team agreed that the District would provide revised goals and objectives by September 26, 2008. *Id.*  The team also agreed on various classroom adaptations, including "functional positioning (right ear to teacher)", simplified directions, flexible or extended time, and to the use of books on tape.  ARII 938 (IEP Accommodations).  Ms. Gebers began the requested speech and language assessment of C.M. on September 30, 2008. *See* ARII 1062-1968.[29]

_____

Loomos informed Ms. Gebers that she would talk to E.M. about consenting.  Nonetheless, no consent was given for the assessment until four months later, at the Sept. 17, 2008 IEP meeting.  ALJ Geren concluded, due to this delay, that "any lack of information available to the IEP team regarding [C.M.]'s speech and language needs, therefore, is due to Parent's delay in consenting."  OAH II/III Decision at 25.

[29]ALJ Geren refers to Ms. Gebers' report as seven single-spaced pages, while the record lodged with the Court contains only four.  It appears AR 1070-1077 are missing from the lodged records.  The Court notes this for the parties' benefit in case this decision is appealed.  As the Court has the majority of Gebers' report, ALJ Geren's unchallenged summary and analysis of the report, and the testimony from both of Ms. Gebers' appearances at hearings (*see* AR 1574-1646, 2937-2953), the Court finds that it can adequately decide the pending issues notwithstanding the missing three pages.

United States District Court
For the Northern District of California

On September 24, 2008, District provided parents with a proposed assessment plan.[30] ARII 941. The plan proposed assessment in five areas, including educational achievement, social/emotional/behavioral status, motor/perceptual development, communication development, and intellectual development. The IEP form shows that parents refused consent until November 14, 2008, and then only to the motor/perceptual development assessment. *Id.*

On October 20, 2008, parents obtained an evaluation from Lindamood-Bell Learning Processes (LMB). *See* ARII 489-491. Plaintiffs point out that the test placed C.M. at below grade level for "Rate" and "Fluency," below first-grade level for "Accuracy," and placed "Word attack" and "Comprehension" scores at 2.3 and 2.4 respectively. Pls.' MSJ App. II at 23 (*citing* AR II 49091). Beyond their continued assertion that the District withheld RTI data, plaintiffs' central basis for contending that C.M. was denied a FAPE between March 2008 and March 2009 is that the proposed IEPs contained goals that "were set below levels C.M. attained through LMB." *Id.*

Following the September 17, 2008 meeting, at least two facilitated IEP meetings were held, on November 18, 2008 and January 26, 2009. Though one of the goals set for the November 18, 2008 meeting was "an appropriate IEP that can be supported by all and implemented by the District," no agreement was reached. *See* ARII 1088-89, 1109. The neutral facilitator at the November 18 sent a follow-up email to parents the next day, stating in part that:

> The district has offered to provide you with that assessment plan and update on [C.M.]'s current reading abilities and is willing to expedite the assessment to have it completed by the next IEP meeting . . . I also shared, when you suggested that you didn't want the same team that completed the last assessment to assess his abilities again, that the district is willing to assign another team from within the district to update [C.M.]'s assessment.

ARII 1109. ALJ Geren found this email to be evidence that the District "worked diligently, expeditiously, and reasonably, to assess C.M.'s needs, so that it could develop an IEP with additional goals and objectives, consistent with Parents' and C.M.'s advocate's demands . . . Despite this, this FIEP [facilitated IEP] was continued, without a new IEP being agreed upon." OAH II/III Decision at 31.

Immediately prior to and following the November 18, 2008 meeting, the two assessments parents

---

[30]As discussed above, the Court finds that the issue of whether or not the District was entitled to reassess C.M. is moot. The Court here discusses the offers of assessment in the context of C.M.'s FAPE only.

United States District Court
For the Northern District of California

consented to were completed.  The first was Ms. Gebers's report following her speech and language assessment of C.M., which states that she had considered the parents' Loomos report, as well as a Lindamood-Bell report the parents had obtained in October 2008.  ARII 1062.  ALJ Geren found that Ms. Gebers' opinion that C.M. did not need speech and language interventions was persuasive.  OAH II/III Decision at 28 ("Based on Ms. Gebers's training, including her special education credential, and her extensive experience, her opinion that [C.M.] did not need speech and language interventions is persuasive, as are her observations that he did not have any other undetected special education needs.")  The second was an occupational therapy assessment completed by Michelle Weinman on January 7, 2009.  Her report concludes that C.M. had "attained the basic foundations of movement control" and that he "has been provided with a pencil with a rubber band to facilitate improved distal finger control, as well as appropriate thumb and index finger placement . . . The aforementioned strategies have contributed to improved pencil control and increased quality of written expression."  ARII 1083.  ALJ Geren found that because plaintiffs did not call a registered occupational therapist to testify, there was insufficient evidence to support their contention that C.M.'s occupational therapy needs were not fully addressed.

The next facilitated IEP meeting was held on January 26, 2009.  The "program description summary," notes, Special Education Local Plan Area , and measurement plans are detailed and thorough.  *See* ARII 1190-1198.  The meeting was attended by nine people, as well as E.M. and student advocate Linda Geller.  ARII 1190.  The IEP proposed an increase of support to 4x per week, 105-minute "services to address reading, written language, handwriting in special educational settings."  There are five pages of detailed goals, in subjects from "word analysis, fluency and vocabulary" to "Writing/Punctuation."  AR1194-98.  The goals are described in "Measurement Plans and Documentation Required" subsections, and include separate "Evidence of Mastery" examples.  *Id.*  For example, one such goal is "using 'r' controlled letter sound associations to read words (grade 1)," and the evidence of mastery is "decoding skills for 'r' controlled and vowel diagraphs on teacher made tests with 80% accuracy over 3 consecutive tests."  ARII 1194.  The IEP includes an "Action Plan" chart, delegating various tasks to members of the team.  ARII 1193.  However, parents did not consent to the IEP.  *See* ARII 1190 (no signature on the consent line).

Meanwhile, in his third grade class, C.M. was taught by Lauren Bole. Ms. Bole read C.M.'s IEP at the beginning of the year, and accommodated C.M.'s needs by having him sit in front, with his right ear facing her. TRII 2352. Ms. Bole gave C.M. shortened homework assignments. TRII 2353-54. She also would often email E.M. about the curriculum in class. TRII 2354. She testified that C.M. showed steady improvement throughout the year, based on her observations and various tests. TRII 2366-68. She found that C.M. exhibited belief that he was learning to read, and that he was excited about that fact. TRII 2372. She concluded that while C.M. did not end the year at grade level, the discrepancy between him and his classmates had shrunk, and that (put another way) he had improved relative to his peers. TRII 2384-85.

The Court concludes that given ALJ Geren's analysis, the evidence of the IEP meetings, the facilitator's notes, and the testimony provided, the District has proven by a preponderance of the evidence that the March 18, 2008 IEP and its amendments were reasonably calculated to confer an educational benefit, and that C.M. was offered and provided a FAPE from March 18, 2008 to March 16, 2009. ALJ Geren's findings are AFFIRMED. Plaintiffs' motion for summary judgment on the issue is DENIED, and the District's is GRANTED.

### 5. Whether the District Unlawfully Retaliated by filing a Due Process Complaint

Following the September 2008 IEP meeting and plaintiffs' request for an IEE, plaintiffs filed a compliance complaint with the California Department of Education (CDE). The District thereafter filed the due process complaint forming the basis of OAH Case I, and requested the CDE stay their investigation. In their SAC, plaintiffs contend that by filing that complaint and requesting a stay, the District engaged in retaliatory behavior against plaintiffs in violation of § 504 of the Rehabilitation Act to "intimidate, punish, and discourage Plaintiffs" from asserting their rights. SAC ¶¶ 63, 64, 217, 218. The District moves for summary judgment on the issue. Def.'s MSJ App. I, at 21.

On this issue, ALJ Geren found that "the weight of the evidence established that CDE dismissed the compliance complaint on its own volition following Student's filing of his request for due process hearings. Accordingly, Student offered insufficient evidence to support his contention." OAH II/III

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Decision 33.

2        The Court agrees.  The Court already addressed this issue in its June 2, 2010 Order Re:

3    Defendants' Motion to Dismiss in the OAH I Appeal.  CV 09-4624 SI, Doc. 60.  There, the issue was

4    addressed with respect to CDE itself; the Court found that CDE acted properly in staying plaintiffs'

5    compliance complaint pursuant to 34 C.F.R. § 300.152(c)(1).  ("If a written complaint is received that

6    is also the subject of a due process hearing . . ., the State must set aside any part of the complaint that is

7    being addressed in the due process hearing until the conclusion of the hearing.")  The same reasoning

8    holds true for the District.  The law requires the District to either fund a request for an IEE or file for due

9    process to show that its assessments were appropriate.  34 C.F.R. § 300.502(b)(2) ("If a parent requests

10   an IEE at public expense, the public agency must, without unnecessary delay, either (i) file a due process

11   complaint to request a hearing to show that its evaluation is appropriate, or (ii) ensure that an IEE is

12   provided at public expense...")  The District acted in compliance with that mandate.  The Court therefore

13   GRANTS the District's motion for summary judgment on the issue.

14

15       E.     **Whether the District Provided C.M. with a FAPE from March 16, 2009**
                **through June 2009**
16

17       The third issue analyzed by ALJ Geren was whether C.M. was denied a FAPE from March 16,

18   2009 through June 2009.  ALJ Geren found that C.M. was provided a FAPE. The parties cross-move for

19   summary judgment on the issue.  The Court AFFIRMS the ALJ's decision.

20       On March 16, 2009, another IEP meeting was held, the second annual IEP revision.  *See* ARII

21   1178-1187.  The meeting included 11 attendees, including parents' outside expert Dr. Guterman.  The

22   District again increased the proposed services to C.M., this time to 2 hours per day, 5 days per week of

23   ISP implemented in a one to one setting to address reading, and 30 minutes per day, 5 days per week of

24   ISP in a small group to work on writing goals.  ARII 1178.  The two hours of ISP were to include

25   "Lindamood Bell instructional strategies to be used systematically by appropriately trained staff."  AR

26   II 1182.[31]  The IEP also restated the accommodations from the September 17, 2008 IEP and added 12 new

27   ───────────────
         [31]Parents disputed that the District was offering LMB services at this point.  *See* TRII 2873
28   (M.M. testifying that no LMB services were offered).  The IEP explicitly offers the use of LMB
     strategies, *see* TRII 1182, and ALJ Geren agreed.  The Court defers to ALJ Geren's finding on this
     point, and that the weight of the evidence "supported that District's staff was adequately trained to

accommodations, including adopting recommendations from parents' outside reports.  *See* ARII 1180 (for example, it states "4.  Slow pace/allow for extra time for responding, check for understanding (Loomis & Listening Report).") Parents did not consent to the IEP, and instead enrolled C.M. in outside LMB learning processes.  TRII 2846.

On June 4, 2009, yet another IEP meeting was held.  *See* ARII 1041-1055.  This meeting included six District staff, Linda Geller, and both parents.  The IEP offered was substantially similar to the one offered on March 16, 2009: "1:1 instructional support services in a public school not general education setting based on Lindamood Bell Strategies" 2 hours per day, 5 days per week, and "Small group instruction to address writing and other non-language arts goals . . ." at 30 minutes a day, 5 days per week.  The parents did consent to this IEP.

In the relevant section of their motion, plaintiffs make no direct allegations that C.M. was denied a FAPE during this period, other than re-alleging that they were not provided with RTI data.  *See* Pls.' MSJ App. II at 24-25.  Instead, plaintiffs discuss the nine week outside LMB instruction C.M. received, and describe the significant improvements they allege resulted from it.  *Id.* (e.g., "C.M. was able to score 88% on third-grade level and 63% of four-grade level passages, as compared to 0% on third-grade and 88% on second-grade passages in testing October 2008 . . . C.M. made dramatic progress in reading that sustains him today.")  The point, presumably, is that any progress C.M. made was attributable only to outside assistance, not the District's educational program.

The Court finds that the District proved by a preponderance of the evidence that the March 16, 2009 IEP was reasonably calculated to provide an educational benefit to C.M.  Particularly persuasive here is the fact that plaintiffs later consented to an IEP substantially similar to the March 16, 2009 IEP.  The Court finds that C.M. was provided a FAPE during the final relevant period, and therefore DENIES plaintiffs' motion on the issue, and GRANTS the District's motion.

**F.      Whether the Plaintiffs are entitled to reimbursement**

At the OAH hearings, plaintiffs sought reimbursement for C.M.'s audiology and processing assessments, assessment by Lindamood-Bell Learning Processes, Tomatis therapy, and Lindamood-Bell

_____

provide the instruction described in the IEP."  OAH II/III Decision at 34.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

reading interventions.  ALJ Geren denied reimbursement because plaintiffs had failed to meet their burden of proof that District had denied C.M. a FAPE.  OAH II/III Decision at 47.  Here, plaintiffs seek reversal of that decision, as well as compensatory education services in an intensive remedial reading program through Lindamood-Bell.  Pls.' Reply App. II at 15.

Because the Court finds that the District complied with all of the procedural requirements of the IDEA, and provided C.M. a FAPE, it finds that reimbursement or compensatory services are inappropriate.  20 U.S.C.A. § 1412;  *see also* 34 C.F.R. § 300.148(c);  *School Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370-71 (1985).  The Court therefore DENIES plaintiffs' motion on the issue.

## CONCLUSION

In case CV 09-4624 SI, plaintiffs' motion for summary judgment on the issue of reimbursement for Dr. Guterman's presentation of her assessment results at the March 2009 IEP meeting is GRANTED.  On all other issues, plaintiffs' motion is DENIED.  The District's motion for summary judgment is GRANTED.   On the presentation-payment issue, the Order in OAH CASE NO. 200812016 is REVERSED; on all other issues, the Order is AFFIRMED.

In case 10-4223, plaintiffs' motion for summary judgment on all issues is DENIED.  The Districts' motion for summary judgment is GRANTED.  The Order in CONSOLIDATED OAH CASE NO. OAH 2009040640/2009081105 is AFFIRMED IN FULL.

The Districts' motion to strike plaintiffs' declarations in support of plaintiffs' opposition to defendants' motion for partial summary judgment on remaining IDEA claims and briefs is DENIED.

**IT IS SO ORDERED.**

Dated: February 9, 2012

_____
SUSAN ILLSTON
United States District Judge